AO 241 (Rev. 5/85)

## PETITION UNDER 28 USC § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

If petitioner is attacking a judgment which imposed a sentence to be served in the future, petitioner must fill in the name of the state where judgment was entered. If petitioner has a sentence to be served in the future under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. § 2255, in the federal court which entered the judgment.)

### PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

#### *Instructions — Read Carefully*

(1) This petition must be legibly handwritten or typewritten, and signed by the petitioner under the penalty of perjury. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form.

(2) Additional pages are not permitted except with respect to the facts which you rely upon to support your grounds for relief. No citation of authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

(3) Upon receipt of a fee of $5 your petition will be filed if it is in proper order.

(4) If you do not have the necessary funds for transcripts, counsel, appeal, and other costs connected with a motion of this type, you may request permission to proceed *in forma pauperis*, in which event you must execute form AO 240 or any other form required by the court, setting forth information establishing your inability to pay the costs. If you wish to proceed *in forma pauperis*, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution. If your personal account exceeds $ _____ , you must pay the filing fee as required by the rules of the district court.

(5) Only judgments entered by one court may be challenged in a single motion. If you seek to challenge judgments entered by different courts either in the same state or in different states, you must file separate petitions to each court.

(6) Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the petition you file seeking relief from any judgment of conviction.

(7) When the petition is fully completed, the original and at least two copies must be mailed to the Clerk of the United States District Court whose address is

(8) Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

Original
Copy

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District _Massachusett_ |
|---|---|

| Name _Jordan Martell Rice_ | Prisoner No. _W65429_ | Case No. |
|---|---|---|

Place of Confinement
_Old Colony Correctional Center in Bridgewater, Mass._

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| _Jordan Martell Rice_ | v. _Bernard Brady, Superintendent_ |

The Attorney General of the State of: _Thomas F. Reilly_

## PETITION

1. Name and location of court which entered the judgment of conviction under attack _Brockton Superior Court, 72 Belmont St., Brockton, Mass. 02301_

2. Date of judgment of conviction _October 20, 1998_

3. Length of sentence _Life without Parole and 19-20 years concurrent._

4. Nature of offense involved (all counts) _First Degree Murder and Arson_

_____

_____

_____

5. What was your plea? (Check one)
   (a) Not guilty ☑
   (b) Guilty ☐
   (c) Nolo contendere ☐

   If you entered a guilty plea to one count or indictment, and not a guilty plea to another count or indictment, give details:

   _____

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☑
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☑    No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☑    No ☐

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

    (a) Name of court   Supreme Judicial Court

    (b) Result   All grounds raised were denied

    (c) Date of result and citation, if known   March 24, 2004

    (d) Grounds raised   Ineffective assistance of Counsel, Trial court erroneously denied discharge of trial Counsel, lower court erroneously denied motion to suppress, unlawful closing summation, unlawful jury instruction and more.

    (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

        (1) Name of court   No because Supreme Judicial Court is the highest COUrt in Mass.

        (2) Result

        (3) Date of result and citation, if known

        (4) Grounds raised

    (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

        (1) Name of court   No, never filed certiorari in the United States Supreme Court

        (2) Result

        (3) Date of result and citation, if known

        (4) Grounds raised

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
    Yes ☑     No ☐

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court   Brockton Superior Court

        (2) Nature of proceeding   Rule 30 Motion for New Trial

        (3) Grounds raised   Denial of effective assistance of counsel on numerous grounds

AO 241 (Rev. 5/85)

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐        No ☑

(5) Result Denied without Evidentiary Hearing.

(6) Date of result February 3, 2003

(b) As to any second petition, application or motion give the same information: NO

(1) Name of court _____

(2) Nature of proceeding _____

_____

(3) Grounds raised _____

_____

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐        No ☐

(5) Result _____

(6) Date of result _____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.              Yes ☑        No ☐
(2) Second petition, etc.          Yes ☐        No ☑

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting the same.
    Caution:  In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted you state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self−incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(h) Denial of right of appeal.

A.    Ground one: Trial Court Erroneously denied a Pretrial Defense Application for discharge of trial

Supporting FACTS (state *briefly* without citing cases or law) Prior the commencement of trial, Trial Counsel, himself, moved to be discharged as counsel, citing an irretrievable breakdown of the attorney-client relationship. (See attached Affidavit)

B.    Ground two: Conviction obtained by use of evidence gained pursuant to unconstitutional Search and seizure

Supporting FACTS (state *briefly* without citing cases or law) Cognizant that probable cause was lacking for a warrant authorizing the seizure of DNA evidence from the defendant's person so the State Police and Prosecutor evaded an warrant and probable cause by effecting a warrantless seizure of DNA evidence from the defendant's Tee-Shirt, Bed Linens and Uniform at the SouthBay Correctional Institution, where he was incarcerated. (See attached Affidavit)

C.    Ground three: Conviction Obtained by improper Closing summation of Prosecutor and Opening Summation was improper.

Supporting FACTS (state *briefly* without citing cases or law) In closing summation the Prosecutor argued his own personal belief, the defendant's Criminal past, unfound facts, emotional facts, prejudicial facts, mistated facts into evidence and inflammatory facts. In Opening Summation the Prosecutor promised to call an witness to repeat, is false claims that was never called to testify. Also the Prosecutor made reference to the defendant's criminal past in his opening summation. (See attached Affidavit)

D.    Ground four: Conviction obtained by a violation of the privilege against self-incrimination.

Supporting FACTS (state *briefly* without citing cases or law) In the grand jury proceeding, improper comments was repeatedly made upon the defendant's right against self-incrimination and to produce incriminating evidence. Further more this violation of the defendant's right against self-incrimination and produce incriminating evidence effectly distorted the fact of evidence the defendant did turn over to the State Police. (See attached Affidavit).

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐        No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:

(a)    At preliminary hearing    There was no Preliminary hearing

(b)    At arraignment and plea    Russell Redgate, 1025 Rt 6A, P.O. Box 82, West Barnstable, Ma. 02668        Phone No. 508-362-6607

PAGE (6A)

E. Denial of effective assistance of counsel.

Supporting
FACTS: Trial Counsel failed to: preserve, analyse and present potentially exculpatory forensic evidence, retain and call expert witnesses, move to dismiss the indictment for destruction of forensic evidence, present other witnesses and proof that other persons committed the crime, effectively confront and cross-examine witnesses, move for mistrial upon highly prejudicial opening statement, move for Bill of Particulars, make objection to term "Rape kit" because there was no evidence of rape, make an Opening statement, proper object or propose jury instructions, move for dismissal of indictment, investigate, honor defendants pretrial request or file pretrial motions, Show motive evidence and other favorable proofs on the defendants behalf. (see Affidavit)

F. Conviction obtained by use of improper jury instruction.

Supporting
FACTS: The lower court erred in its instructions to the jury by failing to charge the jury that a unanimous verdict was required with respect to the factors considered in arriving at a verdict of First Degree Murder by Extreme Atrocity or Cruelty, in violation of the Defendant's rights under under the Fifth, Sixth and Fourteenth Amendments because some members of the jury may have used the prosecutor's references to facts not into evidence to unfairly convict the defendant. (See attached Affidavit)

G. Conviction obtained by improper cross-examination of the defendant.

Supporting
FACTS The prosecutor communicated false impressions not based upon any evidence through his cross-examination of the defendant. (See attached Affidavit).

# PAGE (6B)

H. Conviction obtained by use of Commonwealth Witnesses testifying beyond their expertise.

Supporting FACTS: Commonwealth Chemist Daniel Pratt testified that tails may be found only 16 hours after ejaculation. This testimony was later contradicted by the Commonwealth's own pathologist, Dr. Weiner, who testified that sperm with tails may be found up to 24 Hours after ejaculation and further, that heat may break down sperm more quickly. An inadequate foundation was laid for such testimony by Pratt who obviously was testifying beyond his area of expertise. Likewise, an inadequate foundation was laid for Dr. Weiner's testimony that heat may break down sperm more quickly (See Affidavit)

I. Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

Supporting FACTS: At trial, the defendant learned the State Police testified she took an bloody palm print found at the crime scene to an F.B.I. Agent who is an Latent Print Expert and he destroyed it. Then the State Police took an photo of the palm print to an Mississippi State Latent Print Expert and he believed in some respects it was consistent with the victims print and not any of the other suspect's prints. Since trial it's been learned the F.B.I. Agent in question denies destroying the palm print and the Mississippi Expert denies he provided and forensic opinion to the State Police and stated he was shown any of the other suspects prints. There was never any pretrial discovery or any testing to this bloody palm print, another full palm print, numerous blood stains, numerous other prints, numerous hairs and numerous fibers, all which were found at the crime scene. Nor was the F.B.I. Agent or Mississippi Expert called by the Commonwealth to support these fictitious claims by the State Police. It's clear the bloody print and other forensic evidence will exonerate the defendant once it's all examined and/or tested and this is why the State Police has made fictitious claims about all the forensic evidence. (See attached Affidavit.)

(c) At trial Henry Owens, 101 Federal St., Boston, Ma. 02110, Phone No. 617-345-9800

(d) At sentencing Henry Owens, 101 Federal St., Boston, Ma. 02110, Phone No. 617-345-9800

(e) On appeal Donald Harwood, 305 Broadway, 7th Floor, New York, New York 10007, Phone No. 212-822-1400 Ext. 109

(f) In any post—conviction proceeding (Rule 30) Donald Harwood, 305 Broadway, 7th Floor, New York, New York, Phone No. 212-822-1400 Ext. 109

(g) On appeal from any adverse ruling in a post—conviction proceeding    None

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and the same time?

Yes ☑    No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ☐    No ☑

(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence: _____

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐    No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_Jordan Martell Rice_, Pro Se
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

March 30, 2004 A.D.
(date)

_Jordan Martell Rice_, Pro Se
Signature of Petitioner

**AFFIDAVIT**

Jordan Martel Rice, hereby deposes and states:

1.  I am the defendant in the above-captioned matter.  I submit this Affidavit in support of my accompanying motion for new trial and related post-trial discovery pursuant to Mass.R.Cr.P. 30.

2.  On October 28, 1998, I was convicted in the Brockton Superior Court following a jury trial, Hely, J., presiding, of crimes I did *not* commit:  arson and first-degree murder (by extreme atrocity or cruelty) of one Diane Harrigan, allegedly occurring on September 23, 1995, in her apartment at 475 Battles Farm Village, Brockton, Massachusetts, where she was found stabbed to death.  *See* copies of indictments and docket entries collectively annexed hereto as Ex. "A"; *see also* copy of Trial Transcript (to be submitted as exhibit under separate cover due to its voluminous nature), Volume 6, pp. 5-6, hereinafter "T.Vl/5-6").

3.  I vehemently deny the charges and maintain that by my conviction, a gross injustice has been done.

4.  My privately retained trial attorney was Henry F. Owens, III; Attorney Lawrence Murray also appeared with Mr. Owens as my counsel.

5.  As fully set forth below, I maintain that I was denied my right to the effective assistance of counsel under Article 12 and the Sixth and Fourteenth Amendments, including because my trial counsel:

(a)  failed to preserve, analyze, and present potentially exculpatory forensic evidence at the crime scene which would have conclusively established my innocence of the crimes charged;

(b)  failed to retain and/or call expert witnesses on my behalf at the trial;

(c)  failed to move to dismiss the indictment in light of the Commonwealth's destruction of potentially exculpatory forensic evidence;

(d)  failed to present other witnesses and proofs establishing that person(s) other than myself may have committed the crimes charged;

(e)  failed to effectively confront and cross-examine hostile Commonwealth witnesses with inconsistent statements, motive evidence, and other favorable proofs on my behalf;

(f)  failed to move for mistrial based upon the Commonwealth's opening statement which made reference to highly prejudicial evidence which was never subsequently produced at trial;

(g)  failed to move for a bill of particulars as to the basis for the Commonwealth's murder charge(s), thereby depriving me of prior notice that the Commonwealth would allege at the trial that an aggravated rape had been committed;

(h)  failed to make proper objections at the trial to the Commonwealth's repeated prejudicial references to a "rape-kit" having been utilized in the case, there being no evidence of a rape of the victim;

2

(i)  failed to make an opening statement;

(j)  failed to make proper objection(s) and/or
     proposed instructions for the Court's charge to
     the jury; and,

(k)  failed to move to dismiss the indictment on the
     ground that improper comment was made in the
     grand jury proceedings upon my right against
     self-incrimination and to produce incriminating
     evidence.

6.  As also set forth below, I did not receive a
fair trial, and my state and federal due process rights
under Article 12 and the Fifth and Fourteenth Amendments
have been violated.

### The Commonwealth's Theory of the Crime

7.  The Commonwealth's theory of the crime was
that I allegedly raped and murdered Diane Harrigan in her
apartment in the early morning hours of September 23, 1995,
following a wedding reception which both of us had attended
the prior evening.  Police investigators theorized that
Harrigan was raped and murdered on the living room couch in
her apartment -- where blood and hair were found -- and
that she was then placed on a bed in the bedroom of her
apartment (where Harrigan's naked body was found).  To
conceal the crime, an attempt was supposedly made by me to
set fire to both the living room couch and the bed.  *See,*
*e.g.*, Affidavit in Support of Search Warrant dated October
31, 1996, p. 26, copy annexed hereto as Ex. "B".

8.   There was no print, hair, fiber or blood evidence presented at the trial which in any way linked me to the crimes charged.  Rather, the Commonwealth's proof against me at trial consisted of the following:   (i) DNA evidence demonstrated that I had sex with Harrigan because my sperm was found in her body; and, (ii) witness testimony allegedly indicated that I subsequently admitted committing the crime, including testimony from an immunized witness, Alan Paine, and his various family members and friends.

9.   I maintained, by contrast, that I had *consensual* sex with Harrigan at approximately 4 o'clock in the afternoon *prior to* the wedding reception which we both attended the evening before the killing (a time consistent with the state pathologist's testimony that the sperm in Harrigan's body could have been deposited within such a time frame).   I also maintained that Paine and his family members and friends were lying when they testified that I subsequently admitted complicity in the crime.  Finally, there was substantial evidence that other persons may very well have committed the crime, including:   (i) the victim's current boyfriend, Jack Madden; (ii) an ex-boyfriend of Harrigan's, James Morgan, who previously had beaten and threatened Harrigan resulting in the issuance of a restraining order; and, (iii) Jewell Whatley, my aunt, and

4

a friend of Harrigan's who made contradictory statements,
initially admitting to police that she had gone to
Harrigan's apartment (with Harrigan) *after* the wedding
reception and staying there as late as *1:30 a.m.*, a time
which was consistent with the state pathologist's estimate
of time of death. *See* police reports dated August 9, 1995;
September 23, 1995; and October 2, 1995, collectively
annexed hereto as Ex. "C."

10. *Because I had not committed the crime, I*
*emphasized from the outset to my trial counsel the*
*importance of preserving, maintaining, and analyzing any*
*and all forensic evidence at the crime scene because it*
*would establish that someone other than myself committed*
*the crime. I also asked my trial counsel to investigate,*
*obtain and present evidence establishing that other persons*
*committed the crime, such as Madden or Morgan, and further,*
*that Alan Paine and his family members and friends were*
*lying when they testified that I had admitted complicity in*
*the crime.*

11. As fully set forth below, counsel failed to
honor any of these requests, thereby resulting in the
forfeiture of substantial defenses which would have
resulted in my acquittal of the crimes charged.

### Counsel's Failure to Move For Preservation, Analysis And The Production Of Exculpatory Forensic Evidence

12. By my letter dated March 14, 1998 (copy annexed hereto as Ex. "D"), I requested, among other things, that my trial counsel file a motion to compel any and all fingerprint evidence; to compel any and all hair and fiber evidence; to have such evidence "D.N.A. tested"; and, to have the court appoint a forensic pathologist and latent fingerprint expert for my defense.

13. I made this request because, as stated in my letter to counsel, "All outlined issues are vital to proving my innocents [sic.] in this case" (Ex. "D"). Indeed, I wanted all of the crime scene evidence preserved and analyzed so that the true perpetrator of the crime would be revealed. I also wanted a pathologist to analyze the Commonwealth's evidence to ascertain the time of the alleged victim's death, and to establish that there was no evidence of a sexual assault.

14. By reply letter dated March 11, 1998 (copy annexed hereto as Ex. "E"), my trial counsel declined to any of the above. Instead, he indicated, among other things, that a forensic pathologist would be of no assistance to my defense; nor did counsel address my request for preservation and analysis of forensic evidence.

15.  Instead, counsel indicated that my case would be decided only on "the accuracy and reliability of the DNA evidence. *The DNA test results and whether or not said results can be effectively challenged will decide the outcome of this case*" (emphasis added) (Ex. "E"). Counsel's reference to DNA evidence referred only to his retention of defense experts to determine the accuracy and reliability of the Commonwealth's **evidence** that my sperm was found in the Harrigan's body.

16.  In other words, *rather than develop evidence that person(s) other than myself had committed the crime, Mr. Owens' sole focus was on attacking the Commonwealth's DNA/sexual intercourse evidence -- a manifestly unreasonable defense strategy.*

17.  Not only was I aware that I had sexual intercourse with Harrigan on the afternoon before the killing -- *something I testified to at my trial* -- the odds that the Commonwealth's DNA test had mistakenly identified my sperm were very small, i.e., 1 in 1.5 million according to the Commonwealth's June 30, 1997 report (copy annexed hereto as Ex. "F").

18.  *Indeed, counsel's "approach" was not "strategic" at all since uncovering evidence that other person(s) had perpetrated the crime would not have been*

7

inconsistent with a defense that the Commonwealth's incriminating DNA evidence was unreliable. Thus, counsel's "approach" was nothing more than a transparent excuse to fail to investigate other readily available and viable defenses.

19. Moreover, there was ample forensic evidence retrieved by police investigators at the crime scene which could have been preserved, analyzed and tested by defense experts, including blood, hair, fiber, and print evidence – which testing may have (and may still) establish that other person(s) committed the crime.

20. The report of Commonwealth chemist Patricia A. Forti dated October 21, 1995 (copy annexed hereto as Ex. "G"), lists no less than 65 items which were seized in connection with the police investigation of this case, many of which contained blood, hair and fiber evidence.

21. Similarly, the Report of Commonwealth chemist Daniel Pratt dated December 29, 1997 (copy annexed hereto as Ex. "H"), describes numerous locations at the crime scene where blood stains were found, including a kitchen faucet handle, knife in the bedroom, gold chain (recovered under victim's body), coffee cup inside the kitchen sink, toilet seat, telephone on couch, and couch cushions.

8

22.   Likewise, Trooper Patricia Beehan testified at my trial that she seized a bloody palm print on a coffee cup in the kitchen sink (T.II/100,144-146; Ex. 41, T.II/177); hair from the bathroom sink (T.II/165-166); blood, hair and other fibers from the living room, including the living room couch where the crime supposedly occurred (T.II/168,176-177); and latent fingerprints from a left and right faucet of the kitchen sink, a telephone, a cigarette lighter, a rattan table, a smoke detector, and various other items (T.II/174-176).

23.   Despite repeated written and oral demand by me, Mr. Owens simply refused to file any motion or make any request to have defense experts conduct comparison and/or DNA testing of the palm print(s), fingerprint(s), blood, hair, fiber and/or other forensic crime scene evidence against any of the other suspects in this case, including Jack Madden and/or James Morgan -- even after the Commonwealth's DNA testing of Madden's and Morgan's sperm had proved negative.

24.   I continued to maintain to Mr. Owens that the true assailant's blood, hair, print, fiber or other forensic evidence could be found on recovered items at the crime scene, and that Madden, Morgan or someone else must

have killed Harrigan *out of hate (even if the assailant had not had sex with her)*.

a.    *Failure to Investigate And Present Forensic Evidence Establishing That No Rape Occurred*

25.    In this regard, Patricia Forti's Chemist Report dated October 21, 1995 (Ex. "I", p. 2) indicated that *a screening test for the presence of seminal fluid on Harrigan's pajama bottom "was **negative** on the crotch area."*

26.    Remarkably, Mr. Owens neglected to bring out even this crucial piece of evidence at trial, including in his cross-examination of Ms. Forti, which evidence would have completely undercut the Commonwealth's rape/murder theory against me, demonstrating that Harrigan was not raped at all, but rather, was simply murdered.

27.    Likewise, the Commonwealth's Autopsy Report by Dr. Bruce Weiner dated March 6, 1996 (copy annexed hereto as Ex. "J"), indicated that the victim's ". . . genitalia *are **unremarkable**"*, i.e., there was no medical evidence of rape trauma (Ex. "J", p. 4).

28.    Incredibly, Mr. Owens also neglected to bring out this crucial piece of evidence at the trial, including in his cross-examination of the Commonwealth's pathologist, Bruce Weiner.

10

29.   There clearly was no conceivable "strategic" reason for these omissions by counsel.

### b. Failure to Investigate, Test And Present Evidence Concerning The Bloody Palmprint On the Coffee Cup

30.   Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of which were introduced at the trial as Ex. "41" (T.II/177).

31.   The bloody palmprint on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink.  According to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T.IV/22).

32.   The Commonwealth had obtained comparison prints of 48 individuals, including the victim and myself, as well as James L. Morgan, John J. Madden, Jewell Whatley, and numerous others (T.II/158-159; see also Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (copy annexed hereto as Ex. "K").

33.   Recognizing its evidential significance, Trooper Patricia Beehan testified at the trial that she

took photographs of the bloody palmprint, but that
subsequently, an FBI agent, Randall Fitzwaters, destroyed
the print when applying chemicals to enhance it (T.II/148-
149). When showing photographs of the print to its own
expert(s), including a specialist, Ron Smith of the
Mississippi Crime Laboratory, the palmprint allegedly
lacked sufficient detail to be identified with any of the
prints of the 47 suspects, including myself (T.II/149,159-
161,162-163). Trooper Beehan's Report dated May 30, 1996,
also indicated that Smith believed that the print was, in
some respects, consistent with that of the victim, but that
there was insufficient detail to make a positive
identification (Ex. "K").

    34. I insisted that Mr. Owens thoroughly
investigate the Commonwealth's evidence on this point
because: (i) I doubted that the print on the coffee cup
had been destroyed, as claimed by Trooper Beehan; and, (ii)
I truly believed (and still believe) that the true
perpetrator of the crime could be determined with proper
and thorough testing of the evidence.

    35. Notwithstanding my insistence that the
Commonwealth's evidence be thoroughly investigated and
tested by a defense print expert, Mr. Owens refused to do
anything at all in this regard.

35. Since my trial, I have learned through my present counsel's investigator, Mr. Ron Rice, that: (i) Randall Fitzwaters, the FBI agent who supposedly destroyed the print on the coffee cup with chemicals, *denies any knowledge or involvement with the alleged destruction of evidence*; and (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; *nor was Smith shown any of the comparison prints of myself or any other suspects, directly contradicting Beehan's trial testimony that she brought with her all such comparison prints* for Smith's examination (T.II/162-163). *See* accompanying Affidavit of Ron Rice sworn to October 25, 2002 ("the Ron Rice Affidavit").

36. Had Attorney Owens conducted even a minimal investigation in this regard as I requested, he could have easily discredited the Commonwealth's claims in this regard at trial.

37. Indeed, now that my new counsel has obtained Mr. Owens's file, it is obvious he did not even read the materials contained within it concerning the coffee cup for use at my trial.

13

38.   By Cellmark Laboratory report dated January 7, 1998, found by my present counsel in Mr. Owens's file (copy annexed hereto as Ex. "L"), **the Commonwealth tested DNA material which was recovered from stained materials on the telephone and coffee cup at the crime scene (DNA material could not be extracted from a toilet seat for testing).  Cellmark's testing excluded me as the source of the DNA material on the telephone and the coffee cup (although it could not exclude Harrigan) -- a fact which, remarkably, Mr. Owens never brought out at the trial, including in his cross-examination of Trooper Beehan.**

39.   Indeed, Trooper Beehan testified at trial that she had no knowledge of DNA testing being performed on the coffee cup (T.II/169-170); *Attorney Owens failed to confront Beehan with the Cellmark January 7th Report which excluded me as the source of DNA material on both the coffee cup and telephone.*

40. There hardly can have been a "strategic" reason for Mr. Owens to fail to present this exclusion evidence and to impeach the Commonwealth witness's demonstrably false testimony.

41.  Accordingly, by this motion, I not only request a new trial due to ineffectiveness of counsel and on state and federal due process grounds, but an

14

evidentiary hearing concerning the Commonwealth's

destruction of evidence, the truthfulness of its trial

testimony, and the production of all of its print, blood,

hair, fiber and other forensic evidence for inspection and

comparison testing by a defense expert.  I include in this

request all of the above-described print, blood, hair and

fiber evidence, as well as any evidence concerning a palm

print impression left in the bathroom sink which Trooper

Beehan claimed may have been left by police and/or fire

investigators -- a highly doubtful claim in light of these

new disclosures concerning her demonstrably false and/or

inaccurate testimony and handling of evidence (T.II/

108,156-157; Ex. 24).

*Counsel's Failure to Move To Dismiss The Indictment*

42.  To the extent that the bloody palmprint on

the coffee cup was, in fact, destroyed, trial counsel was

ineffective in failing to move to dismiss the indictments

on the ground that potentially exculpatory evidence was

destroyed.

43.  As stated above, DNA and/or print testing of

the coffee cup may very well have established the true

identity of the assailant of the victim -- it was not me.

44.  Further, and in any event, the

Commonwealth's destruction of such critically important

15

evidence justifies dismissal of the indictment on due process grounds -- even at this stage of the proceedings and even though trial counsel ineffectively failed to previously move for dismissal.

*Counsel's Failure to Present Exculpatory*
*Evidence Concerning The Culpability of Other Suspects*

a.  *Jim Morgan*

45.  Counsel inexplicably and inexcusably failed to present exculpatory evidence that other suspects committed the crime.

46.  Police investigation had established that the victim's ex-boyfriend, Jim Morgan, had physically abused her, resulting in the issuance of a restraining order.  *See* police reports dated September 26, 1995; October 2, 1995; and October 3, 1995, collectively annexed hereto as Ex. "M".

47.  Harrigan's family members reported that Morgan had gone to the Plymouth County jail, and when he was released six months before the killing, he contacted Harrigan and asked to see her, prompting her to be alarmed and to request a renewal of the restraining order (Ex. "M").

48.  Moreover, police learned that **on September 21, 1995, the day before the killing, a Deborah Hannon was**

16

*present when Harrigan received no less than three (3) telephone calls from a person named "Jim", prompting Harrigan to say that he was "getting on her nerves"* (Ex. "M").

49.    When confronted by police, Morgan falsely claimed that he had not had contact with Harrigan for a month and that she declined to give him her new telephone number (Ex. "M"); regarding the restraining order, Morgan claimed that "he was suppose to have hit her" and "Dianne [Harrigan] wanted to get rid of him so she had him put in jail" (Ex. "M").

50.    Remarkably, Mr. Owens neglected to bring out any of the above evidence at trial in his examination of Commonwealth police officers and witnesses, nor did he independently investigate witnesses and evidence concerning Morgan's involvement in the crime despite my demand that he do so.

51.    Since the trial, my present investigator, Ron Rice, has obtained a copy of the restraining order which Harrigan obtained against Morgan dated January 26, 1994 (copy annexed hereto as Ex. "N"). *In support of the restraining order, Harrigan indicated that Morgan "threatened to kill me" and that he previously broke her nose* (Ex. "N").

52.    Evidence of Morgan's prior threats to kill, coupled with his harassing telephone calls the day before the murder, might very well have tipped the scales in favor of my acquittal in the eyes of the jury.    Attorney Owens's failure to investigate and present such evidence was inexcusable.

*b. Jack Madden*

53.    Regarding the victim's current friend/boyfriend, Jack Madden, trial counsel failed to effectively cross-examine Madden concerning a prior statement to police on October 19, 1995 (copy annexed hereto as Ex. "O"), that he and Harrigan had an "open" and "mature" relationship -- thereby corroborating my assertion that Harrigan did indeed have sexual relations with other person(s) like myself.

54.    In a related vein, counsel also ineffectively failed to underscore Madden's testimony on direct examination that he "guess[ed]" he was Harrigan's "boyfriend" -- evidence which was indicative of a very attenuated relation with Harrigan.

55.    Indeed, Harrigan had described her relationship with Madden as "shaky" to a witness, Willie Johnson, the night before the killing (T.II/227).

*c. Jewell Whatley*

56.   Counsel did not ask a single question on cross-examination on my aunt, Jewell Whatley (T.III/58), a close friend of Harrigan's who made contradictory statements to police, initially admitting to police that she had gone to Harrigan's apartment (with Harrigan) *after* the wedding reception and stayed there as late as *1:30 a.m.*, a time which was consistent with the state pathologist's estimate of time of death.  *See* police reports dated August 9, 1995; September 23, 1995; and October 2, 1995, collectively annexed hereto as Ex. "C."

57.   One family members of the victim, Pamela Harrigan, claimed that Whatley had once pulled a knife on her and run her out of the house; Harrigan's daughters also claimed that Whatley often argued with Harrigan and that the two had had physical altercations (Ex. "C", October 2nd Report p. 15).

58.   Whatley, herself, admitted to police that she had "a lot of arguments" with Harrigan but that "she did not think that she hurt Diane" (Ex. "C", October 2nd Report p. 7). Police also found two photographs of Harrigan in a bathing suit in Whatley's apartment (Ex. "C", pp. 5-6).

19

59.   None of the above evidence was brought out
by my counsel at trial.

**Counsel's Failure To Effectively Confront And Cross-**
**examine Hostile Witnesses, Including With Favorable Proofs**

60.   A principal witness against me at the trial
was Alan Paine, an immunized witness (T.II/136-144) who,
along with family members and friends, falsely testified
that I subsequently admitted complicity in the crime.

61.   Despite repeated request by me, my trial
counsel ineffectively failed to confront and cross-examine
Paine, his family members, and friends, including with
favorable proofs that conclusively demonstrated that Paine
and others were falsely implicating me.

62.   On March 21, 1996, Paine (and others) were
arrested on firearms and ammunition charges; as an excuse
and to curry favor with police, Paine falsely stated to
police that I had brought him the guns and asked him to
hide them because I supposedly felt police were after him;
this resulted in my arrest on March 22, 1996, on gun and
firearm charges (see police reports dated March 21, 1996,
and March 22, 1996, collectively annexed hereto as Ex.
"P").

63.   Paine subsequently embellished his story to
Trooper Joseph Mason, informing him that in March, 1996, I

20

brought the guns and ammunition to his house, and asked him
to hold them because I was being questioned about a murder
and I felt I was going to be arrested for a murder (see
Affidavit of Joseph Mason in support of Search Warrant, Ex.
"B", p. 17).

64. I was represented on the gun and ammunition
charges by an Attorney Robert Laliberte. At a probation
surrender hearing at which I appeared on April 12, 1996,
Paine and others, including Joanne Maldonado, Paine's
grandmother -- also a witness against me at trial --
testified that I had made incriminating statements and
brought the guns and ammunition to Paine's home *at*
*approximately 11:00 a.m. on the morning of March 19, 1996.*
*See* the accompanying Affidavit of Robert J. Laliberte sworn
to April 8, 1992 ("the Laliberte Affidavit").

65. *These allegations were demonstrably false*
*because records from my then employer, Ryan Iron Works,*
*Raynham, Massachusetts, which were obtained by Mr.*
*Laliberte, established that I was at work at the time.* *See*
Laliberte Affidavit; *see also* Ryan Work records annexed
hereto as Ex. "Q".

66. The gun and ammunition charges against me
were subsequently dismissed, including because Paine was

not granted immunity, and accordingly, he refused to testify. *See* Laliberte Affidavit.

67.   At trial, Paine, Maldonado and others repeated their false allegations -- although any reference to guns was not introduced -- including that I had made statements that I believed I would be arrested on murder charges (T.II/197-198).

68.   Despite demand by me, Mr. Owens refused to impeach Paine and others by confronting them with Ryan Work records demonstrating that I could not have made the incriminating statements *on the morning of March 19, 1996*, because I was at work at the time; in this regard, no reference to guns would have had to come out -- just the fact that I was not present in Paine's home when the statements were supposedly made.

69.   *Nor did Owens impeach Paine's credibility by eliciting the true extent of Paine's grant of immunity, and thus, his motive to testify against me.*

70.   These omissions by counsel deprived me of critical impeachment evidence at the trial.

**Counsel's Failure to Move For Mistrial**
**Based Upon The Prosecutor's Opening Statement**

71.   In his opening statement, the prosecutor made the highly prejudicial claim that it would be calling

22

a witness, Beverly Wilson, who would testify that I, ". . .was in Florida because the police were looking for [me] for a murder." Wilson would also supposedly testify, among other things, that I described the murder as being of "an older woman . . .who had been stabbed and raped and a fire had been set to cover it up" (T.I/99-100).

72. Not surprisingly, the prosecutor never called Wilson at the trial to repeat this fictitious claim. Ms. Wilson had previously told police I had made this statement in Florida *in the summer (Ex. "B", p. 21); the murder occurred in September of 1995, and I was incarcerated in the Summer of 1996, following my above-described probation surrender hearing. Wilson's account could not possibly be true, a fact of which the prosecutor was undoubtedly aware.*

73. The prosecutor also commented in his opening statement that Trooper Joseph Mason knew me "pretty well", improperly implying that I had an extensive criminal past (T.I/98).

74. My counsel was ineffective in failing to move for mistrial after the prosecutor's improper comments and his failure to present evidence in support of his claims; indeed, my due process rights were violated by the introduction of such baseless and prejudicial assertions.

*Counsel's Failure to Move For A Bill of Particulars*

75. Counsel also failed to move for a bill of particulars as to the basis for the Commonwealth's murder charge(s), thereby depriving me of prior notice that the Commonwealth would allege at the trial that an aggravated rape had been committed.

76. Only after commencement of the trial did the Commonwealth formally indicate a rape theory would be pursued (T.II/15).

77. Not only was my right to effective counsel violated, my due process right to notice of the charges was violated as well.

*Counsel's Failure To Object To "Rape-Kit" References*

78. Counsel was also ineffective in that he failed to make proper objections at the trial to the Commonwealth's repeated prejudicial references to a "rape-kit" having been utilized in the case (T.I/97; III/86,87,89,93,107,144,145,150; IV/23-25,32,40) -- there being absolutely no evidence of a rape of the victim.

79. As previously mentioned, semen was not detected in the crotch area of the victim's pajama bottom, nor was there any sign of rape trauma revealed in the Commonwealth's autopsy.

80.  Again, not only was my right to effective counsel violated, my due process right to a fair trial was violated as well.

### Counsel's Failure to Make An Opening Statement

81.  Counsel was ineffective in that he failed to make an opening statement on my behalf (T.I/100-101).

### Counsel's Failure to Make Proper Requests and/or Objections To the Court's Jury Instructions

82. Counsel was ineffective in that he failed to request that the jury be instructed that they must be unanimous with respect to the so-called Cunneen factors which are necessary to support a conviction for extreme atrocity or cruelty -- the theory by which I was convicted of first degree-murder.

83.  Not only was I deprived of the effective assistance of counsel, my due process rights, my right to a fair jury trial, and my right to a unanimous jury verdict were violated as well, under the Sixth and Fourteenth Amendments and Article 12.

### Counsel's Failure to Move to Dismiss The Indictment On The Ground of Comment Upon the Right Against Self-Incrimination And To Produce Incriminating Evidence

84. In the grand jury proceedings (copy of Grand Jury Minutes annexed hereto as Ex. "R"), improper comment was repeatedly made upon my right against self-

25

incrimination and to produce incriminating evidence, as guaranteed by the Fifth and Fourteenth Amendments and Article 12.  On this ground, too, counsel should have moved to dismiss the indictments against me.

85.    Trooper Joseph Mason testified that, unlike others, I had not volunteered to submit DNA evidence; that such evidence was recovered from my laundry which had been discarded; and that I had declined to voluntarily submit such samples (Ex. "R", p. 40-42,48).

86.    Conversely, when a grand juror asked how the Commonwealth had obtained my palm print evidence -- I had voluntarily submitted to such testing -- the prosecutor instructed Trooper Mason not to answer (Ex. "R", p. 50), thereby leaving the jury with the false impression that I had not voluntarily submitted such print evidence.

87.    This distorted presentation of evidence, together with the improper comment upon my right against self-incrimination and to produce incriminating evidence, fully warrants dismissal of the indictment -- even at this stage of the proceedings and even though my counsel ineffectively failed to previously move for dismissal.

*Request for Post-trial Discovery And Evidentiary Hearing*

88. As stated previously, by the accompanying motion, I not only request a new trial due to

26

ineffectiveness of counsel and on state and federal due process grounds, but an evidentiary hearing concerning the Commonwealth's destruction of evidence, the truthfulness of its trial testimony, and the production of all of its print, blood, hair, fiber and other forensic evidence for inspection and comparison testing by a defense expert.

89. Substantial issues have been raised which merit such a hearing and such discovery.

90. I also request the production of work records and log book of a Commonwealth witness, Jaime Baker, who falsely testified that in January of 1996 in connection with work, he traveled from Florida to Massachusetts where he supposedly heard me make incriminating statements.

91.    I reserve the right to supplement my motion and requests should it become necessary.

SIGNED UNDER PENALTY OF PERJURY THIS 24th day OF OCTOBER, 2002

JORDAN MARTEL RICE

27