## AFFIDAVIT

FILED
CLERKS OFFICE

DISTRICT OF MASS

Jordan Martel Rice, hereby deposes and states:

1.   I am the defendant in the above-captioned matter.  I submit this Affidavit in support of my accompanying motion for new trial and related post-trial discovery pursuant to Mass.R.Cr.P. 30.

2.   On October 28, 1998, I was convicted in the Brockton Superior Court following a jury trial, Hely, J., presiding, of crimes I did *not* commit:  arson and first-degree murder (by extreme atrocity or cruelty) of one Diane Harrigan, allegedly occurring on September 23, 1995, in her apartment at 475 Battles Farm Village, Brockton, Massachusetts, where she was found stabbed to death.  *See* copies of indictments and docket entries collectively annexed hereto as Ex. "A"; *see also* copy of Trial Transcript (to be submitted as exhibit under separate cover due to its voluminous nature), Volume 6, pp. 5-6, hereinafter "T.VI/5-6").

3.   I vehemently deny the charges and maintain that by my conviction, a gross injustice has been done.

4.   My privately retained trial attorney was Henry F. Owens, III; Attorney Lawrence Murray also appeared with Mr. Owens as my counsel.

Exhibit No. 1

-13-

5.   As fully set forth below, I maintain that I was denied my right to the effective assistance of counsel under Article 12 and the Sixth and Fourteenth Amendments, including because my trial counsel:

(a)   failed to preserve, analyze, and present potentially exculpatory forensic evidence at the crime scene which would have conclusively established my innocence of the crimes charged;

(b)   failed to retain and/or call expert witnesses on my behalf at the trial;

(c)   failed to move to dismiss the indictment in light of the Commonwealth's destruction of potentially exculpatory forensic evidence;

(d)   failed to present other witnesses and proofs establishing that person(s) other than myself may have committed the crimes charged;

(e)   failed to effectively confront and cross-examine hostile Commonwealth witnesses with inconsistent statements, motive evidence, and other favorable proofs on my behalf;

(f)   failed to move for mistrial based upon the Commonwealth's opening statement which made reference to highly prejudicial evidence which was never subsequently produced at trial;

(g)   failed to move for a bill of particulars as to the basis for the Commonwealth's murder charge(s), thereby depriving me of prior notice that the Commonwealth would allege at the trial that an aggravated rape had been committed;

(h)   failed to make proper objections at the trial to the Commonwealth's repeated prejudicial references to a "rape-kit" having been utilized in the case, there being no evidence of a rape of the victim;

Exhibit No. 1

-3-

(i)    failed to make an opening statement;

(j)    failed to make proper objection(s) and/or
proposed instructions for the Court's charge to
the jury; and,

(k)    failed to move to dismiss the indictment on the
ground that improper comment was made in the
grand jury proceedings upon my right against
self-incrimination and to produce incriminating
evidence.

6.    As also set forth below, I did not receive a
fair trial, and my state and federal due process rights
under Article 12 and the Fifth and Fourteenth Amendments
have been violated.

### The Commonwealth's Theory of the Crime

7.    The Commonwealth's theory of the crime was
that I allegedly raped and murdered Diane Harrigan in her
apartment in the early morning hours of September 23, 1995,
following a wedding reception which both of us had attended
the prior evening.    Police investigators theorized that
Harrigan was raped and murdered on the living room couch in
her apartment -- where blood and hair were found -- and
that she was then placed on a bed in the bedroom of her
apartment (where Harrigan's naked body was found).    To
conceal the crime, an attempt was supposedly made by me to
set fire to both the living room couch and the bed.    *See*,
*e.g.*, Affidavit in Support of Search Warrant dated October
31, 1996, p. 26, copy annexed hereto as Ex. "B".

-14-

8. There was no print, hair, fiber or blood evidence presented at the trial which in any way linked me to the crimes charged. Rather, the Commonwealth's proof against me at trial consisted of the following: (i) DNA evidence demonstrated that I had sex with Harrigan because my sperm was found in her body; and, (ii) witness testimony allegedly indicated that I subsequently admitted committing the crime, including testimony from an immunized witness, Alan Paine, and his various family members and friends.

9. I maintained, by contrast, that I had *consensual* sex with Harrigan at approximately 4 o'clock in the afternoon *prior to* the wedding reception which we both attended the evening before the killing (a time consistent with the state pathologist's testimony that the sperm in Harrigan's body could have been deposited within such a time frame). I also maintained that Paine and his family members and friends were lying when they testified that I subsequently admitted complicity in the crime. Finally, there was substantial evidence that other persons may very well have committed the crime, including: (i) the victim's current boyfriend, Jack Madden; (ii) an ex-boyfriend of Harrigan's, James Morgan, who previously had beaten and threatened Harrigan resulting in the issuance of a restraining order; and, (iii) Jewell Whatley, my aunt, and

Exhibit No. 1

4

-15-

a friend of Harrigan's who made contradictory statements,
initially admitting to police that she had gone to
Harrigan's apartment (with Harrigan) *after* the wedding
reception and staying there as late as *1:30 a.m.*, a time
which was consistent with the state pathologist's estimate
of time of death.  *See* police reports dated August 9, 1995;
September 23, 1995; and October 2, 1995, collectively
annexed hereto as Ex. "C."

10. *Because I had not committed the crime, I
emphasized from the outset to my trial counsel the
importance of preserving, maintaining, and analyzing any
and all forensic evidence at the crime scene because it
would establish that someone other than myself committed
the crime.  I also asked my trial counsel to investigate,
obtain and present evidence establishing that other persons
committed the crime, such as Madden or Morgan, and further,
that Alan Paine and his family members and friends were
lying when they testified that I had admitted complicity in
the crime.*

11.  As fully set forth below, counsel failed to
honor any of these requests, thereby resulting in the
forfeiture of substantial defenses which would have
resulted in my acquittal of the crimes charged.

-16-

Exhibit No. 1

*Counsel's Failure to Move For Preservation, Analysis*
*And The Production Of Exculpatory Forensic Evidence*

12.  By my letter dated March 14, 1998 (copy annexed hereto as Ex. "D"), I requested, among other things, that my trial counsel file a motion to compel any and all fingerprint evidence; to compel any and all hair and fiber evidence; to have such evidence "D.N.A. tested"; and, to have the court appoint a forensic pathologist and latent fingerprint expert for my defense.

13.  I made this request because, as stated in my letter to counsel, "All outlined issues are vital to proving my innocents [sic.] in this case" (Ex. "D"). Indeed, I wanted all of the crime scene evidence preserved and analyzed so that the true perpetrator of the crime would be revealed.  I also wanted a pathologist to analyze the Commonwealth's evidence to ascertain the time of the alleged victim's death, and to establish that there was no evidence of a sexual assault.

14.  By reply letter dated March 11, 1998 (copy annexed hereto as Ex. "E"), my trial counsel declined to any of the above.  Instead, he indicated, among other things, that a forensic pathologist would be of no assistance to my defense; nor did counsel address my request for preservation and analysis of forensic evidence.

Exhibit No. 1

-17-

15. Instead, counsel indicated that my case would be decided only on "the accuracy and reliability of the DNA evidence. *The DNA test results and whether or not said results can be effectively challenged will decide the outcome of this case*" (emphasis added) (Ex. "E"). Counsel's reference to DNA evidence referred only to his retention of defense experts to determine the accuracy and reliability of the Commonwealth's evidence that my sperm was found in the Harrigan's body.

16. In other words, *rather than develop evidence that person(s) other than myself had committed the crime, Mr. Owens' sole focus was on attacking the Commonwealth's DNA/sexual intercourse evidence -- a manifestly unreasonable defense strategy.*

17. Not only was I aware that I had sexual intercourse with Harrigan on the afternoon before the killing -- *something I testified to at my trial* -- the odds that the Commonwealth's DNA test had mistakenly identified my sperm were very small, i.e., 1 in 1.5 million according to the Commonwealth's June 30, 1997 report (copy annexed hereto as Ex. "F").

18. *Indeed, counsel's "approach" was not "strategic" at all since uncovering evidence that other person(s) had perpetrated the crime would not have been*

7

-18-

inconsistent with a defense that the Commonwealth's incriminating DNA evidence was unreliable. Thus, counsel's "approach" was nothing more than a transparent excuse to fail to investigate other readily available and viable defenses.

19. Moreover, there was ample forensic evidence retrieved by police investigators at the crime scene which could have been preserved, analyzed and tested by defense experts, including blood, hair, fiber, and print evidence -- which testing may have (and may still) establish that other person(s) committed the crime.

20. The report of Commonwealth chemist Patricia A. Forti dated October 21, 1995 (copy annexed hereto as Ex. "G"), lists no less than 65 items which were seized in connection with the police investigation of this case, many of which contained blood, hair and fiber evidence.

21. Similarly, the Report of Commonwealth chemist Daniel Pratt dated December 29, 1997 (copy annexed hereto as Ex. "H"), describes numerous locations at the crime scene where blood stains were found, including a kitchen faucet handle, knife in the bedroom, gold chain (recovered under victim's body), coffee cup inside the kitchen sink, toilet seat, telephone on couch, and couch cushions.

-19-

8

22.  Likewise, Trooper Patricia Beehan testified at my trial that she seized a bloody palm print on a coffee cup in the kitchen sink (T.II/100,144-146; Ex. 41, T.II/177); hair from the bathroom sink (T.II/165-166); blood, hair and other fibers from the living room, including the living room couch where the crime supposedly occurred (T.II/168,176-177); and latent fingerprints from a left and right faucet of the kitchen sink, a telephone, a cigarette lighter, a rattan table, a smoke detector, and various other items (T.II/174-176).

23.  Despite repeated written and oral demand by me, Mr. Owens simply refused to file any motion or make any request to have defense experts conduct comparison and/or DNA testing of the palm print(s), fingerprint(s), blood, hair, fiber and/or other forensic crime scene evidence against any of the other suspects in this case, including Jack Madden and/or James Morgan -- even after the Commonwealth's DNA testing of Madden's and Morgan's sperm had proved negative.

24.  I continued to maintain to Mr. Owens that the true assailant's blood, hair, print, fiber or other forensic evidence could be found on recovered items at the crime scene, and that Madden, Morgan or someone else must

Exhibit No. 1

-20-

have killed Harrigan *out of hate (even if the assailant had not had sex with her)*.

a.  *Failure to Investigate And Present Forensic
    Evidence Establishing That No Rape Occurred*

25.  In this regard, Patricia Forti's Chemist Report dated October 21, 1995 (Ex. "I", p. 2) indicated that *a screening test for the presence of seminal fluid on Harrigan's pajama bottom "was **negative** on the crotch area."*

26.  Remarkably, Mr. Owens neglected to bring out even this crucial piece of evidence at trial, including in his cross-examination of Ms. Forti, which evidence would have completely undercut the Commonwealth's rape/murder theory against me, demonstrating that Harrigan was not raped at all, but rather, was simply murdered.

27.  Likewise, the Commonwealth's Autopsy Report by Dr. Bruce Weiner dated March 6, 1996 (copy annexed hereto as Ex. "J"), indicated that the victim's ". . . genitalia **are unremarkable**", i.e., there was no medical evidence of rape trauma (Ex. "J", p. 4).

28.  Incredibly, Mr. Owens also neglected to bring out this crucial piece of evidence at the trial, including in his cross-examination of the Commonwealth's pathologist, Bruce Weiner.

-21-

Exhibit No. 4

29. There clearly was no conceivable "strategic" reason for these omissions by counsel.

b. *Failure to Investigate, Test And Present Evidence Concerning The Bloody Palmprint On the Coffee Cup*

30. Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of which were introduced at the trial as Ex. "41" (T.II/177).

31. The bloody palmprint on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink. According to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T.IV/22).

32. The Commonwealth had obtained comparison prints of 48 individuals, including the victim and myself, as well as James L. Morgan, John J. Madden, Jewell Whatley, and numerous others (T.II/158-159; *see also* Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (copy annexed hereto as Ex. "K").

33. Recognizing its evidential significance, Trooper Patricia Beehan testified at the trial that she

Exhibit No. 1

-22-

took photographs of the bloody palmprint, but that subsequently, an FBI agent, Randall Fitzwaters, destroyed the print when applying chemicals to enhance it (T.II/148-149). When showing photographs of the print to its own expert(s), including a specialist, Ron Smith of the Mississippi Crime Laboratory, the palmprint allegedly lacked sufficient detail to be identified with any of the prints of the 47 suspects, including myself (T.II/149,159-161,162-163). Trooper Beehan's Report dated May 30, 1996, also indicated that Smith believed that the print was, in some respects, consistent with that of the victim, but that there was insufficient detail to make a positive identification (Ex. "K").

34.  I insisted that Mr. Owens thoroughly investigate the Commonwealth's evidence on this point because:  (i) I doubted that the print on the coffee cup had been destroyed, as claimed by Trooper Beehan; and, (ii) I truly believed (and still believe) that the true perpetrator of the crime could be determined with proper and thorough testing of the evidence.

35. Notwithstanding my insistence that the Commonwealth's evidence be thoroughly investigated and tested by a defense print expert, Mr. Owens refused to do anything at all in this regard.

-33-

12

35. Since my trial, I have learned through my present counsel's investigator, Mr. Ron Rice, that: (i) Randall Fitzwaters, the FBI agent who supposedly destroyed the print on the coffee cup with chemicals, *denies any knowledge or involvement with the alleged destruction of evidence*; and (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; *nor was Smith shown any of the comparison prints of myself or any other suspects, directly contradicting Beehan's trial testimony that she brought with her all such comparison prints* for Smith's examination (T.II/162-163). *See* accompanying Affidavit of Ron Rice sworn to October 25, 2002 ("the Ron Rice Affidavit").

36. Had Attorney Owens conducted even a minimal investigation in this regard as I requested, he could have easily discredited the Commonwealth's claims in this regard at trial.

37. Indeed, now that my new counsel has obtained Mr. Owens's file, it is obvious he did not even read the materials contained within it concerning the coffee cup for use at my trial.

-34-

Exhibit No. 1

13

38.   By Cellmark Laboratory report dated January 7, 1998, found by my present counsel in Mr. Owens's file (copy annexed hereto as Ex. "L"), *the Commonwealth tested DNA material which was recovered from stained materials on the telephone and coffee cup at the crime scene (DNA material could not be extracted from a toilet seat for testing). Cellmark's testing excluded me as the source of the DNA material on the telephone and the coffee cup (although it could not exclude Harrigan) -- a fact which, remarkably, Mr. Owens never brought out at the trial, including in his cross-examination of Trooper Beehan.*

39.   Indeed, Trooper Beehan testified at trial that she had no knowledge of DNA testing being performed on the coffee cup (T.II/169-170); *Attorney Owens failed to confront Beehan with the Cellmark January 7th Report which excluded me as the source of DNA material on both the coffee cup and telephone.*

40.  There hardly can have been a "strategic" reason for Mr. Owens to fail to present this exclusion evidence and to impeach the Commonwealth witness's demonstrably false testimony.

41.   Accordingly, by this motion, I not only request a new trial due to ineffectiveness of counsel and on state and federal due process grounds, but an

- 25 -

14

evidentiary hearing concerning the Commonwealth's
destruction of evidence, the truthfulness of its trial
testimony, and the production of all of its print, blood,
hair, fiber and other forensic evidence for inspection and
comparison testing by a defense expert. I include in this
request all of the above-described print, blood, hair and
fiber evidence, as well as any evidence concerning a palm
print impression left in the bathroom sink which Trooper
Beehan claimed may have been left by police and/or fire
investigators -- a highly doubtful claim in light of these
new disclosures concerning her demonstrably false and/or
inaccurate testimony and handling of evidence (T.II/
108,156-157; Ex. 24).

*Counsel's Failure to Move To Dismiss The Indictment*

    42.  To the extent that the bloody palmprint on
the coffee cup was, in fact, destroyed, trial counsel was
ineffective in failing to move to dismiss the indictments
on the ground that potentially exculpatory evidence was
destroyed.

    43.  As stated above, DNA and/or print testing of
the coffee cup may very well have established the true
identity of the assailant of the victim -- it was not me.

    44.  Further, and in any event, the
Commonwealth's destruction of such critically important

15

evidence justifies dismissal of the indictment on due

process grounds -- even at this stage of the proceedings

and even though trial counsel ineffectively failed to

previously move for dismissal.

*Counsel's Failure to Present Exculpatory*
*Evidence Concerning The Culpability of Other Suspects*

a.  *Jim Morgan*

45.  Counsel inexplicably and inexcusably failed

to present exculpatory evidence that other suspects

committed the crime.

46.  Police investigation had established that

the victim's ex-boyfriend, Jim Morgan, had physically

abused her, resulting in the issuance of a restraining

order.  *See* police reports dated September 26, 1995;

October 2, 1995; and October 3, 1995, collectively annexed

hereto as Ex. "M".

47.  Harrigan's family members reported that

Morgan had gone to the Plymouth County jail, and when he

was released six months before the killing, he contacted

Harrigan and asked to see her, prompting her to be alarmed

and to request a renewal of the restraining order (Ex.

"M").

48.  Moreover, police learned that **on September**

**21, 1995, the day before the killing, a Deborah Hannon was**

Exhibit No. 1

-27-

16

*present when Harrigan received no less than three (3)*
*telephone calls from a person named "Jim", prompting*
*Harrigan to say that he was "getting on her nerves"* (Ex.
"M").

49.   When confronted by police, Morgan falsely
claimed that he had not had contact with Harrigan for a
month and that she declined to give him her new telephone
number (Ex. "M"); regarding the restraining order, Morgan
claimed that "he was suppose to have hit her" and "Dianne
[Harrigan] wanted to get rid of him so she had him put in
jail" (Ex. "M").

50.   Remarkably, Mr. Owens neglected to bring
out any of the above evidence at trial in his examination
of Commonwealth police officers and witnesses, nor did he
independently investigate witnesses and evidence concerning
Morgan's involvement in the crime despite my demand that he
do so.

51.   Since the trial, my present investigator,
Ron Rice, has obtained a copy of the restraining order
which Harrigan obtained against Morgan dated January 26,
1994 (copy annexed hereto as Ex. "N"). *In support of the*
*restraining order, Harrigan indicated that Morgan*
*"threatened to kill me" and that he previously broke her*
*nose* (Ex. "N").

-28-

17

52.  Evidence of Morgan's prior threats to kill,
coupled with his harassing telephone calls the day before
the murder, might very well have tipped the scales in favor
of my acquittal in the eyes of the jury. Attorney Owens's
failure to investigate and present such evidence was
inexcusable.

b. Jack Madden

53.  Regarding the victim's current
friend/boyfriend, Jack Madden, trial counsel failed to
effectively cross-examine Madden concerning a prior
statement to police on October 19, 1995 (copy annexed
hereto as Ex. "O"), that he and Harrigan had an "open" and
"mature" relationship -- thereby corroborating my assertion
that Harrigan did indeed have sexual relations with other
person(s) like myself.

54.  In a related vein, counsel also
ineffectively failed to underscore Madden's testimony on
direct examination that he "guess[ed]" he was Harrigan's
"boyfriend" -- evidence which was indicative of a very
attenuated relation with Harrigan.

55.  Indeed, Harrigan had described her
relationship with Madden as "shaky" to a witness, Willie
Johnson, the night before the killing (T.II/227).

Exhibit No. 4

-34-

c.  *Jewell Whatley*

56.  Counsel did not ask a single question on
cross-examination on my aunt, Jewell Whatley (T.III/58), a
close friend of Harrigan's who made contradictory
statements to police, initially admitting to police that
she had gone to Harrigan's apartment (with Harrigan) *after*
the wedding reception and stayed there as late as *1:30*
*a.m.*, a time which was consistent with the state
pathologist's estimate of time of death.  *See* police
reports dated August 9, 1995; September 23, 1995; and
October 2, 1995, collectively annexed hereto as Ex. "C."

57.  One family members of the victim, Pamela
Harrigan, claimed that Whatley had once pulled a knife on
her and run her out of the house; Harrigan's daughters also
claimed that Whatley often argued with Harrigan and that
the two had had physical altercations (Ex. "C", October 2nd
Report p. 15).

58.  Whatley, herself, admitted to police that
she had "a lot of arguments" with Harrigan but that "she
did not think that she hurt Diane" (Ex. "C", October 2nd
Report p. 7). Police also found two photographs of Harrigan
in a bathing suit in Whatley's apartment (Ex. "C", pp. 5-
6).

-30-

Exhibit No. 1

59.    None of the above evidence was brought out by my counsel at trial.

*Counsel's Failure To Effectively Confront And Cross-examine Hostile Witnesses, Including With Favorable Proofs*

60.    A principal witness against me at the trial was Alan Paine, an immunized witness (T.II/136-144) who, along with family members and friends, falsely testified that I subsequently admitted complicity in the crime.

61.    Despite repeated request by me, my trial counsel ineffectively failed to confront and cross-examine Paine, his family members, and friends, including with favorable proofs that conclusively demonstrated that Paine and others were falsely implicating me.

62.    On March 21, 1996, Paine (and others) were arrested on firearms and ammunition charges; as an excuse and to curry favor with police, Paine falsely stated to police that I had brought him the guns and asked him to hide them because I supposedly felt police were after him; this resulted in my arrest on March 22, 1996, on gun and firearm charges (see police reports dated March 21, 1996, and March 22, 1996, collectively annexed hereto as Ex. "P").

63.    Paine subsequently embellished his story to Trooper Joseph Mason, informing him that in March, 1996, I

Exhibit No. 1

-31-

brought the guns and ammunition to his house, and asked him to hold them because I was being questioned about a murder and I felt I was going to be arrested for a murder (see Affidavit of Joseph Mason in support of Search Warrant, Ex. "B", p. 17).

64. I was represented on the gun and ammunition charges by an Attorney Robert Laliberte. At a probation surrender hearing at which I appeared on April 12, 1996, Paine and others, including Joanne Maldonado, Paine's grandmother -- also a witness against me at trial -- testified that I had made incriminating statements and brought the guns and ammunition to Paine's home *at approximately 11:00 a.m. on the morning of March 19, 1996. See* the accompanying Affidavit of Robert J. Laliberte sworn to April 8, 1992 ("the Laliberte Affidavit").

65. *These allegations were demonstrably false because records from my then employer, Ryan Iron Works, Raynham, Massachusetts, which were obtained by Mr. Laliberte, established that I was at work at the time. See* Laliberte Affidavit; *see also* Ryan Work records annexed hereto as Ex. "Q".

66. The gun and ammunition charges against me were subsequently dismissed, including because Paine was

Exhibit No. 1

-32-

21

not granted immunity, and accordingly, he refused to
testify. *See* Laliberte Affidavit.

67.  At trial, Paine, Maldonado and others
repeated their false allegations -- although any reference
to guns was not introduced -- including that I had made
statements that I believed I would be arrested on murder
charges (T.II/197-198).

68.  Despite demand by me, Mr. Owens refused to
impeach Paine and others by confronting them with Ryan Work
records demonstrating that I could not have made the
incriminating statements *on the morning of March 19, 1996*,
because I was at work at the time; in this regard, no
reference to guns would have had to come out -- just the
fact that I was not present in Paine's home when the
statements were supposedly made.

69.  *Nor did Owens impeach Paine's credibility by
eliciting the true extent of Paine's grant of immunity, and
thus, his motive to testify against me.*

70.  These omissions by counsel deprived me of
critical impeachment evidence at the trial.

*Counsel's Failure to Move For Mistrial
Based Upon The Prosecutor's Opening Statement*

71.  In his opening statement, the prosecutor
made the highly prejudicial claim that it would be calling

-33-

22

a witness, Beverly Wilson, who would testify that I, "... .was in Florida because the police were looking for [me] for a murder." Wilson would also supposedly testify, among other things, that I described the murder as being of "an older woman . . .who had been stabbed and raped and a fire had been set to cover it up" (T.I/99-100).

72. Not surprisingly, the prosecutor never called Wilson at the trial to repeat this fictitious claim. Ms. Wilson had previously told police I had made this statement in Florida *in the summer* (Ex. "B", p. 21); *the murder occurred in September of 1995, and I was incarcerated in the Summer of 1996, following my above-described probation surrender hearing. Wilson's account could not possibly be true, a fact of which the prosecutor was undoubtedly aware.*

73. The prosecutor also commented in his opening statement that Trooper Joseph Mason knew me "pretty well", improperly implying that I had an extensive criminal past (T.I/98).

74. My counsel was ineffective in failing to move for mistrial after the prosecutor's improper comments and his failure to present evidence in support of his claims; indeed, my due process rights were violated by the introduction of such baseless and prejudicial assertions.

-34-

*Counsel's Failure to Move For A Bill of Particulars*

75. Counsel also failed to move for a bill of particulars as to the basis for the Commonwealth's murder charge(s), thereby depriving me of prior notice that the Commonwealth would allege at the trial that an aggravated rape had been committed.

76. Only after commencement of the trial did the Commonwealth formally indicate a rape theory would be pursued (T.II/15).

77. Not only was my right to effective counsel violated, my due process right to notice of the charges was violated as well.

*Counsel's Failure To Object To "Rape-Kit" References*

78. Counsel was also ineffective in that he failed to make proper objections at the trial to the Commonwealth's repeated prejudicial references to a "rape-kit" having been utilized in the case (T.I/97; III/86,87,89,93,107,144,145,150; IV/23-25,32,40) -- there being absolutely no evidence of a rape of the victim.

79. As previously mentioned, semen was not detected in the crotch area of the victim's pajama bottom, nor was there any sign of rape trauma revealed in the Commonwealth's autopsy.

Exhibit No. 1

-35-

24

80.   Again, not only was my right to effective counsel violated, my due process right to a fair trial was violated as well.

### Counsel's Failure to Make An Opening Statement

81.   Counsel was ineffective in that he failed to make an opening statement on my behalf (T.I/100-101).

### Counsel's Failure to Make Proper Requests and/or Objections To the Court's Jury Instructions

82. Counsel was ineffective in that he failed to request that the jury be instructed that they must be unanimous with respect to the so-called Cunneen factors which are necessary to support a conviction for extreme atrocity or cruelty -- the theory by which I was convicted of first degree-murder.

83.   Not only was I deprived of the effective assistance of counsel, my due process rights, my right to a fair jury trial, and my right to a unanimous jury verdict were violated as well, under the Sixth and Fourteenth Amendments and Article 12.

### Counsel's Failure to Move to Dismiss The Indictment On The Ground of Comment Upon the Right Against Self-Incrimination And To Produce Incriminating Evidence

84. In the grand jury proceedings (copy of Grand Jury Minutes annexed hereto as Ex. "R"), improper comment was repeatedly made upon my right against self-

- 36.-

25

incrimination and to produce incriminating evidence, as guaranteed by the Fifth and Fourteenth Amendments and Article 12. On this ground, too, counsel should have moved to dismiss the indictments against me.

85. Trooper Joseph Mason testified that, unlike others, I had not volunteered to submit DNA evidence; that such evidence was recovered from my laundry which had been discarded; and that I had declined to voluntarily submit such samples (Ex. "R", p. 40-42,48).

86. Conversely, when a grand juror asked how the Commonwealth had obtained my palm print evidence -- I had voluntarily submitted to such testing -- the prosecutor instructed Trooper Mason not to answer (Ex. "R", p. 50), thereby leaving the jury with the false impression that I had not voluntarily submitted such print evidence.

87. This distorted presentation of evidence, together with the improper comment upon my right against self-incrimination and to produce incriminating evidence, fully warrants dismissal of the indictment -- even at this stage of the proceedings and even though my counsel ineffectively failed to previously move for dismissal.

**Request for Post-trial Discovery And Evidentiary Hearing**

88. As stated previously, by the accompanying motion, I not only request a new trial due to

-37-

ineffectiveness of counsel and on state and federal due process grounds, but an evidentiary hearing concerning the Commonwealth's destruction of evidence, the truthfulness of its trial testimony, and the production of all of its print, blood, hair, fiber and other forensic evidence for inspection and comparison testing by a defense expert.

89. Substantial issues have been raised which merit such a hearing and such discovery.

90. I also request the production of work records and log book of a Commonwealth witness, Jaime Baker, who falsely testified that in January of 1996 in connection with work, he traveled from Florida to Massachusetts where he supposedly heard me make incriminating statements.

91. I reserve the right to supplement my motion and requests should it become necessary.

SIGNED UNDER PENALTY OF PERJURY THIS 24th day QF OCTOBER, 2002

JORDAN MARTEL RICE

38-

27

Jordan M. Rice-W65429
1 Administration Road
Bridgewater, Ma. 02324

Federal Bureau of Investigation
Attn: Violent Crime Division
1 Center Plaza, Suite # 600
Boston, Ma.

May 4, 2004, Page 1 of 3

Dear Agent,

    Hello, my name is Jordan M. Rice. I am currently serving a Life Sentence without the possibility of parole for Murder in the First Degree with 19-30 years running concurrently for Arson. On April 21, 2004 my Mother and I spoke with an Female Agent at your office over the telephone. She wouldn't provide me with her name pursuant to Bureau Policy as I was informed by her but she directed me to author this correspondence to your Division. On April 30, 2004 I mistakenly forward my correspondence to the attention of Agent in Charge Kenneth Kaiser.

    I have been wrongly convicted in my criminal matter, and in fact this is why I am writing your office for the third time, in hopes your Agency will launch an full scale probe into my wrongful conviction. Please let me respectfully demonstrate why such an probe is warranted in my criminal matter.

    At my trial, a Massachusetts State Trooper (Patricia Bechan); a crime scene expert, testified that, "She took a bloody palm print found on a cup at the crime scene to F.B.I. Latent Print Expert Randall Fitzwaters, who was conducting a seminar. While Agent Fitzwaters was applying chemicals to enhance the print, he destroyed it." There was never any pretrial discovery on this destruction of the print, which is a serious violation of Massachusetts Rules of Courts. Nor was Agent Fitzwaters called to testify at my trial.

29.

Exhibit No. 1A