

Page 1 of 3

# NEW ENGLAND LEGAL INVESTIGATIONS

CRIMINAL
INDUSTRIAL
INSURANCE
FORENSIC

*Certified Handwriting and Profiling Experts*
53 AMANDA AVENUE • PLYMOUTH, MA 02360
TEL: (508) 759-2551 • FAX: (508) 759-4672

October 24, 2002

Donald Harwood
Attorney At Law
c/o Primo Law Firm
20 Corporate Woods Blvd.
Albany, New York 12211

### AFFIDAVIT OF RONALD H. RICE

I, Ronald H. Rice, hereby depose and state as follows:

I am a fully licensed Private Investigator through the Massachusetts Department Of State ⟨ ⟩ce, license number: P-99 (copy attached). I have been retained by the defendant, Jordan M. F⟨ ⟩.

On Friday, October 4, 2002, I spoke with an FBI agent, Randall Fitzwater, who supposedly destroyed a palm print on a coffee cup with chemicals, according to the trial testimony of trooper Patricia A. Beehan.

Mr. Fitzwater expressly denied any knowledge, remembrance or involvement with this alleg⟨ ⟩ destruction of evidence, although he declined to forward an affidavit to me in this regard.

On Friday, October 4, 2002, I spoke with Ron Smith, a latent print expert, formerly of the Mississippi Crime Laboratory, who supposedly provided a forensic opinion to the Commonwealth concerning the bloody palm print found on a coffee cup in the kitchen sink at the crim⟨ ⟩ scene.

Mr. Smith told me that he _did not_ provide a forensic opinion to the Commonwealth, only a curtesy opinion, as there was not enough detail to include or exclude the victim as the source ⟨f⟩ the print; nor was Mr. Smith shown any of the comparison prints of Mr. Rice or any other su⟨s⟩pect, contradicting trooper Beehan's trial testimony that she brought with her all such comp⟨ar⟩ison prints for Smith's examination. Mr. Smith was unable to forward an affidavit to me in th⟨is⟩ regard.

Attached hereto is a certified copy of a restraining order dated 1/26/94 that the victim obtain⟨ ⟩ against James Morgan.

Exhibit No. 1





2 of 2

Signed under the penalties of perjury this 24th day of October at Plymouth, MA.

_____
Ronald H. Rice

Page 2 of 3

Exhibit No. 1

Exhibit No. 1, Page 3 of 3

Exhibit No. _____

# The Commonwealth of Massachusetts

## Department of State Police

This is to certify that  CHECKMATE FORENSIC SERVICES, INC.

of  PLYMOUTH, MASSACHUSETTS

has been duly licensed to conduct the business of a

### PRIVATE DETECTIVE

under the title of  NEW ENGLAND LEGAL INVESTIGATIONS (RONALD H. RICE, RESIDENT MANAGER)

at  53 AMANDA AVENUE, PLYMOUTH, MASSACHUSETTS 02360

in accordance with the provisions of Section 22-30, Chapter 147, of the General Laws,

from  AUGUST 31, 2002  to  AUGUST 31, 2003

(License Number P-99)

_Thomas J. Foley_, Colonel

THIS LICENSE DOES NOT CONFER UPON THE LICENSEE THE POWER AND THE AUTHORITY OF A CONSTABLE OR POLICE OFFICER

29. There clearly was no conceivable "strategic" reason for these omissions by counsel.

b. *Failure to Investigate, Test And Present Evidence Concerning The Bloody Palmprint On the Coffee Cup*

30. Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of which were introduced at the trial as Ex. "41" (T.II/177).

31. The bloody palmprint on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink. According to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T.IV/22).

32. The Commonwealth had obtained comparison prints of 48 individuals, including the victim and myself, as well as James L. Morgan, John J. Madden, Jewell Whatley, and numerous others (T.II/158-159; see also Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (copy annexed hereto as Ex. "K").

33. Recognizing its evidential significance, Trooper Patricia Beehan testified at the trial that she

11

took photographs of the bloody palmprint, but that subsequently, an FBI agent, Randall Fitzwaters, destroyed the print when applying chemicals to enhance it (T.II/148-149). When showing photographs of the print to its own expert(s), including a specialist, Ron Smith of the Mississippi Crime Laboratory, the palmprint allegedly lacked sufficient detail to be identified with any of the prints of the 47 suspects, including myself (T.II/149,159-161,162-163). Trooper Beehan's Report dated May 30, 1996, also indicated that Smith believed that the print was, in some respects, consistent with that of the victim, but that there was insufficient detail to make a positive identification (Ex. "K").

34. I insisted that Mr. Owens thoroughly investigate the Commonwealth's evidence on this point because: (i) I doubted that the print on the coffee cup had been destroyed, as claimed by Trooper Beehan; and, (ii) I truly believed (and still believe) that the true perpetrator of the crime could be determined with proper and thorough testing of the evidence.

35. Notwithstanding my insistence that the Commonwealth's evidence be thoroughly investigated and tested by a defense print expert, Mr. Owens refused to do anything at all in this regard.

Exhibit No. 8

35. Since my trial, I have learned through my present counsel's investigator, Mr. Ron Rice, that: (i) Randall Fitzwaters, the FBI agent who supposedly destroyed the print on the coffee cup with chemicals, *denies any knowledge or involvement with the alleged destruction of evidence;* and (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; *nor was Smith shown any of the comparison prints of myself or any other suspects, directly contradicting Beehan's trial testimony that she brought with her all such comparison prints* for Smith's examination (T.II/162-163). *See* accompanying Affidavit of Ron Rice sworn to October 25, 2002 ("the Ron Rice Affidavit").

36. Had Attorney Owens conducted even a minimal investigation in this regard as I requested, he could have easily discredited the Commonwealth's claims in this regard at trial.

37. Indeed, now that my new counsel has obtained Mr. Owens's file, it is obvious he did not even read the materials contained within it concerning the coffee cup for use at my trial. [stop here]

Exhibit No. a

## Consultant has roots in religion

**By MICHELE McPHEE**

The symbol of the Mississippi-based fingerprint company that has been paid $250,000 in a no-bid contract by the BPD to analyze a backlog of latent prints is a Christian fish — and the firm's "philosophy" is a homespun aphorism invoking God's munificence.

On the Ron Smith and Associates Web site, the 3-year-old forensic consulting company states its philosophy: "GOD created only two kinds of days: Good Days and Great Days! One of the greatest blessings in life is that YOU get to pick which one YOU are going to have each morning when YOU wake up!"

The Web site does not link to president Ron Smith's resume or indicate past experience, but lists itself as a "forensic consulting, managing, and training" firm.

Still, the company motto is not rooted in any law enforcement principles.

Instead it reads, "We do the right thing because it is the right thing. We need no other reason!"

This week, the BPD provided a copy of Smith's resume. It showed that from 1987 until June 2002, when he started his company, Smith was an associate director of the Mississippi crime lab.

Before that, he spent a single year from 1972 to 1973 as an FBI fingerprint technician before moving to the Alabama Bureau of Investigation, where he worked until he was hired at the Mississippi Crime Lab.

Last week, Police Commissioner Kathleen O'Toole said Smith and his experts were the only company with the availability and expertise to examine the backlog of BPD prints. The contract Smith received — and is expected to be extended — was not put out to public bid.

"His company is the only entity that could do this work," said BPD legal adviser Amy Ambarick.

Exhibit No. 3

PAGE No. 1 of 2

---

## Police keep fingerprint unit empty

### Firm grabbed $250G, looking for extension

**By MICHELE MCPHEE**

Nearly a year after the Boston Police Department shut down its fingerprint unit and paid an out-of-state firm almost a quarter million dollars to clear up the city's backlog of evidence, the BPD still has not hired its own fingerprint experts.

As a result, Police Commissioner Kathleen O'Toole plans to extend the pricey no-bid contract with Ron Smith and Associates — a Mississippi-based company that has already billed the BPD almost $250,000 in consulting fees, travel expenses, hotels, food and even lab coat costs, according to documentation obtained by the Herald.

The technicians are also paid $1,000 a day to testify about latent prints at court hearings, most recently at a homicide trial in Suffolk County this March.

The $204,618 contract ends on Sept. 30, but no civilian scientists have been hired, forcing the BPD to extend it to prevent another backlog of evidence from building up. Before the contract was in place, the BPD paid the company $42,577 — money that is now being questioned by watchdog groups.

"I truly believed we would get this done a lot faster," O'Toole said this week, referring to the delay in hiring in-house experts. "We had to negotiate with the union and identify the possible civilians to work in the unit."

O'Toole said she [plans] to hire a total of six [fore]nsics experts to work i[n the] ID Unit. Police officer[s wi]ll no longer be responsib[le for] examining latent print[s].

The unit was shut d[own] in October after Ron S[mith and] Associates wrote a s[cathing] report about the BP[D fin]gerprint unit shortly aft[er] Roxbury man, Stephen [E]vans, spent six years in jai[l b]ecause shoddy fingerprint a[na]lysis falsely linked him [to] the crime. Ron Smith [was] paid $16,705 for the repor[t].

And, weeks before t[he] unit shut down, the comp[any] was paid $25,872 for "fir[st] print classification tra[ining]," money that the exec[utive] director of the Boston [Fin]ance Commission said sh[oul]d not have been paid wi[thout] a contract. The mone[y ca]me from the Law Enfo[rcem]ent Trust Fund, money [seiz]ed from drug dealers ear[ma]rked for narcotics enforce[men]t.

"You can't pay [out] one $25,000 to do anythin[g w]ithout a formal contra[ct from] the city," FinCom ch[ief] Jeff Conley said. "You ju[s]t can't go out and spend [pu]blic money without a con[trac]t in that amount."

Conley would n[ot] say whether the BPD co[u]l[d] extend the contract [w]i[thout] putting out to public b[id], saying: "I have not seen [a c]ontract."

BPD legal adviser [A]my Amabarik said the c[ont]ract will be extended with [o]ut being put out to public b[id], saying, "the terms have no[t b]een solidified as of right n[ow]."

BOSTON HERALD FRIDAY, SEPTEMBER 16, 2005, B, No. 4 - Part 1 of 2

Exhibit No. ?
PAGE 2 of 2

## WHAT THEY BOUGHT

The bulk of the Law Enforcement Trust Fund money seized from Jan. 2004 until Aug. 2005 was used to pay Ron Smith & Associates, while other large payments went into the Criminal Investigation Divison fund to pay drug informants. These are some of the other items purchased with trust fund money:

**Feb. 23, 2004:**
Software enhancements and customizations for the Coplink Program, which links law enforcement agencies to one another for
**$78,750**

What that money could buy: three high-end undercover vehicles for BPD drug unit.

**Nov. 12, 2004:**
36 Olympus 5060 Digital Camera Kits for detectives from Perfecta Camera for
**$33,106.84**

What that money could buy:
New "kels," or hidden recording devices for BPD drug officers, who are using outdated equipment.

**Feb. 17, 2005:**
Crime scene evidence cones for
**$9,864.87**

What that money could buy:
Infrared cameras for night recording of drug dealers in city parks.



## THE MONEY TRAIL

Ron Smith and Associates has been paid nearly $250,000 in BPD funds to evaluate the department's latent print unit and to clear a backlog of evidence. Here's where the money came from:

**$172,577** was paid from the Law Enforcement Trust Fund, which is earmarked for drug enforcement activities.

**$11,333** was paid from the Edward Byrne Grant, named for a slain New York City cop and awarded to police departments to establish anti-drug task forces.

**$63,285** was paid from the BPD's yearly operational budget.

STAFF GRAPHIC BY SARAH DUBOIS

## Questions raised, city orders an audit for police trust fund

**By MICHELE McPHEE**

The city has hired a white-shoe accounting firm to conduct an independent audit of the Boston Police Department's Law Enforcement Trust Fund, and part of that review will include questions about $172,577 paid from the fund to a forensic firm in a no-bid contract, officials said yesterday.

The firm KPMG was hired in recent months to review the "finances and accounting" of the Law Enforcement Trust Fund, which is comprised of money from drug forfeitures and earmarked for narcotics enforcement, said Seth Gitell, spokesman for Mayor Thomas M. Menino.

Yesterday, the Herald reported that the Mississippi-based company Ron Smith and Associates has been paid nearly $250,000 in BPD money to clear a backlog of fingerprint evidence.

The bulk of the money came from the Law Enforcement Trust Fund — including a $25,872 payment for a fingerprint training class last September that was paid just months before the unit was shut down.

That pay[ment] it was questioned by [the] Boston Finance Com[mis]sion, which said a city c[on]tract is required for [a] amount that large.

The fund [also] was used to buy $9,864 w[or]th of crime scene cones a[nd] 36 cameras at $1,000 ea[c]h [fo]r the BPD's Bureau of I[n]v[es]tigative Services, the H[e]r[ald] reported.

"It's a rel[ative]ly common business pra[c]ti[c]e to have an accounting [en]tity review a public trus[t,]" Gitell said. "The review w[ill] encompass a range of t[he] [tr]ust's expenditures and [cont]racts."

Gitell sai[d th]e audit will include que[st]i[on]s raised by the Herald.

Ron Smit[h &] [A]ssociates was hired la[s]t [A]pril to conduct a revie[w] [o]f the BPD's fingerprint [unit], a report that earned [the f]irm $16,705 from the La[w E]nforcement Trust Fund. [The] firm then was hired [to a]nalyze the BPD's latent [prin]ts until the department [coul]d hire civilian scientist[s.]

The cont[ract] ends this month, and [Polic]e Commissioner Katl[een] O'Toole said she inte[nds] to extend it without put[ting] it out to public bid.

When asked how much more the BPD is expected to pay the company, Ambarik said, "I am not at liberty to discuss the terms of a contract in negotiations."

In February, the Herald reported that the BPD was spending up to $40,000 a month for the consultants to travel, along with Boston Tremont Hotel bills and per diem costs. At the time, BPD officials said the experts would stop working in May.

Boston Herald, Friday September 16, 2005, Pg. No. 4 - Part 2 of 2

Boston Herald, Sept. 17, 20[05], Page No.

# Geoghan suspect says guard allowed him to kill priest

**By Franci Richardson**
GLOBE CORRESPONDENT

WORCESTER — The man charged with killing pedophile John Geoghan accused a correction officer at the maximum-security prison in Shirley yesterday of turning his back on a plot that he knew would result in the former priest's murder.

"Lonergan let me in there to kill . . . I mean, castrate him," an agitated Joseph Druce said of David Lonergan as he was led out of Worcester Superior Court yesterday.

Earlier during the pretrial hearing, Druce said, "I was allowed to go into John Geoghan's cell" while a correction officer knowingly turned his back and went into his office. He later added: "A corrections officer let me kill John Geoghan. . ."

Druce, who had been imprisoned for killing a man in 1988, is charged with the murder of Geoghan, who was strangled in his cell at the Souza-Baranowski Correction Center in Shirley in August of 2003. A law enforcement source with knowledge of the investigation said yesterday after the hearing that Druce has confessed to killing Geoghan. Druce himself has said publicly at a previous court hearing that he "did it for the children."

At yesterday's hearing, Druce also accused Department of Correction officials of covering up for Lonergan.

"This isn't about correction officers, it's about the administration of the DOC," said Druce, who yesterday filed his own motion for a protective order against the department. "My sanity is about to break. They're either going to kill me or I'm going to go nuts, but before that, so help me God, this court will know the whole story."

Druce's mother, Donna Gauthier, said her son is afraid that correction officials will kill him.

"He feels like if he doesn't make the facts known now, he will never get the chance to do that because they've been trying to kill him," she said.

Kelly Nantel, spokeswoman for the department, declined to comment on Druce's allegations. She said Lonergan, who was put on leave during an internal investigation following the murder, was still working as a guard at Souza-Baranowski.

A report released after an investigation into the murder by an independent, governor-appointed panel revealed that Lonergan was the only guard on duty in Druce's area at the time of the killing. He was in a back room fixing his lunch when an inmate working in the area noticed "a head bobbing" inside Geoghan's cell, according to the report.

Druce's attorney said his client's frequent public rantings illustrate why he is mounting an insanity defense.

"This defense is one of a lack of criminal responsibility due to his mental state," said John LaChance, adding that his client is "manic and has a very explosive personality."

"His in-court behavior is reflective of his mental state," LaChance said.

Prosecutors have charged Druce with first-degree murder and have said he carefully plotted to kill Geoghan, who was serving a nine- to 10-year sentence for molesting a 10-year-old boy.

The hearing on a motion to dismiss the charges against Druce was continued until next Thursday. Defense attorneys are trying to get a copy of a videotape that correction officials say was "pirated" from their system and given to a reporter for the Boston Herald, which published photos from it earlier this week.

LaChance said he plans to subpoena the reporter who wrote the story. Worcester Superior Court Judge Timothy Hillman cautioned LaChance against "assigning it value that it doesn't deserve."

Exhibit No. 4

PAGE 1 of

FORM "A"

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE FORM**

Exhibit No. 5

| INMATE'S NAME: Jordan M. Rice | INMATE'S #: W65449 | DATE: 9-2-05 |
|---|---|---|
| INSTITUTION: OCCC | | DATE OF INCIDENT: 9/2/05 |

**INSTRUCTIONS:**
Refer to 103 CMR 491, Inmate Grievance Policy.
Check off a grievance type that best describes your grievance in **Block A**.
In **Block B**, give a brief and understandable summary of your complaint/issue.
List any actions you may have taken to resolve this matter in **Block C**. Be sure to include the identity of staff memyou have contacted.
Provide a Requested Remedy in **Block D**.
Check off one grievance type only (Listed on reverse side). When filing an Emergency Grievance select Emergenc
and one additional grievance type.

_____ EMERGENCY

Give a brief and understandable summary of your complaint/issue. Additional paper may be used, if necessary.

Mr. Rice is being denied access to the Court because he is a Protective Custody Prisoner and if he goes to the law library he will be forced to go with Population Prisoners. If Mr. Rice is forced to exercise self defense against a Population Prisoner the DOC will use this to portray him as a unruly prisoner, which is there ultimate gold to continue covering up the mental, Physical and Sexual torturing of Rice along with how all his Civil liberties has been circumvented via unlawfully confining him in punitive seg segation since June 15, 2

List any action taken to address/resolve this matter. Include the identity of staff members you have contacted.

I spoke with Attorney Lauren Petit of MCLS who informed me to file this grievance form

Provide your Requested Remedy. To grant Mr. Rice 5 Hour's a week in the Law Library alone, i.e., not with Population Prisoners.

130/4

Inmate's Signature _____ Date: 9/2/05
Staff Recipient _____ Date: 9-8-05

**DENIED GRIEVANCES MAY BE APPEALED TO THE REVIEWING AUTHORITY WITHIN 10 BUSINESS DAYS.
(Inmate receipts/responses will be generated via the Inmate Management System.)
Block A. Continued (SELECT ONE TYPE ONLY)

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

| | | | | |
|---|---|---|---|---|
| **Name** | RICE JORDAN M | **Grievance#** 13014 | **Institution** | OLD COLONY CORRECTIONAL CENTER |
| **Commit No.** | W65429 | **Housing** SEGREGATION UNIT | **Date Of Incident** 20050902 | **Date Of Grievance** 200509 2 |

**Complaint:** Mr. Rice is being denied access to the court because he is a protective custody prisoner and if he goes to the law library he will be forced to go with population prisoners. If Me Rice is forced to exercise self defense against a population prisoner the DOC will use this to portray him as a unruly prisoner, which is there ultimate gold to continue covering upp the mental, physical and sexual torturing of Rice along with how all his civil liberties has been circumvented via unlawfully confing hims in punitive segation since June 18 2001.

**Remedy Requested:** to grant Mr. Rice 5 hours a week in the law library alone, i.e, not with population prisoners.

**Staff Recipient:** McKenzie Amanda   CO I

**Staff Involved:**

**Signature:**

---

## RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20050908    **Decision Date** 20050915

**Signature** Costello Richard K   CO I

**Final Decision** PARTIAL APPROVAL

**Decision:** This grievance is partially approved. I have met with the Director of Classification and was informed that you are not on protective custody status as you claim in your grievance; you are being held for disciplinary reasons. You may submit a slip to attend law library during normally scheduled hours to your Unit OIC. You will only attend law library with other individuals from Segregation, not with population prisoners, as that is not allowed per policy. You will not be allowed additional library time as requested. We keep records indicating any possible enemy issues that you or other Segregation inmates may have here. These lists are checked before the library schedule is established to avoid any potential conflict situations.

**Signature:** _[signature]_   **Date:** 9/15/05

Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.

---

## INMATE RECEIPT

| | | | | |
|---|---|---|---|---|
| **Name** | RICE JORDAN M | | **Institution** | OLD COLONY CORRECTIONAL CENTER |
| **Commit No.** | W65429 | **Grievance#** 13014 | **Date Received** | 20050908 |
| **Signature** | McKenzie Amanda   CO I | | | |

Exhibit No. 5
PAGE 2 of 2

FORM "B"

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE APPEAL FORM

| INMATE'S NAME: Jordan M. Rice | INMATE'S #: W65429 | DATE: |
|---|---|---|
| INSTITUTION: OCCC | ASSIGNED GRIEVANCE #: 13014 | |

**INSTRUCTIONS:**
1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Provide your appeal argument in Block A, in a brief and understandable manner.
3. Provide your requested remedy in Block B.

**A. Provide your appeal argument in a brief and understandable manner.**

Mr. Rice now appeals the decision of Grievance Form No. 13014 because the Grievance Coordinator misconstrue the Complaint language and distorted the facts with his final decision. Mr. Rice is being denied access to the Court because he is a Protective Custody Prisoner being arbitrarily held in punitive segregation. If Mr. Rice physically goes to the Law Library, he will be forced to go with population prisoners, who are being held in punitive segregation, for disciplinary infractions allegedly committed in population, and are Rice's natural enemy for two reasons (1) Rice testified against some of their friends and (2) Rice is a protective custody prisoner. If Mr. Rice is forced to exercise self defense in the law library against a population prisoner being held in punitive segregation the DOC will use this to portray Rice as a unruly prisoner, which is there ultimate gold to continue covering up their retaliatory Mental, Physical and Sexual torturing of Mr. Rice and how all his Civil Liberties has been circumvent via unlawful arbitrarily confining Rice in punitive segregation basically since June 18, 2001 to the present date which is in direct violation of Blaney v. Commissioner, 374 Mass. 337 (1978). The DOC must still Protect Rice even while unlawfully confining him in punitive segregation, and he is still a protective custody prisoner.

**B. Provide your requested remedy**

To Grant Mr. Rice five hours a week in the law library alone, i.e., not with population prisoner being held in punitive segregation with Rice. This requested remedy is in pursuant to the following caselaw. Blaney v. Commissioner, 374 Mass. 337, 339 (1974); Bounds v. Smith, 430 U.S. 817, 821 (1977); and Messere v. Fair, 752 F.Supp. 48, 50 (D. Mass. 1990). See also Cepulonis v. Fair, 78-3033-RWZ (D. Mass. 1987)

Inmate's Signature: [signature] M.R.    Date: 9/16/05

Staff Recipient _____    Date: _____

(Inmate receipts/responses will be generated via the Inmate Management System.)

Exhibit No. 6

Exhibit No. 7

From JM 5/4/05

**Souza-Baranowski Correctional Center Cha[rge] Slip**

Date: 5-05-15

Inmate Number: W65439

Inmate Name: Jordan M. Rice

Amount to be charged: $ 4.75

Payable To: SBCC

For: Legal Package to Attorney Greta Janu

Inmate Signature: JM.R    Block: 3

Approval: Staff Member [signature]

IF SLIP IS $75.00 OR OVER IT MUST BE COUNTERSIGNED BELOW.

Approval: IPS _____

RECEIVED MAY 1 0 2005

Check #: _____   Date: _____

# GRETA A. JANUSZ
Attorney at Law
179 William Street
New Bedford, MA 02740
Tel. (508) 993-6499
Fax (508) 993-4680

June 13, 2005

Mr. Jordan M. Rice, W-65429
Souza Baronowski Correctional Center
P.O. Box 8000
Shirley, MA 02464

Exhibit No. 8

Dear Mr. Rice:

Please be advised that I am in receipt of your letter dated June 3, 2005. At the moment, your file contains the following legal documents:

- Department of Public Health Complaint against Charles Black.
- Umass Correctional Health Inmate Grievance and Appeal Form.
- Inmate Grievance Appeal Form.
- Plaintiff's Motion for Judgement on the Pleadings and/or in the Alternative Summary Judgement (re: Civil Action No. 04-741).
- Two letters to Edward Flynn, Secretary of Public Safety dated 12/02/04 and 12/03/04 respectively.
- Letter to SBCC Superintendent Lois Russo, dated 11/18/04. Enclosing your Motion to Dismiss D Report
- Civil Action 04-741, Plaintiff's Opposition to Defendant's Cross-Motion to Dismiss or, Alternatively, for Summary Judgment, with attached exhibits.

I do not have what you refer to as your complaint. Please resend it, if you wish.

Very truly yours,

Greta A. Janusz, Esq.

GAJ/dcw

Jordan M. Rice - W65129
Seg. Unit "G", Cell #5

Bernard Brady, Superintendent
OCCC

Exhibit No. 8

Re: Incoming and Outgoing Mail

Dear Sir,

 Hello, would you please confirm or deny in writing if my incoming and outgoing Personal and Legal Mail is being "Flagged, Screened and/or Censored"? If yes, why? I haven't received several articles of mail addressed to myself, nor has addressees received several articles of mail I forwarded to there attention.

 I look forward to your response.

Respectfully Submitted,
x. [signature]

Dated: Sept. 15, 2005 A.D.

CC: Kenneth Jones, Postal Inspector
    Rice Attorney
    Rice Family
    Edward J. Sullivan, Clerk
    Mark L. Wolf, Federal Justice
    Enclosure

Jordan M. Rice w/s
Seg. Unit "G", Cell #5

Bernard Brady, Superintendent
OCCC

Exhibit No. 9

Re: Two Missing Outgoing Legal Articles of Mail

Dear Sir,
 Hello, on Sept. 13, 2005 Mr. Rice gave two Legal Manila Envelopes, with charge sh[ip] attached, to the SMU Caseworker that needed to be weighed for postage cost and mailed w[hich] the caseworker did and forwarded them to someone unknown to Mr. Rice. Each En[vel]ope postage cost was $5.40 as I am informed. On Sept. 16, 2005 no postage funds w[ere] extracted from Rice's Prisoner Account as indicated on Rice's "Inmate Transaction [R]eport". Then Mr. Rice requested his two Legal Manila Envelopes be returned to him [a]s [I] was informed his outgoing mail can't be located which isn't due to them being p[lac]ed in the mail. Would you please insure my two legal Envelopes are located? [T]o insure that these irregular situations no longer continue in regards to all my mail.
 I look forward to your anticipated cooperation in this matter.

Respectfully Subm[itt]ed,
x. [signature]

Dated: Sept. 16, 2005 A.D.

CC: Kenneth Jones, Postal Inspector
 Rice Attorney
 Rice Family
 Edward J. Sullivan, Clerk
 Mark L. Wolf, Federal Justice
 Enclosure