# United States District Court
## District Of Massachusetts

Jordan M. Rice,
    Petitioner,

v.

Bernard Brady,
    Respondent.

No. 04-10859-MLW

Memorandum Of Law In
Support Of Traverse

## Statement Of Facts

This is a Petition under 28 USC § 2254 For Writ Of Habeas Corpus.[1]  Petitioner claims that he is not "lawfully" in custody because his Constitutional Rights were violated before, during and after the State Trial and the State Courts determinations of the Petitioners State Appellate Processes were contrary to the holding of the U.S. Supreme Court and/or a unreasonable application of clearly

---

[1] The Department of Corrections has willfully lost all the Petitioners Legal Documents, which is prohibiting him from submitting supporting exhibits with this Memorandum of Law. The Petitioner requests that this court refer to the initial "Lodgment" already filed with the Respondents Answer because the Petitioner has used the same exhibit numerical system.

– 2 –

established Law by the U.S. Supreme Court as set forth:

## Arguments

I.      The Petitioner Was Denied The Effective
        Assistance Of Trial Counsel And Due Process Of
        Law Under The U.S. Constitution. Also, Newly
        Discovered Evidence Mandates A New Trial
        In The Interests Of Justice.

The essence of an ineffective assistance of counsel claim is that

"Counsel's" unprofessional errors so upset the adversarial balance between defense and

prosecution that the trial was rendered unfair and the verdict rendered suspect"

Kimmelman V. Morrison, 477 U.S. 365, 373 (1986), citing Strickland V. Washington,

466 U.S. 668, 686 (1984). In order to prevail on an ineffective assistance of counsel

claim, the defendant must demonstrate both that counsel's representation fell below

an objective standard of reasonableness, Strickland, 466 U.S. at 688, and that there

exits a "reasonable probability that, but for counsel's unprofessional errors, the result of

proceeding would have been different." Kimmelman, 477 U.S. at 376

- 3 -

Significantly to this case, the constitutional right to effective assistance of counsel includes a duty by counsel to conduct a reasonable investigation and to present all favorable proofs. Strickland, 466 U.S. at 691. Additionally counsels is ineffective when his "tactical" or "strategic" decision isn't "based upon information the attorney has made after conducting a reasonable investigation". Wiggins V. Smith, 539 U.S. 510, 518 (2003).

"When a federal claim is properly presented for purposes of exhaustion, but not addressed by the state court, it must be considered de novo by the reviewing federal court". Campiti V. Matesanz, 186 F Supp. 2d. 29, 44 (D. Mass. 2002), citing Fortini V. Murphy, 257 F. 3d. 39, 47 (1st. Cir. 2001).[a]

Petitioner maintains there was no print, hair, fiber or blood evidence presented at the trial which in any way linked him to the crimes charged (R. 71-73). Rather, the

---

[a] In the case at bar the SJC failed to address the merits of the Petitioners Claim in their decision. See Commonwealth V. Rice,

-4-

Commonwealth's proof consisted entirely of the following (i) DNA evidence demonstrating that Rice had sex with Harrigan because his sperm was found in her body; and (ii) witness testimony from Alan Paine, his family members and friends, that Rice admitted committing the crime (R. 72-73)

Rice maintained that he had consensual sex with Harrigan at approximately 4 O'Clock in the afternoon prior to the wedding reception (a time consistent with the state pathologist's testimony that the sperm in Harrigan's body may have been deposited within a 24-hour time frame) (R. 72). Rice also maintained that Paine and his family members and friends were lying when they testified that he (Rice) subsequently admitted complicity in the crime (R. 72-73). Further, there was substantial evidence that other persons committed the crime, including (i) the victim's current boyfriend, Jack Madden, and, (ii) an ex-boyfriend of Harrigan's, James Morgan, who previously had beaten and threatened Harrigan, resulting in the issuance of a restraining order (R. 72-73; see police reports dated August 9, 1995;

September 23, 1995; and October 2, 1995, R. 139-152).

Because he had not committed the crime, Rice emphasized from the outset to his trial counsel the importance of preserving, maintaining, and analyzing any and all forensic evidence at the crime scene because it would establish that someone else committed the crime (R. 73). He also asked trial counsel to investigate, obtain and present evidence establishing that other persons committed the crime, such as Madden or Morgan, and further, that Alan Paine and his family members and friends were lying when they testified that he had admitted complicity in the crime (R. 73). Counsel failed to honor any of these requests, thereby forfeiting substantial defenses which undoubtedly would have resulted in Rice's acquittal of the crimes charged.

Counsel's Failure to Move For Preservation, Analysis
And The Production Of Exculpatory Forensic Evidence

By letter dated March 14, 1998 (R. 154-155), Rice requested, among other things, that his trial counsel file a motion to compel any and all fingerprint evidence, to compel any and all hair and fiber evidence; to have such evidence "D.N.A. tested"; and, to

- 6 -

have the court appoint a forensic pathologist and latent fingerprint expert for his defense.[3]
He made this request because, as stated in his letter to counsel, "All outlined issues
are vital to proving my innocents [sic] in this case" (R.74). Indeed, Rice wanted all
of the crime scene evidence preserved and analyzed so that the true perpetrator of the
crime would be revealed (R.74). He also wanted a pathologist to analyze the forensic
evidence to ascertain the time of the alleged victim's death, and to establish that there was
no evidence of a sexual assault (R.74).

By reply letter dated March 11, 1998 (R.157-158), Rice's trial counsel declined
to do any of the above. Counsel indicated that a forensic pathologist would be of no assistance
to the defense, nor did counsel address Rice's request for preservation and analysis of forensic
evidence (R.74-75). Instead, counsel indicated that the case would be decided only on "the

_____

[3] Had counsel investigated at Rice's request then he would be more than able to
place before the Courts demonstrating such important of the untested exculpatory evidence
that the Commonwealth is withholding. In the case at bar the Respondent's argue to
dismiss that Rice has no affidavit but then content trial counsel wasn't ineffective for not
adhering to Rice's request to investigate such exculpatory evidence. Such argument lacks merit!

- 7 -

accuracy and reliability of the DNA evidence. The DNA test results and whether or not said results can be effectively challenged will decide the outcome of this case" (emphasis added) (R. 157-958).

Counsel's comment upon DNA evidence also referred only to his retention of defense experts to determine the accuracy and reliability of the Commonwealth's evidence that Rice's sperm was found in Harrigan's body (R.75). In other words, rather than develop evidence that person(s) other than Rice had committed the crime, Mr. Owens' sole focus was on attacking the Commonwealth's DNA/sexual intercourse evidence -- a manifestly unreasonable defense strategy. Not only was Rice obviously aware that he had sexual intercourse with Harrigan on the afternoon before the killing -- something he testified to at his trial -- the odds that the Commonwealth's DNA test had mistakenly identified his sperm were very small, i.e., 1 in 1.5 million according to the Commonwealth's June 30, 1997 report (R. 160-162). Indeed, counsel's "approach" was not "strategic" at all since uncovering evidence that other person(s) had perpetrated the crime would not have been inconsistent with a

- 8 -

defense that the Commonwealth's incriminating DNA evidence was unreliable. Thus,

Counsel's "approach" was nothing more than a transparent excuse to fail to investigate

other readily available and viable defenses (R. 75-76). Counsel's inaction represented

"not only behavior falling measurably below that which might be expected from a criminal

defense lawyer of ordinary competence, but was also manifestly unreasonable conduct,

devoid of any 'arguably reasoned tactical or strategic judgment'". Commonwealth V.

Brookins, 33 Mass. App. Ct. 626, 633-634 (1993), quoting Commonwealth V. Lykus,

406 Mass. 135, 139-140 (1989). See Also Wiggins V. Smith, 123 S. Ct. 2527 (2003)

(Supreme Court held in reversing the conviction "inadequate investigation by counsel prejudiced

petitioner") Id at 2527

      Moreover, there was ample forensic evidence retrieved by police investigators at the

crime scene which could have been preserved, analyzed and tested by defense experts, including

blood, hair, fiber, and print evidence - - which testing may have (and may still) establish

that other person(s) committed the crime (R. 76). The report of Commonwealth Chemist

Patricia A. Forti dated October 21, 1995 (R. 164-171), lists no less than 65 items which were seized in connection with the police investigation of this case, many of which contained blood, hair and fiber evidence. Similarly, the Report of Commonwealth Chemist Daniel Pratt dated December 24, 1997 (R. 173-176), describes numerous locations at the crime scene where blood stains were found, including a kitchen faucet handle, knife in the bedroom, gold chain (recovered under victim's body), coffee cup inside the kitchen sink, toilet seat, telephone on couch, and couch cushions. Likewise, Trooper Patricia Beehan testified at trial that she seized a bloody palm print on a coffee cup in the kitchen sink (CT. II/100, 144-146; Ex. 41, T. II/177); hair from the bathroom sink (T. II/165-166); blood, hair and other fibers from the living room, including the living room couch where the crime supposedly occurred (T. II/168, 176-177); and, latent finger prints from a left and right faucet of the kitchen sink, a telephone, a cigarette lighter, a coffee table, a smoke detector and various other items (T. II/174-176).

Despite repeated written and oral demand by Rice, Mr. Owens simply refused

- 10 -

to file any motion or make any request to have defense experts conduct comparison and/or
DNA testing of the palm prints, fingerprints, blood, hair, fiber and/or other forensic
crime scene evidence against any of the other suspects in this case, including Jack
Madden and/or James Morgan. After the Commonwealth's DNA testing of Madden
and Morgan had proved negative (R. 77), Rice continued to maintain to Mr. Owens
that the true assailant's blood, hair, print, fiber or other forensic evidence could be
found on recovered items at the crime scene, and that someone like Madden and Morgan
must have killed Harrigan out of hate even if he had not had sex with her (77-78).

Counsel's Failure to Investigate And Present
<u>Forensic Evidence Establishing That No Rape Occurred</u>

Patricia Forti's Chemist Report dated October 21, 1995 (R. 179)
indicated that a screening test for the presence of seminal fluid on Harrigan's pajama
bottom "was negative on the crotch area". Remarkably, Mr. Owens neglected to bring
out even this crucial piece of evidence at trial, including in his cross-examination of
Trooper Beehan, the Commonwealth's criminalist, which evidence would have completely

-11-

undercut the Commonwealth's rape/murder theory against Rice, demonstrating that Harrigan was not raped at all, but rather was simply murdered (R.78).

Likewise, the Commonwealth's Autopsy Report by Dr. Bruce Weiner dated march 6, 1996 (R.187-192), indicated that the victim's "... genitalia are unremarkable", i.e., there was no medical evidence of rape trauma (R.190, p.4). Incredibly, Mr. Owens also neglected to bring out this crucial piece of evidence at the trial, including in his cross-examination of the Commonwealth's pathologist, Dr. Bruce Weiner (R.78).

There clearly was no conceivable "Strategic" reason for these omissions by trial counsel Wiggins, ~~539 U.S.~~ 123 S.Ct. 2527, 2535 (2003).

Counsel's Failure to Investigate, Test And Present
Evidence Concerning The Bloody Palm Print On the Coffee Cup

Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of

- 12 -

which were introduced at the trial as Ex. "41" (T. II/177).

The bloody palm print on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink -- according to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T. IV/22). The Commonwealth had obtained comparison prints of 48 individuals, including the victim and Rice, as well as James L. Morgan, John J. Madden, Jewell Whately, and numerous others (T. II/158-159), see also Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (R. 194-195).

Recognizing its evidential significance, Trooper Beehan testified at the trial that she took photographs of the bloody palm print, but that subsequently, an FBI agent, Randall Fitzwaters, destroyed the print when applying chemicals to enhance it (T. II/148-149). When showing photographs of the print to its own expert(s), including a specialist, Ron Smith of the Mississippi Crime Laboratory, the palm print allegedly lacked sufficient

- 13 -

detail to be identified with any of the prints of the 47 suspects, including Rice (T. II/149, 159-161, 162-163). Trooper Beehan's Report dated May 30, 1996, also indicated that Smith believed that the print was, in some respects, consistent with that of the victim, but that there was insufficient detail to make a positive

the print on the coffee cup with chemicals, denies any knowledge or involvement with the alleged destruction of evidence; and, (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; nor was Smith shown any of the comparison prints of Rice or any other suspects, directly contradicting Bochin's trial testimony that she brought with her all such comparison prints for Smith's examination (T. II / 162-163) (see Affidavit of Ron Rice sworn to October 25, 2002, R. 310-317).

Had Attorney Owens conducted even a minimal investigation in this regard as Rice requested, he could have easily discredited the Commonwealth's claims in this regard at trial. Newly discovered evidence like this warrants a new trial because "it casts real doubt on the justice of the conviction." Commonwealth v. Grace, 397 Mass. 303, 305 (1986). Additionally, a conviction based upon false testimony violates due process. Giglio v. United States, 405 U.S. 150 (1972)

-16-

Cconviction based upon perjured testimony violates due process); Napue V. Illinois, 360 U.S. 264 (1959) (same). There hardly can have been a "strategic" reason for Mr. Owens to fail to present this exclusion evidence and to impeach Trooper Beehan's demonstrably false testimony [5]

## Counsel's Failure to Move To Dismiss The Indictment Due to The Commonwealth's Destruction of the Palm Print

To the extent that the bloody palm print on the coffee cup was, in fact, destroyed, Rice argued in his new trial motion and direct appeal that trial counsel was ineffective in failing to move to dismiss the indictments on the ground that potentially exculpatory evidence was destroyed (R.83-84). Commonwealth V. Gliniewicz, 398 Mass. 744 (1986) (destruction of blood evidence in course of testing destroyed potentially exculpatory evidence and required suppression);

---

[5] In the Respondent's motion to dismiss doesn't address the claim of Conviction based upon prejuried testimony. Nor do they deny this claim, which is stated in the Petitioner's Habeas Corpus. Therefore, the Respondent has waived its chance to reply or refute.

-17-

Commonwealth V. Sasville, 35 Mass. App. Ct. 15 (1993) (destruction of fetus destroyed potentially exculpatory evidence and required dismissal). See generally United States V. Bryant, 439 F. 2d 642 (1971); Commonwealth V. Willie, 400 Mass. 427 (1987); Commonwealth V. Olszewski, 401 Mass. 749 (1988).

As stated above, DNA and/or print testing of the coffee cup may very well have established the true identity of the assailant of the victim. The Commonwealth conceded the print was not that of the defendant; further, the Commonwealth's explanation that the bloody print may have belonged to the victim was dubious, at best, since the bloody print was recovered on a cup in the kitchen, and the Commonwealth's theory of the crime was that the victim died on a couch in the living room from a rapidly fatal stab wound. Thus, Rice maintained that the Commonwealth's destruction and/or suppression of such critically important evidence, which would have established the true identity of assailant, justified

- 18 -

~~deserve~~ dismissal of the indictment on due process grounds - - even though trial counsel ineffectively failed to previously move for dismissal (R. 83-84). See <u>Brady V. Maryland</u>, 373 U.S. 83, 88 (1963) (prosecution must turn over exculpatory evidence even absent request from defense counsel), <u>United States V. Agurs</u>, 427 U.S 97, 103 (1976); <u>Commonwealth V. Tucceri</u>, 412 Mass. 401, 414 (1992) (same).[6]

## Counsel's Failure to Present Exculpatory Evidence Concerning The Culpability of other Suspects

Counsel inexplicably and inexcusably failed to present exculpatory evidence that other suspects may have committed the crime and the Commonwealth also fails to adequately rebut the ~~de~~ argument.

    i.   Jam Morgan

Police investigation had established that the victim's ex-boyfriend,

---

[6] In the Respondent's motion to dismiss doesn't address the "Brady" Claim. Nor do they deny this claim, which is stated in the Petitioner's Habeas Corpus. Therefore, the Respondent has waived it's chance to reply or refute this claim too.

- 19 -

Jim Morgan, had physically abused her, resulting in the issuance of a restraining order (see police reports, R. 201-208). Moreover, police learned that on September 31, 1995, the day before the killing, a Deborah Hannon was present when Harrigan received no less than three (3) telephone calls from a person named "Jim", prompting Harrigan to say that he was "getting on her nerves" (R. 204-205). When confronted by police, Morgan falsely claimed that he had not had contact with Harrigan for a month and that she declined to give her new telephone number (R. 206-208); regarding the restraining order, Morgan claimed that "he was suppose to have hit her" and "Dianne [Harrigan] wanted to get rid of him so she had him put in jail" (R. 206-207). Since his conviction, the defendant obtained a copy of the restraining order which Harrigan obtained against Morgan (R. 310-314). In support of the restraining order, Harrigan indicated that Morgan "threaten to kill me" and that he previously broke her nose (R. 313). Evidence of Morgan's prior threats to kill, coupled

· 20 -

with his harassing calls the day before the murder, was admissible and might

very well have tipped the scales in favor of acquittal. "When evidence concerning a

critical issue is excluded and when that evidence might have had a significant

impact on the result of the trial, the right to present a full defense has been denied"

Commonwealth V. Bohannon, 376 Mass.90 (1978); Chambers V. Mississippi,

410 U.S. 284 (1973)

    ii.   Jack Madden

    Regarding the victim's live-in boyfriend, Jack Madden (T. II /40,

47), trial counsel failed to effectively cross-examine Madden concerning a prior

statement to police that he and Harrigan had an "open" and "mature" relationship

(Search Warrant Affidavit, R.102-103), thereby corroborating Rice's

assertion that Harrigan had sexual relations with other person(s) like

himself (R.86). Counsel also ~~ineffectual~~ ineffectively failed to underscore

Madden's testimony on direct examination that he "guess[ed]" he was

-21-

Harrigan's "boyfriend" (T. II/46) -- evidence which was indicative of an attenuated relation with Harrigan. Harrigan, herself, had described her relationship with Madden as "Shaky" to a witness, Willie Johnson, the night before the killing (T. II/337).

## Counsel's Failure To Effectively Confront And Cross-examine Hostile Witnesses, Including With Favorable Proofs

A principal witness against Rice at trial was Alan Paine, an immunized witness (T. II/136-144) who, along with family members and friends, testified that Rice subsequently admitted complicity in the crime. Despite repeated request by Rice, trial counsel ineffectively failed to confront and cross-examine Paine, his family members, and friends, including with favorable proofs that conclusively demonstrated that Paine and others were falsely implicating Rice (R. 88).

On March 21, 1996, Paine (and others) were arrested on firearms and ammunition charges; as an excuse, and to curry favor with police, Paine falsely stated to police that Rice had brought him the guns and asked him to hide them because Rice

-22-

Supposedly felt police were after him; this resulted in Rice's arrest on March 22, 1996, on gun and firearm charges (see police reports dated March 21, 1996, and March 22, 1996, R.216-218).

Paine subsequently embellished his story to Trooper Joseph Mason, informing him that in March, 1996, Rice brought the guns and ammunition to his house, and asked him to hold them because Rice was being questioned about a murder and felt he was going to be arrested for a murder (see Affidavit of Joseph Mason in support of Search Warrant, R.115).

Rice was represented on the gun and ammunition charges by an Attorney Robert Laliberte (R.89). At a probation surrender hearing at which Rice appeared on April 12, 1996, Paine and others, including Joanne Maldonado, Paine's grandmother -- also a witness against Rice at trial -- testified that Rice had made incriminating statements and brought the guns and ammunition to Paine's home at approximately 11:00am on the morning of March 19, 1996. See

-23-

Affidavit of Robert J. Laliberte sworn to April 8, 2002 (R. 308-309).

These allegations were were demonstrably false because records from Rice's

then employer, Ryan Iron Works, Raynham, Massachusetts, which were obtained by

Mr. Laliberte, established that Rice was at work at the time (Laliberte Affidavit,

R. 308-309; see also Ryan Work records, R. 221-222). The gun and ammunition

charges against Rice were subsequently dismissed, including because Paine was not

granted immunity, and accordingly, he refused to testify (Laliberte Affidavit,

R. 308-309).

At trial, Paine, Maldonado and others repeated their false allegations --

although any reference to guns was not introduced -- including that Rice had made

statements that he believed he would be arrested on murder charges (T. II / 197-198).

Despite demand by Rice, Mr. Owens refused to impeach Paine and others by

confronting them with Ryan Works records demonstrating that Rice could not have

made the incriminating statements on the morning of March 19, 1996, because he was

- 24 -

at work at the time; in this regard, no reference to guns would have had to come out -- just the fact that Rice was not present in Paine's home when the statements were supposedly made.

Nor did Owens impeach Paine's credibility by eliciting the true extent of Paine's grant of immunity, and thus, his motive to testify against Rice. These omissions by counsel deprived Rice of critical impeachment evidence at the trial.

## Counsel's Failure to Move For Mistrial Based Upon The Prosecutor's Opening Statement

In his opening statement, the prosecutor made the highly prejudicial claim that it would be calling a witness, Beverly Wilson, who would testify that Rice, "... was in Florida because the police were looking for him for a murder" (T. I/99-100). Wilson would also supposedly testify, among other things, that Rice described the murder as being of "an older woman ... who had been stabbed and raped and a fire had been set to cover it up" (T. I/99-100).

Not surprisingly, the prosecutor never called Wilson at the trial to repeat

- 25 -

this fictitious claim. Ms. Wilson had previously told police that Rice made this

statement in Florida in the summer, the murder occurred in September of 1995,

and Rice was incarcerated in the Summer of 1996, following his above-described

probation surrender hearing (R.91-93). Wilson's account could not possibly be

true, a fact of which the prosecutor was undoubtedly aware (R.91-93).

Further, the prosecutor commented in his opening statement that Trooper

Joseph Mason knew Rice "pretty well" -- improperly implying that Rice had an

extensive criminal past (T. I/98).

Trial counsel was ineffective in failing to move for mistrial after the

prosecutor's improper comments and his failure to present evidence in support of

his claims; indeed, Rice's due process rights were violated by the introduction

of such baseless and prejudicial assertions. See, e.g., Commonwealth V. Bearse,

358 Mass. 481, 487 (1970)(improper and prejudicial remarks in opening statement).

-26-

## Counsel's Failure to Move For A Bill of Particulars

Counsel also failed to move for a bill of particulars as to the basis for the Commonwealth's murder charge(s), thereby depriving Rice of prior notice that the Commonwealth would allege at the trial that an aggravated rape had been committed. Only after commencement of the trial did the Commonwealth indicate a rape theory would be pursued (T. II/15). Not only was Rice's right to effective counsel violated, his due process right to notice of the charges was violated as well.[7]

## Counsel's Failure To Object To "Rape-Kit" References

Counsel was also ineffective in that he failed to make proper objections at the trial to the Commonwealth's repeated prejudicial references to a "rape-kit" having been utilized in the case (T. I/97; III/86,87,89,93,107,144,145,150; IV/33-35, 32,40) -- there being absolutely no evidence of a rape of the victim. As previously mentioned, semen was not detected in the crotch area of the victim's pajama bottom, nor

---

[7] Rice has requested a Stay of Execution to ~~adabate~~ exhaust this claim among others before the State Court, which are meritorious.

-27-

was there any sign of rape trauma revealed in the Commonwealth's autopsy. Again, not only was Rice's right to effective counsel violated, his due process right to a fair trial was violated as well.

Counsel's Failure to Make Proper Requests
and/or Objections To the Court's Jury Instructions

Counsel was ineffective in that he failed to request that the jury be instructed that they must be unanimous with respect to the so-called Cunneen factors which are necessary to support a conviction for extreme atrocity or cruelty -- the theory by which Rice was convicted of first degree murder. Not only was Rice deprived of the effective assistance of counsel, his due process rights, right to a fair jury trial, and right to a unanimous jury verdict were violated as well, under the Sixth and Fourteenth Amendments and Article 12 (See Argument V, infra). See also Richardson V. United States, 526 U.S. 813 (1999) (discussing unanimity requirement as to theory of predicate acts under continuing federal crime); Apprendi V. New Jersey, 530 U.S. 466 (2000) (discussing unanimity requirement as to sentencing

-28-

enhancement factors).

Counsel's Failure to Move to Dismiss The Indictment
On The Ground of Comment Upon the Right Against
Self-Incrimination And To Produce Incriminating Evidence

    In the grand jury proceedings, improper comment was repeatedly

made upon Rice's right against self-incrimination and to produce incriminating

evidence, as guaranteed by the Fifth and Fourteenth Amendments and Article

12. On this ground, too, counsel should have moved to dismiss the indictments.

Commonwealth V. Hinckley, 422 Mass. 261, 264 (1996) (improper admission of

refusal evidence violates state constitutional privilege against self-incrimination);

accord Commonwealth V. McGrail, 419 Mass. 774, 778-79 (1995); Commonwealth

V. Lydon, 413 Mass. 309, 314-315 (1992); Opinion of Justices, 412 Mass.

1201, 1208 (1992).

    Trooper Joseph Mason testified that, unlike others, Rice had not

volunteered to submit DNA evidence; that such evidence was recovered from the

- 29 -

laundry which had been discarded; and that Rice had declined to voluntarily submit such samples. (R. 263-265, 271). Conversely, when a grand juror asked how the Commonwealth had obtained my palm print evidence -- Rice had voluntarily submitted to such testing (T. II/144-150). -- the prosecutor instructed Trooper Mason not to answer (R. 272), thereby leaving the jury with the false impression that Rice had not voluntarily submitted such print evidence.[8]

This distorted presentation of evidence, together with the improper comment upon Rice's right against self-incrimination and to produce incriminating evidence, fully warrants dismissal of the indictment -- even at this stage of the proceedings, and even though Rice's counsel ineffectively failed to previously move for dismissal. See, e.g., Commonwealth V. St. Pierre, 377 Mass. 650, 655 (1979).

---

[8] Rice has requested a Stay of Execution because this is one of the meritorious claims that must be exhausted in State Court because the State Courts deemed the Prosecutor's withholding this exculpatory evidence from the Grand Juror's as an harmless error. Withholding exculpatory evidence is never harmless, See Brady V. Maryland, 373 U.S. 83, 88 (1963)(Prosecution must turn over exculpatory evidence).