2

## PAGE 1 of 1

As I outlined in my First Packet, Trooper Beehan knowingly gave perjuried testimony in regards to FBI Agent Fitzwaters in regards to the Bloody Palm Print. But the FBI refuses to provide me with documentation demonstrating Trooper Beehan committed perjury. In the State of Massachusetts the FBI has a well documented history of aidding the State Law Enforcement via withholding documentation from wrongfully convicted defendants. Most infamously co-defendant's Peter Limone, Joseph Salvati and the late Louis Greco (Died in Prison) who all spended over 30 years in prison wrongfully convicted of murder, due to the FBI withholding documents (See Exhibit No. 1). Also there has been several other defendants in a number of cases but these three guys received national coverage. So it was no surprise history repeated itself in my wrongful conviction.

Trooper Beehan also gave perjuried in regards to Mississippi Latent Print Expert (See Exhibit No. 2). My then Private Investigate discovered this perjury too (See Exhibit No. 3). But it was surprising and a mystery why Mississippi Latent Print Expert Ron Smith refused to provide me with any documentation demonstrating the Massachusetts State Police, namely Trooper Beehan, committed perjury. On Sept. 16, & 17, 2005 Boston Herald Reporter Michele McPhee (617-619-6461) article solved the mystery. Mr. Smith's name sake company received lucrative no bid contracts from Massachusetts Law Enforcement (See Exhibit No. 4). Had Mr. Smith provided me documentation contradicting Massachusetts Law Enforcement then his companies corporate welfare would of been terminated. Single handedly this bloody palm prints will exonerate me!

This type of Good Boy Criminal System in Massachusetts, is why Massachusetts is the second highest wrongful conviction rate in the United States, only behiND Illinois whom has the First highest wrongful conviction rate!

*Welcome to the Massachusetts Justice System!*

# Suffolk DA clears Greco posthumously on 1965 murder rap

**By J.M. LAWRENCE**

Louis Greco died behind bars for murder after maintaining his innocence for 30 years.

Now the Suffolk District Attorney's office finally believes him.

Greco, a World War II veteran hobbled by a shot to the ankle in the Philippines, always claimed he was in Florida on March 12, 1965, when the mob shot Edward Deegan in a Chelsea alley. He passed three polygraphs and won two commutations that were never acted upon by former governors.

In a motion quietly filed in Suffolk Superior Court in September, the DA's office finally acknowledged what new testimony and *secret FBI memos uncovered recently have revealed.* Greco was framed by mob hit man-turned-government witness Joseph Barboza.

"It appears that justice may not have been done," Assistant DA Mark Lee said in the motion to drop all charges against Greco posthumously. The motion cites "legal and ethical considerations raised by the *newly discovered FBI documents*, as well as principles of consistency and fundamental fairness" as the reasons.

The DA's office dropped the charges against Greco's co-defendants Peter J. Limone and Joseph Salvati in January 2001. Limone was released after 33 years behind bars. Salvati was in prison for 30.

For Greco's family and friends, the DA's motion is a mere formality in a long battle to clear Greco's name and seek compensation from the FBI for backing perjured testimony in the case.

"Big (expletive) deal," said one longtime friend of Greco's about the move to drop the charges.

The Justice Department refuses to settle the lawsuits filed by Greco's estate, Limone and Salvati. The government has argued it can't be held responsible for the actions of FBI agents under tort laws in effect in the 1960s.

Former New England Mafia leader Francis P. Salemme told congressional investigators that former FBI agent Dennis Condon met with him after the Deegan verdict in 1968 and laughed about setting up Greco.

Greco was 78 when he died in a prison hospital in 1995 from colon cancer and heart disease. He suffered horribly, according to the suit filed by his son, Edward Greco. He could not get proper care for his diabetes and lost a leg to amputation.

His sons grew up without their father and watched him deteriorate in prison. Both men fell into deep depressions as adults. Louis Greco Jr. committed suicide by drinking a bottle of Drano in 1997, court papers said.

Attorney Howard Friedman, who represents Edward Greco, said the DA's decision to drop the charges will aid his lawsuit.

"He knew his father didn't do it," Friedman said. "This was an innocent man who was framed, and the most amazing part is the government knew it."



GRECO: Cleared of murder charge by DA after dying in jail.



Exhibit No. 1

*The FBI is holding evidence that will exonerate me too.*

Please help my Family and I receive Justice, while I am still alive. Don't let me have to meet the same fate as the poor Mr. Greco to receive Justice because that would be <u>UNAMERICAN</u>.

29. There clearly was no conceivable "strategic" reason for these omissions by counsel.

b. *Failure to Investigate, Test And Present Evidence Concerning The Bloody Palmprint On the Coffee Cup*

30. Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of which were introduced at the trial as Ex. "41" (T.II/177).

31. The bloody palmprint on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink. According to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T.IV/22).

32. The Commonwealth had obtained comparison prints of 48 individuals, including the victim and myself, as well as James L. Morgan, John J. Madden, Jewell Whatley, and numerous others (T.II/158-159; *see also* Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (copy annexed hereto as Ex. "K").

33. Recognizing its evidential significance, Trooper Patricia Beehan testified at the trial that she

11

took photographs of the bloody palmprint, but that subsequently, an FBI agent, Randall Fitzwaters, destroyed the print when applying chemicals to enhance it (T.II/148-149). When showing photographs of the print to its own expert(s), including a specialist, Ron Smith of the Mississippi Crime Laboratory, the palmprint allegedly lacked sufficient detail to be identified with any of the prints of the 47 suspects, including myself (T.II/149,159-161,162-163). Trooper Beehan's Report dated May 30, 1996, also indicated that Smith believed that the print was, in some respects, consistent with that of the victim, but that there was insufficient detail to make a positive identification (Ex. "K").

34. I insisted that Mr. Owens thoroughly investigate the Commonwealth's evidence on this point because: (i) I doubted that the print on the coffee cup had been destroyed, as claimed by Trooper Beehan; and, (ii) I truly believed (and still believe) that the true perpetrator of the crime could be determined with proper and thorough testing of the evidence.

35. Notwithstanding my insistence that the Commonwealth's evidence be thoroughly investigated and tested by a defense print expert, Mr. Owens refused to do anything at all in this regard.

Exhibit No. 2

35. Since my trial, I have learned through my present counsel's investigator, Mr. Ron Rice, that: (i) Randall Fitzwaters, the FBI agent who supposedly destroyed the print on the coffee cup with chemicals, *denies any knowledge or involvement with the alleged destruction of evidence;* and (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; *nor was Smith shown any of the comparison prints of myself or any other suspects, directly contradicting Beehan's trial testimony that she brought with her all such comparison prints* for Smith's examination (T.II/162-163). *See* accompanying Affidavit of Ron Rice sworn to October 25, 2002 ("the Ron Rice Affidavit").

36. Had Attorney Owens conducted even a minimal investigation in this regard as I requested, he could have easily discredited the Commonwealth's claims in this regard at trial.

37. Indeed, now that my new counsel has obtained Mr. Owens's file, it is obvious he did not even read the materials contained within it concerning the coffee cup for use at my trial. [handwritten: Stop Here]

[handwritten margin note: Exhibit No. 2]

13



Page 1 of 3

# NEW ENGLAND LEGAL INVESTIGATIONS

CRIMINAL
INDUSTRIAL
INSURANCE
FORENSIC

*Certified Handwriting and Profiling Experts*
53 AMANDA AVENUE • PLYMOUTH, MA 02360
TEL: (508) 759-2551 • FAX: (508) 759-4672

October 24, 2002

Donald Harwood
Attorney At Law
c/o Primo Law Firm
20 Corporate Woods Blvd.
Albany, New York 12211

### AFFIDAVIT OF RONALD H. RICE

I, Ronald H. Rice, hereby depose and state as follows:

I am a fully licensed Private Investigator through the Massachusetts Department Of State Police, license number: P-99 (copy attached). I have been retained by the defendant, Jordan M. Rice.

On Friday, October 4, 2002, I spoke with an FBI agent, Randall Fitzwater, who supposedly destroyed a palm print on a coffee cup with chemicals, according to the trial testimony of trooper Patricia A. Beehan.

Mr. Fitzwater expressly denied any knowledge, remembrance or involvement with this alleged destruction of evidence, although he declined to forward an affidavit to me in this regard.

On Friday, October 4, 2002, I spoke with Ron Smith, a latent print expert, formerly of the Mississippi Crime Laboratory, who supposedly provided a forensic opinion to the Commonwealth concerning the bloody palm print found on a coffee cup in the kitchen sink at the crime scene.

Mr. Smith told me that he _did not_ provide a forensic opinion to the Commonwealth, only a curtesy opinion, as there was not enough detail to include or exclude the victim as the source of the print; nor was Mr. Smith shown any of the comparison prints of Mr. Rice or any other suspect, contradicting trooper Beehan's trial testimony that she brought with her all such comparison prints for Smith's examination. Mr. Smith was unable to forward an affidavit to me in this regard.

Attached hereto is a certified copy of a restraining order dated 1/26/94 that the victim obtained against James Morgan.

Exhibit No. 3





2 of 2

Signed under the penalties of perjury this 24th day of October at Plymouth, MA.

_____
Ronald H. Rice

Page 2 of 3

Exhibit No. 3

# Consultant has roots in religion

**By MICHELE McPHEE**

The symbol of the Mississippi-based fingerprint company that has been paid $250,000 in a no-bid contract by the BPD to analyze a backlog of latent prints is a Christian fish — and the firm's "philosophy" is a homespun aphorism invoking God's munificence.

On the Ron Smith and Associates Web site, the 3-year-old forensic consulting company states its philosophy: "GOD created only two kinds of days: Good Days and Great Days! One of the greatest blessings in life is that YOU get to pick which one YOU are going to have each morning when YOU wake up!"

The Web site does not link to president Ron Smith's resume or indicate past experience, but lists itself as a "forensic consulting, managing, and training" firm.

Still, the company motto is not rooted in any law enforcement principles.

Instead it reads, "We do the right thing because it is the right thing. We need no other reason!"

This week, the BPD provided a copy of Smith's resume. It showed that from 1987 until June 2002, when he started his company, Smith was an associate director of the Mississippi crime lab.

Before that, he spent a single year from 1972 to 1973 as an FBI fingerprint technician before moving to the Alabama Bureau of Investigation, where he worked until he was hired at the Mississippi Crime Lab.

Last week, Police Commissioner Kathleen O'Toole said Smith and his experts were the only company with the availability and expertise to examine the backlog of BPD prints. The contract Smith received — and is expected to be extended — was not put out to public bid.

"His company is the only entity that could do this work," said BPD legal adviser Amy Ambarick.

Exhibit No. 4
PAGE No. 1 of 2

---

# Police keep fingerprint unit empty

## Firm grabbed $250G, looking for extension

**By MICHELE McPHEE**

Nearly a year after the Boston Police Department shut down its fingerprint unit and paid an out-of-state firm almost a quarter million dollars to clear up the city's backlog of evidence, the BPD still has not hired its own fingerprint experts.

As a result, Police Commissioner Kathleen O'Toole plans to extend the pricey no-bid contract with Ron Smith and Associates — a Mississippi-based company that has already billed the BPD almost $250,000 in consulting fees, travel expenses, hotels, food and even lab coat costs, according to documentation obtained by the Herald.

The technicians are also paid $1,000 a day to testify about latent prints at court hearings, most recently at a homicide trial in Suffolk County this March.

The $204,618 contract ends on Sept. 30, but no civilian scientists have been hired, forcing the BPD to extend it to prevent another backlog of evidence from building up. Before the contract was in place, the BPD paid the company $42,577 — money that is now being questioned by watchdog groups.

"I truly believed we would get this done a lot faster," O'Toole said this week, referring to the delay in hiring in-house experts. "We had to negotiate with the union and identify the possible civilians to work in the unit."

O'Toole said she plans to hire a total of six forensics experts to work in the ID Unit. Police officers will no longer be responsible for examining latent prints.

The unit was shut down in October after Ron Smith and Associates wrote a scathing report about the BPD fingerprint unit shortly after a Roxbury man, Stephen Cowans, spent six years in jail because shoddy fingerprint analysis falsely linked him to the crime. Ron Smith was paid $16,705 for the report.

And, weeks before the unit shut down, the company was paid $25,872 for "fingerprint classification training," money that the executive director of the Boston Finance Commission said should not have been paid without a contract. The money came from the Law Enforcement Trust Fund, money seized from drug dealers earmarked for narcotics enforcement.

"You can't pay anyone $25,000 to do anything without a formal contract from the city," FinCom chief Jeff Conley said. "You just can't go out and spend public money without a contract in that amount."

Conley would not say whether the BPD could extend the contract without putting out to public bid, saying: "I have not seen a contract."

BPD legal adviser Amy Ambarik said the contract will be extended without being put out to public bid, saying, "the terms have not been solidified as of right now."

BOSTON HERALD   FRIDAY, SEPTEMBER 16, 2005,   p. No. 4 - Part 1 of 2

Exhibit No. 4
PAGE 2 of 2

## WHAT THEY BOUGHT

The bulk of the Law Enforcement Trust Fund money seized from Jan. 2004 until Aug. 2005 was used to pay Ron Smith & Associates, while other large payments went into the Criminal Investigation Divison fund to pay drug informants. These are some of the other items purchased with trust fund money:

**Feb. 23, 2004:**
Software enhancements and customizations for the Coplink Program, which links law enforcement agencies to one another for

**$78,750**

What that money could buy: three high-end undercover vehicles for BPD drug unit.

**Nov. 12, 2004:**
36 Olympus 5060 Digital Camera Kits for detectives from Perfecta Camera for

**$33,106.84**

What that money could buy:
New "kels," or hidden recording devices for BPD drug officers, who are using outdated equipment.

**Feb. 17, 2005:**
Crime scene evidence cones for

**$9,864.87**

What that money could buy: Infrared cameras for night recording of drug dealers in city parks.



## THE MONEY TRAIL

Ron Smith and Associates has been paid nearly $250,000 in BPD funds to evaluate the department's latent print unit and to clear a backlog of evidence. Here's where the money came from:

**$172,577** was paid from the Law Enforcement Trust Fund, which is earmarked for drug enforcement activities.

**$11,333** was paid from the Edward Byrne Grant, named for a slain New York City cop and awarded to police departments to establish anti-drug task forces.

**$63,285** was paid from the BPD's yearly operational budget.

STAFF GRAPHIC BY SARAH DUBOIS

Boston Herald, Friday September 16, 2005, Pg. No. 4 - Part 2 of 2

## Questions raised, city orders an audit for police trust fund

**By MICHELE McPHEE**

The city has hired a white-shoe accounting firm to conduct an independent audit of the Boston Police Department's Law Enforcement Trust Fund, and part of that review will include questions about $172,577 paid from the fund to a forensic firm in a no-bid contract, officials said yesterday.

The firm KPMG was hired in recent months to review the "finances and accounting" of the Law Enforcement Trust Fund, which is comprised of money from drug forfeitures and earmarked for narcotics enforcement, said Seth Gitell, spokesman for Mayor Thomas M. Menino.

Yesterday, the Herald reported that the Mississippi-based company Ron Smith and Associates has been paid nearly $250,000 in BPD money to clear a backlog of fingerprint evidence.

The bulk of the money came from the Law Enforcement Trust Fund — including a $25,872 payment for a fingerprint training class last September that was paid just months before the unit was shut down.

That payment was questioned by the Boston Finance Commission, which said a city contract is required for an amount that large.

The fund also was used to buy $9,864 worth of crime scene cones and 36 cameras at $1,000 each for the BPD's Bureau of Investigative Services, the Herald reported.

"It's a relatively common business practice to have an accounting entity review a public trust," Gitell said. "The review will encompass a range of the trust's expenditures and contracts."

Gitell said the audit will include questions raised by the Herald.

Ron Smith and Associates was hired last April to conduct a review of the BPD's fingerprint unit, a report that earned the firm $16,705 from the Law Enforcement Trust Fund. The firm then was hired to analyze the BPD's latent prints until the department could hire civilian scientists.

The contract ends this month, and Police Commissioner Kathleen O'Toole said she intends to extend it without putting it out to public bid.

Boston Herald, Sept. 17, 2005, Page No.

When asked how much more the BPD is expected to pay the company, Ambarik said, "I am not at liberty to discuss the terms of a contract in negotiations."

In February, the Herald reported that the BPD was spending up to $40,000 a month for the consultants to travel, along with Boston Tremont Hotel bills and per diem costs. At the time, BPD officials said the experts would stop working in May.