SUPREME JUDICIAL COURT
For the
COMMONWEALTH OF MASSACHUSETTS

NO. 08304

PLYMOUTH COUNTY

---

**COMMONWEALTH OF MASSACHUSETTS,**
Appellee,

Vs.

**JORDAN MARTEL RICE,**
Defendant, Appellant.

---

ON APPEAL FROM A JUDGMENT OF CONVICTION
AND SENTENCE IN THE BROCKTON SUPERIOR COURT

---

BRIEF FOR THE DEFENDANT-APPELLANT

---

DONALD A. HARWOOD, ESQ.
ITKOWITZ & HARWOOD
305 Broadway, 7th Floor
New York, NY 10007
(212) 822-1400
BBO# 225110

the issuance of a restraining order (R.72-73; *see* police reports dated August 9, 1995; September 23, 1995; and October 2, 1995, R. 129-152).

Because he had not committed the crime, Rice emphasized from the outset to his trial counsel the importance of preserving, maintaining, and analyzing any and all forensic evidence at the crime scene because it would establish that someone else committed the crime (R.73). He also asked trial counsel to investigate, obtain and present evidence establishing that other persons committed the crime, such as Madden or Morgan, and further, that Alan Paine and his family members and friends were lying when they testified that he had admitted complicity in the crime (R.73). Counsel failed to honor any of these requests, thereby forfeiting substantial defenses which undoubtedly would have resulted in Rice's acquittal of the crimes charged.

### *Counsel's Failure to Move For Preservation, Analysis And The Production Of Exculpatory Forensic Evidence*

By letter dated March 14, 1998 (R.154-155), Rice requested, among other things, that his trial counsel file a motion to compel any and all fingerprint evidence; to compel any and all hair and fiber evidence; to have such evidence "D.N.A. tested"; and, to have the court appoint a forensic pathologist and latent fingerprint expert for his defense. He made this request because, as stated in his letter to counsel, "All outlined issues are vital to proving my innocents [sic.] in this case" (R.74). Indeed, Rice wanted all of the crime scene evidence preserved and analyzed so that the true perpetrator of the crime would be revealed (R.74). He also wanted a pathologist to analyze the forensic evidence to ascertain the time

14

of the alleged victim's death, and to establish that there was no evidence of a sexual assault (R.74).

By reply letter dated March 11, 1998 (R.157-158), Rice's trial counsel declined to do any of the above. Counsel indicated that a forensic pathologist would be of no assistance to the defense; nor did counsel address Rice's request for preservation and analysis of forensic evidence (R.74-75). Instead, counsel indicated that the case would be decided only on "the accuracy and reliability of the DNA evidence. *The DNA test results and whether or not said results can be effectively challenged will decide the outcome of this case*" (emphasis added) (R. 157-158).

Counsel's comment upon DNA evidence referred only to his retention of defense experts to determine the accuracy and reliability of the Commonwealth's evidence that Rice's sperm was found in Harrigan's body (R.75). In other words, rather than develop evidence that person(s) other than Rice had committed the crime, Mr. Owens' sole focus was on attacking the Commonwealth's DNA/sexual intercourse evidence -- a manifestly unreasonable defense strategy. Not only was Rice obviously aware that he had sexual intercourse with Harrigan on the afternoon before the killing -- something he testified to at his trial -- the odds that the Commonwealth's DNA test had mistakenly identified his sperm were very small, i.e., 1 in 1.5 million according to the Commonwealth's June 30, 1997 report (R.160-162). Indeed, counsel's "approach" was not "strategic" at all since uncovering evidence that other person(s) had perpetrated the crime would not have been inconsistent with a defense that the Commonwealth's incriminating

15

DNA evidence was unreliable. Thus, counsel's "approach" was nothing more than a transparent excuse to fail to investigate other readily available and viable defenses (R.75-76). Counsel's inaction represented "not only behavior falling measurably below that which might be expected from a criminal defense lawyer of ordinary competence, but was also manifestly unreasonable conduct, devoid of any 'arguably reasoned tactical or strategic judgment.'" Commonwealth v. Brookins, 33 Mass.App.Ct. 626, 633-634 (1992), quoting Commonwealth v. Lykus, 406 Mass. 135, 139-140 (1989).

Moreover, there was ample forensic evidence retrieved by police investigators at the crime scene which could have been preserved, analyzed and tested by defense experts, including blood, hair, fiber, and print evidence -- which testing may have (and may still) establish that other person(s) committed the crime (R.76). The report of Commonwealth chemist Patricia A. Forti dated October 21, 1995 (R.164-171), lists no less than 65 items which were seized in connection with the police investigation of this case, many of which contained blood, hair and fiber evidence. Similarly, the Report of Commonwealth chemist Daniel Pratt dated December 29, 1997 (R.173-176), describes numerous locations at the crime scene where blood stains were found, including a kitchen faucet handle, knife in the bedroom, gold chain (recovered under victim's body), coffee cup inside the kitchen sink, toilet seat, telephone on couch, and couch cushions. Likewise, Trooper Patricia Beehan testified at trial that she seized a bloody palm print on a coffee cup in the kitchen sink (T.II/100,144-146; Ex. 41, T.II/177); hair from the bathroom sink (T.II/165-166); blood, hair and other fibers from the

living room, including the living room couch where the crime supposedly occurred (T.II/168,176-177); and, latent fingerprints from a left and right faucet of the kitchen sink, a telephone, a cigarette lighter, a rattan table, a smoke detector, and various other items (T.II/174-176).

Despite repeated written and oral demand by Rice, Mr. Owens simply refused to file any motion or make any request to have defense experts conduct comparison and/or DNA testing of the palm print(s), fingerprint(s), blood, hair, fiber and/or other forensic crime scene evidence against any of the other suspects in this case, including Jack Madden and/or James Morgan. After the Commonwealth's DNA testing of Madden and Morgan had proved negative (R.77), Rice continued to maintain to Mr. Owens that the true assailant's blood, hair, print, fiber or other forensic evidence could be found on recovered items at the crime scene, and that someone like Madden and Morgan must have killed Harrigan *out of hate even if he had not had sex with her* (R.77-78).

### *Counsel's Failure to Investigate And Present Forensic Evidence Establishing That No Rape Occurred*

Patricia Forti's Chemist Report dated October 21, 1995 (R.179) indicated that *a screening test for the presence of seminal fluid on Harrigan's pajama bottom "was **negative** on the crotch area."* Remarkably, Mr. Owens neglected to bring out even this crucial piece of evidence at trial, including in his cross-examination of Trooper Beehan, the Commonwealth's criminalist, which evidence would have completely undercut the Commonwealth's rape/murder theory against Rice, demonstrating that Harrigan was not raped at all, but rather, was simply murdered (R.78).

17

Likewise, the Commonwealth's Autopsy Report by Dr. Bruce Weiner dated March 6, 1996 (R.187-192), indicated that the victim's "... genitalia *are unremarkable*", i.e., there was no medical evidence of rape trauma (R.190, p. 4). Incredibly, Mr. Owens also neglected to bring out this crucial piece of evidence at the trial, including in his cross-examination of the Commonwealth's pathologist, Dr. Bruce Weiner (R.78).

There clearly was no conceivable "strategic" reason for these omissions by trial counsel.

### *Counsel's Failure to Investigate, Test And Present Evidence Concerning The Bloody Palm Print On the Coffee Cup*

Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of which were introduced at the trial as Ex. "41" (T.II/177).

The bloody palm print on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink -- according to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T.IV/22). The Commonwealth had obtained comparison prints of 48 individuals, including the victim and Rice, as well as James L. Morgan, John J. Madden, Jewell Whatley, and numerous others (T.II/158-159; *see also* Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (R.194-195).

18

Recognizing its evidential significance, Trooper Beehan testified at the trial that she took photographs of the bloody palm print, but that subsequently, an FBI agent, Randall Fitzwaters, destroyed the print when applying chemicals to enhance it (T.II/148-149). When showing photographs of the print to its own expert(s), including a specialist, Ron Smith of the Mississippi Crime Laboratory, the palm print allegedly lacked sufficient detail to be identified with any of the prints of the 47 suspects, including Rice (T.II/149,159-161,162-163). Trooper Beehan's Report dated May 30, 1996, also indicated that Smith believed that the print was, in some respects, consistent with that of the victim, but that there was insufficient detail to make a positive identification (R.194-195).

Rice insisted that Owens thoroughly investigate the Commonwealth's evidence on this point because: (i) he doubted that the print on the coffee cup had been destroyed, as claimed by Trooper Beehan; and, (ii) he truly believed (and still believes) that the true perpetrator of the crime could be determined with proper and thorough testing of the evidence. At the very least, confirmation from a defense expert that the print on the coffee cup did not belong to either Rice *or the victim* would have established that someone other than Rice -- known or unknown -- must have committed the crime. The Commonwealth's explanation that the bloody print "probably" belonged to the victim -- unchallenged at trial by Mr. Owens -- was baseless in fact or common sense. The bloody print was recovered on a cup *in the kitchen* and the Commonwealth's theory of the crime was that the victim died on a couch *in the living room* where she was held down, sexually assaulted, and then died from a rapidly fatal stab wound. On the

19

Commonwealth's own theory of the crime, an unknown assailant must have left the print on the coffee cup recovered from the kitchen *since the victim would have been physically incapacitated and/or prevented from doing so*. Notwithstanding Rice's insistence that the Commonwealth's evidence be thoroughly investigated and tested by a defense print expert, Mr. Owens refused to do anything at all in this regard (R.80).[4]

Moreover, since Rice's conviction, present counsel's investigator, Mr. Ron Rice, learned that: (i) Randall Fitzwaters, the FBI agent who supposedly destroyed the print on the coffee cup with chemicals, *denies any knowledge or involvement with the alleged destruction of evidence*; and, (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; *nor was Smith shown any of the comparison prints of Rice or any other suspects, directly contradicting Beehan's trial testimony that she brought with her all such comparison prints for Smith's examination* (T.II/162-163) (*see* Affidavit of Ron Rice sworn to October 25, 2002, R.310-317).

Had Attorney Owens conducted even a minimal investigation in this regard as Rice requested, he could have easily discredited the Commonwealth's claims in this regard at trial. Newly discovered evidence like this warrants a new trial because "it casts real doubt on the justice of the conviction." Commonwealth v.

---

[4] By his motion for post-conviction relief, Rice requested access to all of the Commonwealth's forensic evidence (including print evidence of Harrigan) for testing by new counsel and a retained expert; the motion for post-conviction relief was denied without a hearing and without any discovery.

20

Grace, 397 Mass. 303, 305 (1986). Additionally, a conviction based upon false testimony violates due process. Giglio v. United States, 405 U.S. 150 (1972) (conviction based upon perjured testimony violates due process); Napue v. Illinois, 360 U.S. 264 (1959) (same).

Indeed, following present counsel's having obtained Mr. Owens's file, it is obvious that he did not even read all of the materials contained within it concerning the coffee cup for use at Rice's trial. By Cellmark Laboratory report dated January 7, 1998, found by present counsel in Mr. Owens's file (R.198-199), *the Commonwealth tested DNA material which was recovered from stained materials on the telephone and coffee cup at the crime scene (DNA material could not be extracted from a toilet seat for testing). Cellmark's testing excluded Rice as the source of the DNA material on the telephone and the coffee cup -- a fact which, remarkably, Mr. Owens never brought out at the trial, including in his cross-examination of Trooper Beehan.*

Indeed, Trooper Beehan testified at trial that she had no knowledge of DNA testing being performed on the coffee cup (T.II/169-170); *Attorney Owens failed to confront Beehan with the Cellmark January 7th Report which **excluded** Rice as the source of DNA material on both the coffee cup and telephone.* There hardly can have been a "strategic" reason for Mr. Owens to fail to present this exclusion evidence and to impeach Trooper Beehan's demonstrably false testimony.

*Counsel's Failure to Move To Dismiss The Indictment*
*Due to The Commonwealth's Destruction of the Palm Print*

To the extent that the bloody palm print on the coffee cup was, in fact, destroyed, Rice argued in his new trial motion that trial counsel was ineffective in

21

failing to move to dismiss the indictments on the ground that potentially exculpatory evidence was destroyed (R.83-84). Commonwealth v. Gliniewicz, 398 Mass. 744 (1986) (destruction of blood evidence in course of testing destroyed potentially exculpatory evidence and required suppression); Commonwealth v. Sasville, 35 Mass.App.Ct. 15 (1993) (destruction of aborted fetus destroyed potentially exculpatory evidence and required dismissal). *See generally* United States v. Bryant, 439 F.2d 642 (1971); Commonwealth v. Willie, 400 Mass. 427 (1987); Commonwealth v. Olszewski, 401 Mass. 749 (1988).

As stated above, DNA and/or print testing of the coffee cup may very well have established the true identity of the assailant of the victim. The Commonwealth conceded the print was not that of the defendant; further, the Commonwealth's explanation that the bloody print may have belonged to the victim was dubious, at best, since the bloody print was recovered on a cup *in the kitchen*, and the Commonwealth's theory of the crime was that the victim died on a couch *in the living room* from a rapidly fatal stab wound. Thus, Rice maintained that the Commonwealth's destruction and/or suppression of such critically important evidence, which would have established the true identity of the assailant, justified dismissal of the indictment on due process grounds -- even though trial counsel ineffectively failed to previously move for dismissal (R.83-84). *See* Brady v. Maryland, 373 U.S. 83, 88 (1963) (prosecution must turn over exculpatory evidence even absent request from defense counsel); United States v. Agurs, 427 U.S. 97, 103 (1976); Commonwealth v. Tucceri, 412 Mass. 401, 414 (1992) (same).

*Counsel's Failure to Present Exculpatory*
*<u>Evidence Concerning The Culpability of Other Suspects</u>*

Counsel inexplicably and inexcusably failed to present exculpatory evidence that other suspects may have committed the crime.

a. *Jim Morgan*

Police investigation had established that the victim's ex-boyfriend, Jim Morgan, had physically abused her, resulting in the issuance of a restraining order (*see* police reports dated September 26, 1995; October 2, 1995; and October 3, 1995, R.201-208). Harrigan's family members reported that Morgan had gone to the Plymouth County jail, and when he was released six months before the killing, he contacted Harrigan and asked to see her, prompting her to be alarmed and to request a renewal of the restraining order (R.201-203). Moreover, police learned that ***on September 21, 1995, the day before the killing, a Deborah Hannon was present when Harrigan received no less than three (3) telephone calls from a person named "Jim", prompting Harrigan to say that he was "getting on her nerves"*** (R.204-205). When confronted by police, Morgan falsely claimed that he had not had contact with Harrigan for a month and that she declined to give him her new telephone number (R.206-208); regarding the restraining order, Morgan claimed that "he was suppose to have hit her" and "Dianne [Harrigan] wanted to get rid of him so she had him put in jail" (R.206-207).

Remarkably, Mr. Owens neglected to bring out any of the above evidence at trial in his examination of Commonwealth police officers and witnesses, nor did he independently investigate witnesses and evidence concerning Morgan's involvement in the crime despite my demand that he do so.

23