United States District Court
District Of Massachusetts

Jordan M. Rice,
        Petitioner,
v.
Bernard Brady,
        Respondent

No. 04-10859-MLW

Supplement Of Motions

Now comes Petitioner Jordan M. Rice and moves to Supplement the following motions pending before the Court possibly: 1) Petitioner's Travose in opposition to Respondent's Motion To Dismiss accompanied with request for Evidentiary Hearing and Discovery, 2) Request to Order Counsel to raise issues surrounding the Bloody Palm Print, 3) Renewed Request for Hearing on "Order To Show Cause And Temporary Restraining Order and 4) Renew Request for appointment of Counsel.

This Court found Rice's claim of Prosecutor Misconduct surrounding a Bloody Palm Print meritorious enough to warrant the appointment of counsel along with the fact Prison Officials are denying Rice access to the courts. Appointed Counsel, Eugene P. McCann, has refuse to pursue the Bloody Palm Print issues. And has stated in sworn affadavit that he deems all the claims surrounding the Bloody Palm Print are non-meritorious and has refused to pursue as the court appointed him to do so, which is reprisal for Rice registering complaints against his relative

2

## PAGE 1 OF

As I outlined in my First Packet, Trooper Beshan knowingly gave perjuried testimony in regards to FBI Agent Fitzwaters in regards to the Bloody Palm Print. But the FBI refuses to provide me with documentation demonstrating Trooper Beshan committed perjury. In the State of Massachusetts the FBI has a well documented history of aidding the State Law Enforcement via withholding documentation from wrongfully convicted defendants. Most infamously co-defendant's Peter Limone, Joseph Salvati and the late Louis Greco (Died in Prison) who all spended over 30 years in prison wrongfully convicted of murder, due to the FBI withholding documents (See Exhibit No. 1). Also there has been several other defendants in a number of cases but these three guys received national coverage. So it was no surprise history repeated itself in my wrongful conviction.

Trooper Beshan also gave perjuried in regards to Mississippi Latent Print Expert (See Exhibit No. 2). My then Private Investigate discovered this perjury too (See Exhibit No. 3). But it was surprising and a mystery why Mississippi Latent Print Expert Ron Smith refused to provide me with any documentation demonstrating the Massachusetts State Police, namely Trooper Beshan, committed perjury. On Sept. 16, & 17, 2005 Boston Herald Reporter Michele McPhee (617-619-6466) article solved the mystery. Mr. Smith's name sake company received lucrative no bid contracts from Massachusetts Law Enforcement (See Exhibit No. 4). Had Mr. Smith provided me documentation contradicting Massachusetts Law Enforcement then his companies corporate welfare would of been terminated. Single handedly this bloody palm prints will exonerate me!

This type of Good Boy Criminal System in Massachusetts, is why Massachusetts is the second highest wrongful conviction rate in the United States, only behIND Illinois whom has the First highest wrongful conviction rate!

Welcome to the Massachusetts Justice System!

# Suffolk DA clears Greco posthumously on 1965 murder rap

**By J.M. LAWRENCE**

Louis Greco died behind bars for murder after maintaining his innocence for 30 years.

Now the Suffolk District Attorney's office finally believes him.

Greco, a World War II veteran hobbled by a shot to the ankle in the Philippines, always claimed he was in Florida on March 12, 1965, when the mob shot Edward Deegan in a Chelsea alley. He passed three polygraphs and won two commutations that were never acted upon by former governors.

In a motion quietly filed in Suffolk Superior Court in September, the DA's office finally acknowledged what new testimony and secret FBI memos uncovered recently have revealed: Greco was framed by mob hit man-turned-government witness Joseph Barboza.

"It appears that justice may not have been done," Assistant DA Mark Lee said in the motion to drop all charges against Greco posthumously. The motion cites "legal and ethical considerations raised by the newly discovered FBI documents, as well as principles of consistency and fundamental fairness" as the reasons.

The DA's office dropped the charges against Greco's co-defendants Peter J. Limone and Joseph Salvati in January 2001. Limone was released after 33 years behind bars. Salvati was in prison for 30.

For Greco's family and friends, the DA's motion is a mere formality in a long battle to clear Greco's name and seek compensation from the FBI for backing perjured testimony in the case.

"Big (expletive) deal," said one longtime friend of Greco's about the move to drop the charges.

The Justice Department refuses to settle the lawsuits filed by Greco's estate, Limone and Salvati. The government has argued it can't be held responsible for the actions of FBI agents under tort laws in effect in the 1960s.

Former New England Mafia leader Francis P. Salemme told congressional investigators that former FBI agent Dennis Condon met with him in 1968 and laughed about setting up Greco.

Greco was 78 when he died in a prison hospital in 1995 from colon cancer. He suffered horribly, according to the suit filed by his son, Edward Greco. He could not get proper care for his diabetes and lost a leg to amputation.

His sons grew up without their father and watched him deteriorate in prison. Both men fell into deep depressions as adults. Louis Greco Jr. committed suicide by drinking a bottle of Drano in 1997, court papers said.

Attorney Howard Friedman, who represents Edward Greco, said the DA's decision to drop the charges will aid his lawsuit.

"He knew his father didn't do it," Friedman said. "This was an innocent man who was framed, and the most amazing part is the government knew it."



**GRECO: Cleared of murder charge by DA after dying in jail.**

*[Handwritten left margin:] The FBI is holding evidence that will exonerate me too.*

*[Handwritten bottom:] Please help my Family and I receive Justice, while I am still alive. Don't let me have to meet the same fate as the poor Mr. Greco to receive Justice because that would be UNAMERICAN.*

# Consultant has roots in religion

**By MICHELE McPHEE**

The symbol of the Mississippi-based fingerprint company that has been paid $250,000 in a no-bid contract by the BPD to analyze a backlog of latent prints is a Christian fish — and the firm's "philosophy" is a homespun aphorism invoking God's munificence.

On the Ron Smith and Associates Web site, the 3-year-old forensic consulting company states its philosophy: "GOD created only two kinds of days: Good Days and Great Days! One of the greatest blessings in life is that YOU get to pick which one YOU are going to have each morning when YOU wake up!"

The Web site does not link to president Ron Smith's resume or indicate past experience, but lists itself as a "forensic consulting, managing, and training" firm.

Still, the company motto is not rooted in any law enforcement principles.

Instead it reads, "We do the right thing because it is the right thing. We need no other reason!"

This week, the BPD provided a copy of Smith's resume. It showed that from 1987 until June 2002, when he started his company, Smith was an associate director of the Mississippi crime lab.

Before that, he spent a single year from 1972 to 1973 as an FBI fingerprint technician before moving to the Alabama Bureau of Investigation, where he worked until he was hired at the Mississippi Crime Lab.

Last week, Police Commissioner Kathleen O'Toole said Smith and his experts were the only company with the availability and expertise to examine the backlog of BPD prints. The contract Smith received — and is expected to be extended — was not put out to public bid.

"His company is the only entity that could do this work," said BPD legal adviser Amy Ambarick.

# Police keep fingerprint unit empty

## Firm grabbed $250G, looking for extension

**By MICHELE MCPHEE**

Nearly a year after the Boston Police Department shut down its fingerprint unit and paid an out-of-state firm almost a quarter million dollars to clear up the city's backlog of evidence, the BPD still has not hired its own fingerprint experts.

As a result, Police Commissioner Kathleen O'Toole plans to extend the pricey no-bid contract with Ron Smith and Associates — a Mississippi-based company that has already billed the BPD almost $250,000 in consulting fees, travel expenses, hotels, food and even lab coat costs, according to documentation obtained by the Herald.

The technicians are also paid $1,000 a day to testify about latent prints at court hearings, most recently at a homicide trial in Suffolk County this March.

The $204,618 contract ends on Sept. 30, but no civilian scientists have been hired, forcing the BPD to extend it to prevent another backlog of evidence from building up. Before the contract was in place, the BPD paid the company $42,577 — money that is now being questioned by watchdog groups.

"I truly believed we would get this done a lot faster," O'Toole said this week, referring to the delay in hiring in-house experts. "We had to negotiate with the union and identify the possible civilians to work in the unit."

O'Toole said she plans to hire a total of six forensics experts to work in the ID Unit. Police officers will no longer be responsible for examining latent prints.

The unit was shut down in October after Ron Smith and Associates wrote a scathing report about the BPD fingerprint unit shortly after a Roxbury man, Stephen Cowans, spent six years in jail because shoddy fingerprint analysis falsely linked him to the crime. Ron Smith was paid $16,705 for the report.

And, weeks before the unit shut down, the company was paid $25,872 for "fingerprint classification training," money that the executive director of the Boston Finance Commission said should not have been paid without a contract. The money came from the Law Enforcement Trust Fund, money seized from drug dealers earmarked for narcotics enforcement.

"You can't pay anyone $25,000 to do anything without a formal contract from the city," FinCom chief Jeff Conley said. "You just can't go out and spend public money without a contract in that amount."

Conley would not say whether the BPD could extend the contract without putting out to public bid, saying: "I have not seen a contract."

BPD legal adviser Amy Amabarik said the contract will be extended without being put out to public bid, saying, "the terms have not been solidified as of right now."

Exhibit No.

PAGE No.
1 of 2

BOSTON HERALD    FRIDAY, SEPTEMBER 16, 2005, g. No. 4 - Part 1 of 2

Exhibit No.
PAGE 2 of 2

## WHAT THEY BOUGHT

The bulk of the Law Enforcement Trust Fund money seized from Jan. 2004 until Aug. 2005 was used to pay Ron Smith & Associates, while other large payments went into the Criminal Investigation Division fund to pay drug informants. These are some of the other items purchased with trust fund money:

**Feb. 23, 2004:**
Software enhancements and customizations for the Coplink Program, which links law enforcement agencies to one another for

**$78,750**

**What that money could buy:**
three high-end undercover vehicles for BPD drug unit.

**Nov. 12, 2004:**
36 Olympus 5060 Digital Camera Kits for detectives from Perfecta Camera for

**$33,106.84**

**What that money could buy:**
New "kels," or hidden recording devices for BPD drug officers, who are using outdated equipment.

**Feb. 17, 2005:**
Crime scene evidence cones for

**$9,864.87**

**What that money could buy:**
Infrared cameras for night recording of drug dealers in city parks.



## THE MONEY TRAIL

Ron Smith and Associates has been paid nearly $250,000 in BPD funds to evaluate the department's latent print unit and to clear a backlog of evidence. Here's where the money came from:

**$172,577**
was paid from the Law Enforcement Trust Fund, which is earmarked for drug enforcement activities.

**$11,333**
was paid from the Edward Byrne Grant, named for a slain New York City cop and awarded to police departments to establish anti-drug task forces.

**$63,285**
was paid from the BPD's yearly operational budget.

STAFF GRAPHIC BY SARAH DUBOIS

## Questions raised, city orders an audit for police trust fund

**By MICHELE McPHEE**

The city has hired a white-shoe accounting firm to conduct an independent audit of the Boston Police Department's Law Enforcement Trust Fund, and part of that review will include questions about $172,577 paid from the fund to a forensic firm in a no-bid contract, officials said yesterday.

The firm KPMG was hired in recent months to review the "finances and accounting" of the Law Enforcement Trust Fund, which is comprised of money from drug forfeitures and earmarked for narcotics enforcement, said Seth Gitell, spokesman for Mayor Thomas M. Menino.

Yesterday, the Herald reported that the Mississippi-based company Ron Smith and Associates has been paid nearly $250,000 in BPD money to clear a backlog of fingerprint evidence.

The bulk of the money came from the Law Enforcement Trust Fund — including a $25,872 payment for a fingerprint training class last September that was paid just months before the unit was shut down.

That payment was questioned by the Boston Finance Commission, which said a city contract is required for an amount that large.

The fund also was used to buy $9,864 worth of crime scene cones and 36 cameras at $1,000 each for the BPD's Bureau of Investigative Services, the Herald reported.

"It's a relatively common business practice to have an accounting entity review a public trust," Gitell said. "The review will encompass a range of the trust's expenditures and contracts."

Gitell said the audit will include questions raised by the Herald.

Ron Smith and Associates was hired last April to conduct a review of the BPD's fingerprint unit, a report that earned the firm $16,705 from the Law Enforcement Trust Fund. The firm then was hired to analyze the BPD's latent prints until the department could hire civilian scientists.

The contract ends this month, and Police Commissioner Kathleen O'Toole said she intends to extend it without putting it out to public bid.

Boston Herald, Sept. 17, 2005, Page No.

When asked how much more the BPD is expected to pay the company, Ambarik said, "I am not at liberty to discuss the terms of a con-tract in negotiations."

In February, the Herald reported that the BPD was spending up to $40,000 a month for the consultants to travel, along with Boston Tremont Hotel bills and per diem costs. At the time, BPD officials said the experts would stop working in May.

1

At my trial, a Massachusetts State Trooper (Patricia Beehan), a crime scene expert, testified that, "She took a bloody palm print found on a cup at the crime scene to F.B.I. Latent Print Expert Randall Fitzwaters, who was conducting a seminar. While Agent Fitzwaters was applying chemicals to enhance the print, he destroyed it". There was never any pretrial discovery to any of the print evidence, which is a serious violation of Massachusetts Rules of Courts. Nor was Agent Fitzwaters called to testify at my trial. I have enclosed, in part trial testimony of Trooper Beehan (Marked Exhibit No. A).

Since my trial, I have learned through my Former Counsel's Private Investigator that FBI Agent Fitzwaters, who supposedly destroyed the print on the cup with chemicals, denies any knowledge or involvement in the alleged destruction of the palm print. I have enclosed, the Affidavit of my Former Private Investigator Ronald H. Rice (Marked Exhibit No. B).

The Massachusetts State Police fabricated a story about Agent Fitzwaters destroying the bloody print, because this bloody print was an exculpatory piece of evidence that will exonerate me. The State Police withheld the bloody print to secure this conviction against me.

I will now demonstrate more perjury in regards to fingerprint evidence by Ms. Beehan. At my trial, Ms. Beehan further testified under direct-examination at the crime scene a palm print impression on the bathroom sink supposedly wasn't initially present, when she made her first over-all review of the crime scene. The print was inadvertently left by a Police Officer, Fire Fighter and other personnel at the crime scene (See Exhibit No. C). Under cross-examination Ms. Beehan testified she never filed a report in regards to this print but after working more than a hundred crime scene's, she could testify from her memory about this print (See Exhibit No. D).

The reason why it's impossible for the police or other personnel to contaminate the crime scene is they are trained to preserve the crime scene. As a precaution the State Police post a sign outside the entry of each and every crime scene (See Exhibit No. E). Also the reason why it's impossible for a Fire Fighter

to contaminate the crime scene is pursuant to their protocol they must wear Gloves while in a fire scene to safe guard from injuries (See Exhibit No. F, Page 2 & 3).

At the time of my arrangement through my wrongful conviction, the now U.S. Attorney Michael J. Sullivan was the Plymouth County District Attorney. Every office Mr. Sullivan is Head Prosecuting Attorney, has a history of withholding exculpatory evidence from defendants (See Exhibit No. G).

Former Massachusetts State Police Colonel Thomas Foley has publicly condemned the Federal Government for their use of James "Whitey" Bulger and Stephen "The Rifleman" Flemmi as informants and for allegedly withholding evidence for 30 years that would have exonerated Joseph Salvati, Peter Limone and two other co-defendants in the Deegan Murder.

Now, coincidently, it's the State Police, who are withholding evidence and wrongly accusing the FBI of destroying the evidence that will exonerate me, along with other forensic evidence. If an independent probe is conducted into my wrongful conviction, it would be further discovered the State Police perjured themselves by coaching and feeding five witnesses, all from the same family, information to secure this conviction against me. Work records of this family would prove this point and my work records has already proved this point.

Also, there were other prints, blood samples, hairs and fiber's found at the crime scene that were never tested in anyway. And D.N.A. testing was available in Massachusetts when the crime I am now wrongly convicted of was committed. Testing of all the forensic evidence seized from the crime scene will establish the true identification of the murderer in the case. Who is James Morgan, the victims abusive ex-boyfriend. Mr. Morgan has confessed to committing this murder to a number of his friends. My Trial Attorney Henry Owens,

who conspired with the Prosecutor to convict me, has been disbarred from Practicing Law for his Malpractice Representation of other clients (See Exhibit No. H). The Massachusetts Justice System has a very high wrongful conviction rate, which is the second highest in the United States (See Exhibit No(s). I & J).

I now would like to Supplement my meritorious story about the bloody palm print on PAGE No. 1 of this packet with Newly Discovered Evidence that cast a further shadow of doubt on Ms. Beehan Fictitious story "in regards to FBI Agent Randall Fitzwaters destroying the bloody palm print on a Coffee Cup.

I have discovered two of the same State Police "Evidence Recovery Log." The First Log marked Exhibit No. K shows Trooper Joseph Mason logging the bloody palm print on the coffee cup "in on Oct. 31, 1996. The Second Log marked Exhibit No. L appear to be altered to remove the Oct. 31, 1996 date. Also on the second page of both Exhibit K & L doesn't rule out on this bloody palm print as being of Latent Print Value!

Both Pages of Exhibits K & L substantiate my meritorious claims of the State Police withholding this Bloody Palm Print and numerous other Forensic Pieces of Evidence that will exonerate beyond a reasonable doubt! Please Exhibit No. K in regards to the bloody palm being present is dated Oct. 31, 1996, which is over a year from the Sept. 27, 1995 date Ms. Beehan frivolously claimed F BI Agent Fitzwater destroyed it (See Exhibit No. A). As I earlier demonstrated Agent Fitzwater denied destroying the bloody palm print to my Former Private Investigator (See Exhibit No. B). Now it is clear Agent Fitzwaters didn't destroy the Bloody Palm Print and the State Police is withholding a exculpatory piece of evidence that will prove my innocences!

Exhibit No. A

Page 1 of 3

From Trial Transcript
Day 2/Oct 14.1998

1    palm print cards that I, myself had taken from

2    numerous people in and around the area.

3    Q    One of those is Mr. Rice?

4    A    Yes, sir.

5    Q    Now, the print that was on the coffee cup in

6    blood, how many points were you able to discern of

7    that particular cup?

8    A    I could only see approximately four points, four

9    characteristics.  Four points was all I was able to

10   see.

Start Reading Here.

11   Q    Now, in order to assist you, did you consult

12   with other individuals on how to proceed with this

13   particular print?

14   A    Yes, I do.

15   Q    Who are those individuals?

16   A    When I was still trying to develop to see if I

17   could develop this print more to have more points

18   become visible to the eye, I spoke with Lieutenant

19   Kenneth Martin from my office to see if he could

20   assist me in other chemicals that I was not familiar

21   with, trying to enhance this print.  In turn, he and

22   myself went to Rhode Island.  There was a seminar on

23   developing prints, different ways, one of them being

24   how to develop prints left in blood.

Exhibit No. A
Page 2 of 3
From Trial Transcript
Day 2-Oct. 14, 1998

148

1   Q    Who was conducting that?

2   A    Mr. Fitzwaters, and he was from the

3   Washington FBI Lab out there.  He is a latent print

4   examiner out there.

5   Q    When did this happen?

6   A    I did this on the 27th of September, of 1995, of

7   that year, a couple of days after the scene itself.

8   Q    Now, when you went to Rhode Island, where in

9   particular in Rhode Island did you go?

10  A    The seminar was held at the Johnson & Wales

11  facility out in -- Seekonk, Massachusetts, right on

12  the Rhode Island/Mass. line.

13  Q    Once you went there did you present this item to

14  Mr. Fitzwater?

15  A    Yes, I did.

16  Q    How did you package it for your journey?

17  A    I had it in a box, upside down, and I had it

18  barricaded around, so it would not move, with

19  different other small boxes with tissues, with paper

20  towels so it would stay stationary in the box, not to

21  disturb the print.

22  Q    Okay.  Was that item presented to this

23  individual?

24  A    Yes.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Exhibit No. A
Page 3 of 3
From Trial Transcript
Day 2 - Oct. 14, 1998

149

| | |
|---|---|
| 1 | Q    Did he attempt to enhance the print? |
| 2 | A    Yes, he did. |
| 3 | Q    What happened when he attempted to enhance the |
| 4 | print? |
| 5 | A    Inadvertently when he was -- the chemicals we |
| 6 | work with are very wet; they're liquid, our |
| 7 | chemicals, and while he was working with another |
| 8 | chemical, trying to enhance the print, his gloved |
| 9 | hand was also wet, and when he went to roll the cup, |
| 10 | trying to put the chemicals on the outside of the |
| 11 | cup, he inadvertently held the handle of the cup and |
| 12. | wiped away my print.  He washed it away. |
| 13 | Q    Now, this was obviously before you had taken a |
| 14 | photograph? |
| 15 | A    I had taken a photograph of it, yes. |
| 16 | Q    You still had the photograph? |
| 17 | A    I still had the photograph. |
| 18 | Q    Did you take that photograph to somebody to try |
| 19 | to get help in enhancing it? |
| 20 | A    Yes, I did. |
| 21 | Q    Who was that, please? |
| 22 | A    One of the people was Juan Smith.  He's a palm |
| 23 | print expert out of the Mississippi Crime Lab in |
| 24 | Meridian, Mississippi. |

Stop
Reading
Here.

Exhibit No. B
Page 1 of 3



# NEW ENGLAND LEGAL INVESTIGATIONS

### *Certified Handwriting and Profiling Experts*
*53 AMANDA AVENUE • PLYMOUTH, MA 02360*
*TEL: (508) 759-2551 • FAX: (508) 759-4672*

CRIMINAL
INDUSTRIAL
INSURANCE
FORENSIC

October 24, 2002

Donald Harwood
Attorney At Law
c/o Primo Law Firm
20 Corporate Woods Blvd.
Albany, New York 12211

### *AFFIDAVIT OF RONALD H. RICE*

I, Ronald H. Rice, hereby depose and state as follows:

I am a fully licensed Private Investigator through the Massachusetts Department Of State Police, license number: P-99 (copy attached). I have been retained by the defendant, Jordan M. Rice.

On Friday, October 4, 2002, I spoke with an FBI agent, Randall Fitzwater, who supposedly destroyed a palm print on a coffee cup with chemicals, according to the trial testimony of trooper Patricia A. Beehan.

Mr. Fitzwater expressly denied any knowledge, remembrance or involvement with this alleged destruction of evidence, although he declined to forward an affidavit to me in this regard.

On Friday, October 4, 2002, I spoke with Ron Smith, a latent print expert, formerly of the Mississippi Crime Laboratory, who supposedly provided a forensic opinion to the Common-wealth concerning the bloody palm print found on a coffee cup in the kitchen sink at the crime scene.

Mr. Smith told me that he *did not* provide a forensic opinion to the Commonwealth, only a curtesy opinion, as there was not enough detail to include or exclude the victim as the source of the print; nor was Mr. Smith shown any of the comparison prints of Mr. Rice or any other sus-pect, contradicting trooper Beehan's trial testimony that she brought with her all such compar-ison prints for Smith's examination. Mr. Smith was unable to forward an affidavit to me in this regard.

Attached hereto is a certified copy of a restraining order dated 1/26/94 that the victim obtained against James Morgan.





2 of 2

Signed under the penalties of perjury this 24th day of October at Plymouth, MA.

_____
Ronald H. Rice

Exhibit No. B

Page 2 of 3



Exhibit No. B
Page 3 of 3

# The Commonwealth of Massachusetts

## Department of State Police

This is to certify that  CHECKMATE FORENSIC SERVICES, INC.

of  PLYMOUTH, MASSACHUSETTS

has been duly licensed to conduct the business of a

under the title of  **PRIVATE DETECTIVE**

NEW ENGLAND LEGAL INVESTIGATIONS (RONALD H. RICE, RESIDENT MANAGER)

at  53 AMANDA AVENUE, PLYMOUTH, MASSACHUSETTS 02360

in accordance with the provisions of Section 22-30, Chapter 147, of the General Laws,

from  AUGUST 31, 2002    to    AUGUST 31, 2003

(License Number P-99)

_Thomas J. Foley, Colonel_

THIS LICENSE DOES NOT CONFER UPON THE LICENSEE THE POWER AND THE AUTHORITY OF A CONSTABLE OR POLICE

Exhibit No. C
PAGE 1 of 2
From Trial Transcript
Day 2 / oct. 14, 1998

107

1    bathroom.

2    Q    Is that a fair and accurate representation of

3    the way that looked on the morning in question?

4    A    Yes.

5                    MR. O'CONNELL:  I offer it, your

6    Honor.

7                    THE COURT:  Very well.

Start
reading
here.

8    (Photo of toilet seat is marked as Exhibit 23)

9    Q    (By Mr. O'Connell) I show you this.  Do you

10   recognize that?

11   A    Yes.

12   Q    What do you recognize that to be?

13   A    It is the sink in the bathroom with soap, and a

14   palm print impression on it.

15   Q    Is that a fair and accurate representation of

16   the appearance of that particular area on the morning

17   in question?

18   A    Not initially.

19   Q    What was initially?

20   A    When I first arrived at the scene and I did my

21   overall view of the apartment itself, the sink in the

22   picture here did not have this void, this palm print

23   impression, at the time.  During the course of the

24   examination of the house, three were a lot of police

FORM CSR · LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Exhibit No. C
PAGE 2 of 2
From Trial Transcript
Day / Oct. 14, 1998

1    officers, fire fighters and other personnel in the

2    apartment.  Inadvertently, one of these other members

3    touched the sink, and left a palm print.  It was

4    photographed.  We had not started doing all of the

5    photographs by time.  That was there, but it was not

6    there when I arrived at the scene.

7                    MR. O'CONNELL:  I ask that this be

8    marked for identification.  I'll offer it.

9                    THE COURT:  Thank you.  It may be an

10   exhibit.

11   (Photograph of bathroom sink is marked as Exhibit 24)

12   Q    (By Mr. O'Connell)  I show you those

13   photographs.  Do you recognize what is in those

14   photographs?

15   A    Yes.

16   Q    What is in those photographs?

17   A    They're part of the couch that was in the living

18   room, a pillow or a part of the couch cushion.

19   Q    Do those photographs fairly and accurately

20   depict the location of that pillow when those

21   photographs were taken that morning?

22   A    Yes, they were brought up by the firefighters, I

23   believe.

24                    MR. O'CONNELL:  I'd offer those, your

Stop
Reading
here.

Exhibit No. D
PAGE 1 of 3
From Trial Transcript
Day 2/Oct. 14, 1998

1    investigation; was it not?

2    A    Yes.

3    Q    Because you were trying to preserve as much

4    evidence as you could that would help you determine

5    what happened at the scene?

6    A    That's correct.

7    Q    And as part of that investigation, was it

8    apparent that the victim had stab wounds?

9    A    It appeared that that's what it was.

10    Q    As part of your investigation, did you make a

11    search for knives that may have been the weapon used?

12    A    We searched for knives; yes, sir.

13    Q    And that was at the scene?

14    A    Yes, sir.

15    Q    In addition to that, you've indicated that you

16    were concerned, as you would in any investigation, as

17    to latent or fingerprints that may have been at the

18    scene; is that correct?

19    A    Yes, sir.

start
kedding
here

20    Q    And I think you testified, I think it's Exhibit

21    Number 24.  I'm going to show you what has been

22    marked as Exhibit 24.  And you recall the testimony

23    concerning that photograph; do you not?

24    A    Yes, I do.

Exhibit No. D
PAGE 2 of 3
From Trial Transcript
Day 2 /oct. 14, 1998

1    Q    And it's your testimony that that had been left

2    by a firefighter or someone who was at the scene?

3    A    Someone at the scene; yes.

4    Q    But you don't know that; do you?

5    A    Yes, I do.

6    Q    How do you know?

7    A    Because when I first entered the apartment, that

8    palm print was not on the sink.

9    Q    Is that part of your report, in your report, did

10   you make a note that when I first entered the

11   apartment, you did not observe any palm print on the

12   sink?

13   A    I didn't make a report to that, no.

14   Q    So, is it your testimony before the jury today

15   that you're testifying from your memory?

16   A    On this, yes, I am sir; yes.

17   Q    Since the date that you were at this crime

18   scene, approximately how many other crime scenes have

19   you been at?

20   A    Quite a few.

21   Q    When you say quite a few, more than a dozen?

22   A    Yes, sir.

23   Q    More than fifty?

24   A    Yes, sir.

Exhibit No. D
PAGE 3 of 3
From Trial Transcript
Day 2 | oct. 14, 1998

1  Q     Less than a hundred?

2  A     More than a hundred.

3  Q     More than a hundred, and it's your testimony you

4  remember from memory only that that print was not

5  there when you first arrived?

6  A     Yes, sir.

7  Q     Yet, there's nothing in your report that will

8  reflect this?

9  A     No, sir.

10 Q     Is it fair to say that you drafted your report a

11 short time after you were at the crime scene?

12 A     Yes, sir.

13 Q     How many pages does your report consist of?

14 A     Including the diaries, I believe ten to eleven

15 pages.

16 Q     It's a rather detailed report?

17 A     It's a generic report.

18 Q     You tried to include all the information you

19 saw, that you observed, or that was a result of your

20 crime scene investigation; is that a fair

21 characterization of it?

22 A     My report consists of the evidence that I

23 collected, what I processed, my diagram, and the

24 address, and the victim of the scene.

Stop
Reading
here.

Exhibit No. E



Exhibit No. F
PAGE 1 of 3

# STANDARD OPERATING PROCEDURE #41
## PERSONAL PROTECTIVE EQUIPMENT

**Purpose:**   The purpose of this procedure is to assure that all personnel are prepared to commence fire suppression or rescue operations immediately on arrival at the emergency scene while maintaining the highest degree of personal safety for all personnel.

**Scope:**   This procedure shall apply to all personnel operating at the scene of any emergency incident or training exercise.

**Responsibility:**   Primary responsibility for adherence to this procedure rests with each individual. Company officers are responsible for enforcement of this procedure within their respective companies. District chiefs are responsible for enforcement of this procedure within their respective districts.

**Definitions:**   Protective clothing: For purposes of this procedure, "full protective clothing" shall consist of helmet, fire coat, jump pants and boots.

Protective equipment: For purposes of this procedure, "full protective equipment" shall consist of full protective clothing plus SCBA, hood and gloves.

Safety officer: Officer assigned by the incident commander to be responsible for monitoring and assessing safety hazards or unsafe situations and developing measures for insuring personal safety.

**Procedures:**

41.1. All firefighting personnel shall wear full protective clothing when responding to any type of alarm indicative of fire, potential fire, explosion, potential explosion, or release of any type of hazardous materials. All protective clothing shall be donned prior to boarding the apparatus. Full protecting clothing is optional for drivers and command personnel during response.

41.2 Upon arrival on the scene of any incidents mentioned in 41.1, all firefighting personnel shall don full protective equipment. In addition to full protective equipment, all firefighters shall take with them one tool for possible use at the incident, (i. e. haligan tool, flat head axe, pike pole, etc.) the specific tool to be determined by the company officer.

41.3 If any alarm mentioned in 41.1 is received while the apparatus is out of quarters, the apparatus shall come to a complete stop, and all personnel shall don full protective

clothing before proceeding to the emergency scene and prior to beginning any emergency operations.

41.4 Under no circumstances shall any aspect of personal safety be sacrificed in order to increase the speed of emergency operations. Emergency operations shall not commence until all personnel involved in that particular aspect of the operation have donned full protective equipment.

41.5 Personnel operating at the scene of an EMS or rescue incident shall wear whatever protective equipment is necessary to assure personal safety during the incident, as stated in SOP #30.

41.6 Gloves and a face shield in addition to full protective clothing shall be worn by all personnel operating power tools, hydraulic tools or forcible entry tools. Full protective clothing shall also be required for all personnel in any area where those tools are being used.

41.7 Gloves shall be worn at all times when hand tools, power tools, hose, ladders, or any other equipment is used that could cause injury to the hands. Gloves shall always be used when any personnel are involved in any action pertaining to a window, including opening of, ventilating, making entry to a building through, etc. This shall include all work details, maintenance operations and training exercises.

41.8 Helmets shall not be required to be worn by personnel returning from an incident or in other non response modes. Chauffeurs may drive without their helmet but must don their helmet with chin strap as soon as they arrive at the incident. The chauffeur shall don fire coat and jump pants when they arrive at the scene of an incident. Command personnel must don their helmet as soon as they arrive on the scene.

41.9 Protective hoods shall be worn as specified above. Protective hoods and an activated PASS device are required for all personnel making entry into any environment that requires use of SCBA.

41.10 No alterations, such as removal of coat liners or jump pants liners, shall be made to protective clothing without the approval of the chief.

41.11 Members shall be fully clothed beneath their full protective clothing (wearing the appropriate work uniform).

41.12 Unless the safety of the atmosphere can be determined by testing and continuous monitoring, all personnel shall wear SCBA while working in areas where:

    A. The atmosphere is hazardous.

    B. The atmosphere is suspected of being hazardous.

    C. The atmosphere may rapidly become hazardous.

41.12 Members working with SCBA shall always work in a group of at least two.

41.13 The incident commander, after conferring with the incident safety officer, if designated, shall determine when and if it is safe to remove some or all of the protective clothing or equipment.

41.14 SCBA shall not be removed until the incident safety officer or incident commander has determined by testing that the atmosphere is no longer hazardous and that carbon monoxide levels are less than 35 ppm.

41.15 Incident commanders may use their discretion to determine the appropriate level of protective equipment required for personnel operating at incidents where no specific

guidelines have been established. In all cases, personnel shall be required to wear all protective equipment necessary to protect the safety of the individual members.

41.16 Each individual is responsible to insure by personal inspection at the beginning of their work shift, that all of their personal protective equipment, including SCBA is in good working condition. Any deficiency found in any members personal protective equipment shall be promptly reported to the Company Officer who will then notify fire alarm.

41.17 Once each year in the month of December, Company Officers shall personally inspect all protective equipment for each firefighter assigned to their company. The inspection shall be made in accordance with the guidelines of the current contract to assure that all personnel have all necessary equipment and that it is in useable condition. Any deficiency found in any members personal protective equipment shall be reported on a form #2 or the "Request to replace Protective Gear" form to the Deputy Chief.

Exhibit No. F
PAGE 3 of 3

Exhibit No. G

# Federal judge up in arms over prosecutors' evidence gaffes

B-H. 11/21/02.

By J.M. LAWRENCE

An irate federal judge ordered U.S. marshals to be ready to yank U.S. Attorney Michael J. Sullivan out of a dentist's chair yesterday morning when the top prosecutor failed to appear to defend his office's late disclosures of evidence.

"I've got the U.S. marshal here, because I was contemplating sending him to the dentist," U.S. District Court Judge Mark L. Wolf said from the bench yesterday.

Just before 9 a.m. Wolf ordered Sullivan to personally appear at 10 a.m. to face questions about a series of cases after previously undisclosed evidence derailed Wolf's schedule in a Swansea gun and drug case.

Prosecutors' failure to hand over evidence has led to two mistrials in Wolf's courtroom already this year, while on Monday, U.S. District Court Judge Joseph L. Tauro scorned a bank robbery trial when prosecutors failed to hand over fingerprints.

Sullivan yesterday chose to keep a 10 a.m. appointment for a speaking engagement in Plymouth and sent the chief of the office's criminal division, James B. Farmer, to Wolf's courtroom.

"Quite frankly, I really would have expected that a speaking engagement wouldn't trump a court order," Wolf said.

The judge ordered Sullivan to file an affidavit by noon today "to explain why he has willfully disobeyed my order to 'be here'" and to appear before Wolf on Monday.

Sullivan declined comment on the incident but said his office would file the affidavit today.

The judge's ire comes as defense attorneys are clamoring about an alleged pattern of prosecutors withholding evidence they are legally obligated to turn over to defendants well before trial.

"This series of events shows there is a real systemic problem with prosecutors and agents not paying proper attention to their obligations," said attorney Charles Rankin, president of the defense lawyers' association.

Sullivan dismissed the claim, citing an earlier affidavit he filed with Wolf stating the office faced 19 alleged disclosure violations out of more than 800 criminal cases in the past two years.

"There's no basis. Our experience is just the opposite," Sullivan said. "We're fully committed to timely and complete compliance with our discovery obligation."

He called recent incidents "unintentional" stemming from "human error" when prosecutors are faced with hundreds of reports and other documents before trial.

In the case before Wolf yesterday, a prosecutor revealed he had just discovered an additional state trooper's report about the night police raided a Swansea motel room on April 23, 2001. A 16-year-old girl reported two armed drug dealers had raped her and were holding a 15-year-old girl captive.

Attorney Stephen Hrones, who represents one of the accused men, Leonard Baskin, said the report contradicts police claims that they found a gun under a mattress when they busted into the room and searched for more suspects.

Hrones has asked Wolf to throw out evidence of the gun because police had no search warrant to look under the mattress. The newly obtained report shows the 15-year-old victim told police that night where to find the gun.

Baskin, 24, who has a prior criminal record, faces substantial additional prison time if convicted of possessing a gun in addition to cocaine found in the motel.

Wearing an orange prisoner's jumpsuit yesterday, Baskin sat with his head in his hands as the judge ticked off cases in which he found prosecutors failed to produce evidence on time.

Wolf, who held the landmark hearings in 1998 that exposed the FBI's relationship with gangster informants, declared a mistrial on Friday in a case involving a felon found with a gun in his pants during a traffic stop in West Bridgewater.

In April, the judge threw out a case against an alleged marijuana dealer three months after declaring a mistrial in the case and accused federal prosecutors of a pattern of "extreme misconduct."

Rankin attributes the problem to a lack of training for police and other government agencies who don't open their files fully to prosecutors. "I think the overwhelming majority of prosecutors do their best to comply with their obligations. There's an institutional problem," he said.

FRom Boston Herald Newspaper dated Nov. 21, 2002

# Boston lawyer Owens faces suspension

## BY ERIC CONVEY

One of Boston's highest-flying legal eagles is fighting to keep his wings from getting clipped.

Civil rights lawyer Henry Owens III, who has fought some of the biggest race-related cases in recent Boston history, will be banned from practicing law for four years if the Board of Bar Overseers and Supreme Judicial Court follow a recommendation from a single BBO hearing officer.

In a scathing report, the hearing officer concluded that Owens gave false testimony in a case and over the course of several years held onto nearly $100,000 that was not rightfully his. In one disciplinary case, hearing officer John I. Mirick wrote, Owens offered "testimony (that) is not credible."

Owens said last night that he was sure he'd be "vindicated" by the state's high court, if not by a Bar panel that reviews Mirick's report.

"I've been a fighter my entire career and I do not intend to stop fighting now — especially when an injustice has been served," Owens said.

In addition to criticizing the way that Owens handled money on three occasions, Mirick slammed the lawyer for the way he represented himself during disciplinary hearings last January.

"I do not find that Owens knowingly gave false testimony in the disciplinary proceedings," Mirick wrote. "Rather, I find that he had forgotten his prior testimony and, somewhat astonishingly for an experienced trial attorney, failed to review the prior testimony before testifying in the disciplinary hearing."

Working against Owens, Mirick wrote, is that the alleged misconduct was not carried out in the zealous defense of a client but was apparently for personal financial gain. Mirick suggested that Owens was having money problems at the time he allegedly held onto funds that should have been kept in escrow or returned to clients.

Most or all of the funds have since been returned, some after legal action. A board of overseers decision would not protect Owens from further legal action.

In one instance, Mirick alleges that Owens misrepresented himself in a case involving $50,000 claimed by the federal Department of Housing and Urban Development.

Popular within the defense bar, Owens is a flamboyant crusader against the status quo and a frequent critic of the Boston Police Department.

Among Owens' high-profile cases, he successfully sued the city for the widow of the Rev. Accelynne Williams, who died of a heart attack as police mistakenly stormed his home in a misguided 1994 drug raid.

Owens also represented appeals court judge Frederick Brown after Brown got into trouble with the Judicial Conduct Commission for making hostile remarks about the way judges are picked.

> **Owens is**
> **'a fighter**
> **because**
> **'an injustice'**
> **has been done.**

---

**Exhibit No.**
**H**
**Page 1 of 1**

---

Attorney Owens basically Stole my family and I money because my Parents gave him twenty-five Thousand dollars and he refused to file any standard Pretrial Motions. Had these motions been filed the false charges against me would of been dismissed or I would of been exonerated by an jury of my peers!

In fact I had no defense at all against my false Charges!

# Mass. must atone for jailed innocents

No sense reminding Lawyer Johnson that the wheels of justice turn slow.

Johnson spent 10 years in prison — two on death row — for a murder he didn't commit, and while it took prosecutors less than two years to convict an innocent man, it has taken the state almost 20 years to right its own wrongs.

Ever since his release in 1985, Johnson, 52, has been fighting a reasonable fight based on one of the central tenets of the American justice system: Those who have inflicted an injury must compensate those who have suffered the injury in an amount appropriate to the wrong inflicted.

There is no humane way to assess the "appropriate" amount owed someone like Johnson.

Yesterday the state Sen-

**Howard MANLY**

ate passed legislation to award those wrongfully convicted as much as $500,000 and to force officials to apologize.

State Sen. Dianne Wilkerson (D-Roxbury), a co-sponsor of the Senate version of the bill said her colleagues had little choice.

"This is more than a question of being fair," Wilkerson said, citing a recent Boston Herald series in which the faces of 21 wrongfully convicted men were published. "Those are the faces of reality and as a result of the countless stories that are appearing on a much too regular basis, the public pressure has become so intense that a responsible Legislature couldn't do anything but to approve this bill."

Once the bill is approved, Gov. Mitt Romney should also do the right thing and sign it

into law. Romney, a strong advocate for the death penalty, would at least have more credibility if he were to have the state accept responsibility.

Looking up an innocent man is bad enough: failing to acknowledge the mistake and compensate the innocent is worse, largely because the system depends on basic integrity. As it is now, 23 wrongfully convicted men have been exonerated and released over the last 22 years. Most of the convictions were overturned because of false identifications.

Until the apology and compensation become law, the wrongfully convicted must take their chances in court and sue the city or in some cases the detectives involved in pursuing them. It shouldn't come to that.

Just ask Johnson.

He was 18 when he was arrested for the murder of James Christian in Mission Hill. His conviction was based on the testimony of some less than outstanding citizen later believed to be the real killer. Johnson was sentenced to death in 1972. The state abolished its death penalty two years later, and Johnson remained in maximum security until 1982.

His case was overturned when a new witness came forward. A year later, the Legislature gave preliminary approval to a bill that would have given Johnson $75,000 but that measure failed to gain final approval. To add more salt on Johnson's wounds, the state awarded $500,000 in 1992 to Bobby Joe Leaster, another innocent man who spent 15 years in prison for a crime he didn't commit.

But Johnson kept pressing. In 1999, three legislators — Reps. Patricia Jehlen (D-Somerville), Byron Rushing (D-South End) and

Benjamin Swan (D-Springfield) — took up his cause, filed legislation to "pay him" $500,000. That bill has languished in the State House for the last five years. That's a crime in itself and was largely the result of an effective lobbying campaign waged by shameless district attorneys.

At one point, Johnson admits, he lost faith in the system.

"But then," Johnson said, "over a period of years, I realized that there are still some good people in government who would like to see against the death penalty and to see to it that I get rightfully compensated for this grave injustice that took 10 years of my life away from me."

Johnson can't get those 10 years back. But

### Lawyer Johnson is living proof of government's ability to err.

he is living proof of prosecutors' ability to make a mistake — and the death penalty's fatal flaw. And make no mistake about it. Compensation for the wrongfully convicted is part of the death penalty debate.

"The compensation is a prelude to the debate over Gov. Romney's much anticipated 'error-proof death penalty'," Wilkerson said. "There's no such thing as an error-proof death penalty. In each one of these wrongfully convicted cases, a jury deliberated long and hard and reached a decision that met the incredible difficult standard of beyond a reasonable doubt. But they were wrong. Dead wrong. But it happens. We're all human."

Johnson still must wait. But at least the rock is moving in the right direction—downhill.

*Howard Manly's column runs Sunday, Tuesday and Thursday.*

*Exhibit No. H*

The State of Massachusetts has the Second highest wrongful conviction in the United States. Illinois has the Highest wrongful conviction rate in the United States.

# Justice must be trial without error

**Jennifer CHIUNIAS and Neil RAPHAEL**

With the recent overturned conviction of Laurence Adams, Massachusetts has released 23 prisoners in the past 22 years based on new evidence that the individual was not guilty of the crime for which he or she had been convicted. DNA testing of evidence has been the catalyst for many exonerations.

In some cases, however, it has been the subsequent discovery of previously undetected but significant errors at trial that ultimately resulted in the individual's release.

For instance, in the case of Adams, newly discovered evidence showed that Boston police failed to turn over documents and reveal other evidence to defense lawyers that cast doubt on his guilt.

And Stephan Cowans was recently exonerated only after DNA testing and then the discovery of faulty fingerprint analysis demonstrated that he was not the perpetrator. Had the DNA testing of the evidence in Cowans' case not been done, the state likely never would have discovered that the fingerprint match that was apparently made at the time of trial was, in fact, mistaken.

The New England Innocence Project's mission is to locate and assist those individuals who have been wrongly convicted. NEIP focuses on cases involving DNA evidence makes it a relatively persuasive tool to obtain a new trial. However, of the approximately 700 requests the NEIP has received for assistance since early 2000, the majority of these cases do not involve DNA evidence or are so old that any attempt to locate that evidence has proven nearly impossible.

These men and women who seek our assistance often have no further hope of justice.

There should be hope of justice for these individuals and for the original victims of the crimes for which they were wrongly convicted. The state can work to ensure that the necessary reforms are made to seek actual justice and to avoid the need for post-conviction relief. One way to do this is for the state to follow the lead of those states that have sought to enact legislation establishing "innocence commissions" to examine past cases that have resulted in wrongful convictions and sought to determine what went wrong. Other jurisdictions, including North Carolina and Connecticut, have dedicated resources to the establishment of a joint commission of prosecutors, defense counsel, judges, legal scholars and representatives of the victims of violent crimes.

These innocence commissions have broad investigative power to scrutinize individual wrongful convictions. The commission's work culminates in a report that makes recommendations on how to correct (or at least minimize) the systemic flaws that failed the victim and the accused. The commission's report can then be a springboard to audit other felony convictions.

The Governor's Council on Capital Punishment has recently adopted this very same idea in its report relating to a recommendation for the introduction of a capital punishment statute. In support of one of its themes that "no innocent person, nor any person who is guilty but legally ineligible for the death penalty, will ever wrongly be con-

## How many years will innocent people have to spend in prison?

demned to death," the council proposed the creation of a death-penalty review commission to review all claims of substantive error and to study the causes of such error.

However, the establishment of such a commission should not be limited to capital cases, and should begin now by examining the 23 cases in Massachusetts in which we already know there were serious errors in our criminal justice system that resulted in wrongful convictions. The establishment of an innocence commission as an independent agency with broad investigative powers to examine these cases is necessary to ensure that these mistakes do not continue to repeat themselves.

Those who are incarcerated and claim their actual innocence do not have strong political constituency. They are often ignored because of the perception that everyone who has been convicted of a crime claims that he or she is innocent. But any citizen who is concerned about fairness should be concerned about the spate of wrongful convictions in this state. Certainly, other prisoners in Massachusetts will be exonerated through DNA and other evidence in the next decade. The only question is how many years will these innocent men and women have to spend in prison and how many others will die in prison, while the true perpetrators remain free.

*Jennifer Chunias and Neil Raphael are lawyers at Testa, Hurwitz & Thibeault LLP, and work on the New England Innocence Project, a pro bono project of the firm.*

Exhibit No. 5

CASE# D95-0808

Exhibit No. K
PAGE 1 of 2

## MASSACHUSETTS STATE POLICE
## CRIME SCENE SERVICES SECTION
## EVIDENCE RECOVERY LOG

LOCATION  475 Battles Farm Dr., Brockton
DATE  9-23-95
VICTIM  Diane Harrigan
CRIME SCENE TECH.  Tpr. EM Clifford
                    Tpr. PA Beehan

INVEST. OFFICER  Tpr. Joseph Mason
EVID. OFFICER  Tprs. Clifford & Beehan
SIGNED
DATE/TIME  9-23-95

| ITEM# DESCRIPTION | WHERE FOUND | RECOVERED BY | MARKING Direct / Indirect | PACKAGE METHOD | RETURNED TO: DATE | SIGNATURE |
|---|---|---|---|---|---|---|
| Smoke detector | Under bed | EMC/PAB | I | Bag | 12-1-95 | Tpr.J.Mason |
| Misc papers | Bedroom floor | EMC/PAB | I | Bag | 9-23-95 | Tpr.J.Mason |
| Roll of film | Kitchen table | EMC/PAB | I | Bag | 12-1-95 | Tpr.J.Mason |
| Empty boxes soap | Bathrm wastebsk | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Coffee cup | Kitchen sink | EMC/PAB | I | Bag | 10-23-96 | |
| Phone,pink | Kitchen counter | EMC/PAB | I | Bag | 12-1-95 | Tpr.J.Mason |
| Key ring | Kitchen counter | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Kitchen sink faucet Kitchen | | EMC/PAB | I | Bag | | Tpr.J.Mason |
| -Right handle | | EMC/PAB | I | Bag | | Tpr.J.Mason |
| -Left handle | | EMC/PAB | I | Bag | | Tpr.J.Mason |
| -Base | | EMC/PAB | I | Bag | | Tpr.J.Mason |
| -Water purifier | | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Dial soap | Kitchen,over sink | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Fast orange soap | Kitchen,over sink | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Formica | Kitchen,log by sink | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Phone,white | Living rm.on couch | EMC/PAB | I | Bag | | Tpr.J.Mason |
| Remote control | LvRm.table by couch | EMC/PAB | I | Bag | | Tpr.J.Mason |

EVIDENCE PROCESSING RESULTS

RESULTS OF PROCESSING

No latent prints of value developed.

Did not process for prints.

Did not process for prints.

No latent prints of value developed.

Partial palm print (in blood).

No latent prints of value developed.

No latent prints of value developed.

Insufficient points on right faucet handle (in blood). No value on rest of faucet parts.

No latent prints of value developed.

No latent prints of value developed.

No latent prints of value developed (in blood).

No latent prints of value developed.

No latent prints of value developed.

TROOPER PATRICIA A. BEEHAN #0591
CRIME SCENE SERVICES SECTION
STATE POLICE MIDDLEBORO SUB-LAB

Exhibit No. K
PAGE 2 of 2

MASSACHUSETTS STATE POLICE
CRIME SCENE SERVICES SECTION
EVIDENCE RECOVERY LOG

CASE# D95-0808

Exhibit No. L
PAGE 1 of 2

LOCATION   475 Battles Farm Dr., Brockton
DATE     9-23-95
VICTIM   Diane Harrigan
CRIME SCENE TECH.  Tpr. EM Clifford
                   Tpr. PA Beehan

INVEST. OFFICER  Tpr. Joseph Mason
EVID. OFFICER  Trs. Clifford & Beehan
SIGNED
DATE/TIME  9-23-95

| ITEM# | DESCRIPTION | WHERE FOUND | RECOVERED BY | MARKING Direct | Indirect | PACKAGE METHOD | RETURNED TO: DATE | SIGNATURE |
|---|---|---|---|---|---|---|---|---|
| | Smoke detector | Under bed | EMC/PAB | I | | Bag | 12-1-95 | Tpr.J.Mason |
| | Misc papers | Bedroom floor | EMC/PAB | I | | Bag | 9-23-95 | Tpr.J.Mason |
| | Roll of film | Kitchen table | EMC/PAB | I | | Bag | 12-1-95 | Tpr.J.Mason |
| | Empty boxes soap | Bathrm wastebsk | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Coffee cup | Kitchen sink | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Phone,pink | Kitchen counter | EMC/PAB | I | | Bag | 12-1-95 | Tpr.J.Mason |
| | Key ring | Kitchen counter | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Kitchen sink faucet | Kitchen | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | -Right handle | | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | -Left handle | | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | -Base | | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | -Water purifier | | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Dial soap | Kitchen,over sink | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Fast orange soap | Kitchen,over sink | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Formica | Kitchen,log by sink | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Phone,white | Living rm,on couch | EMC/PAB | I | | Bag | | Tpr.J.Mason |
| | Remote control | LvRM,table by couch | EMC/PAB | I | | Bag | | Tpr.J.Mason |

EVIDENCE PROCESSING RESULTS

## RESULTS OF PROCESSING

| ITEM # | |
|---|---|
| 1. | No latent prints of value developed. |
| 2. | Did not process for prints. |
| 3. | Did not process for prints. |
| 4. | No latent prints of value developed. |
| 5. | Partial palm print. (in blood). |
| 6. | No latent prints of value developed. |
| 7. | No latent prints of value developed. |
| 8. | Insufficient points on right faucet handle (in blood). No value on rest of faucet pa |
| 9. | No latent prints of value developed. |
| 10. | No latent prints of value developed. |
| 11. | No latent prints of value developed. (in blood). |
| 12. | No latent prints of value developed. |
| 13. | No latent prints of value developed. |

TROOPER PATRICIA A. BEEHAN #0591
CRIME SCENE SERVICES SECTION
STATE POLICE MIDDLEBORO SUB-LAB

Exhibit No. 1
PAGE 2 of 2