FILED
CLERKS OFFICE

2006 MAR 17 A 11: 56

U.S. DISTRICT COURT
DISTRICT OF MASS.

Jordan M. Rice - W65439
P.O. Box 8000
Shirley, Ma. 01464

54-10859-MLW

Office of the Bar Counsel
Attn: Review Department
99 High St.
Boston, Ma. 02110-2320

Re: BBO File No(s). B2-05-0265-DA (Eugene P. McCann, Esq.)

Dear Review Dept.,

Hello, I now in a timely manner appeal the February 13, 2006 decision not to further probe the above referenced complaint because it's finding isn't based on any factual evidence (See Exhibit No. 1) and I request a Independent Review. In denying this complaint Attorney Dorothy Anderson mistakely interprets that Mr. Rice requested this Bar: (1) to have jurisdiction over any claims and/or (2) to provide legal advice or representation. Furthermore, in denying this complaint Attorney Anderson held Mr. Rice believes Attorney Eugene P. McCann should "pursue certain arguments", i.e., a Prosecution Misconduct Claim, Mr. Rice will now demonstrate Attorney Anderson's denial is a unreasonable presumption of ~~hesedout~~ facts.

Again the argument in question is Prosecution Misconduct Claim, i.e., prosecution failed to disclose exculpatory evidence (a Bloody Palm Print), which is a highly meritorious claim (See Exhibit No. 3). Contrary to Attorney Anderson's findings, "it is Habeas Corpus Judge Mark L. Wolf" whom ordered Attorney McCann to pursue the Prosecution Misconduct Claim. On March 17, 2005 in granting Mr. Rice's request for Counsel, Judge Wolf held "the prosecution failed to disclose possibly exculpatory evidence, a claim which in this case . . . is sufficiently complex to warrant professional legal assistance" (See Exhibit No. 3 at Pg. no(s) 2-3).

Despite this order by Judge Wolf, Attorney McCann has refused to pursue the Highly Meritorious Prosecution Misconduct Claim, which ~~could~~ would lead to reversal of the First Degree Murder Conviction and exoneration upon production of the Bloody Palm Print. Yes Mr. Rice maintains his innocence! More importantly failure to raise the said claim is clearly contempt of the court and clearly isn't sound professional appellate strategy. Especially in light of Judge Wolf has frequently been critical of government misconduct (See Exhibit No. 4). Furthermore my Private Investigator (P.I.) Ronald Rice (no relation), whom discovered the prosecution misconduct, was disturbed by Attorney McCann's misconduct that he (P.I. Rice) authored a letter to Judge Wolf (See Exhibit No. 5).

Further unsettling about Attorney Anderson's decision is the fact Attorney McCann doesn't deny my complaints against him, nor does he attempt to refute them. Instead he (McCann) attempts to elude answering my meritorious charges by assassinating my character with frivolous and baseless charges in his answer to this complaint (See Exhibit No. 6). Attorney

<u>PAGE 2 OF 3</u>

Attorney McCann never responded to the following charges: (1) he is related to Souza-Baranowski Correctional Center, Prison Guard, Lieutenant McCann whom mentally and physically tortured Mr. Rice and is now a defendant in a Pro Se Lawsuit filed by Mr. Rice for the said Torturing. Officer's employed for the Department of Corrections are a rogue gang whom malfeasance behavior has been extended to there Boss, i.e., Commissioner Kathleen Dennehy (See Exhibit No. 6A). Therefore, Mr. Rices claims against Attorney McCann's relative must be taking seriously. And (2) Attorney McCann's friends with Attorney Henry Owens whom is the subject of a ineffective assistance to counsel claim for failing to investigate the Prosecutions withholding the exculpatory evidence, i.e., the Bloody Palm Print (See Exhibit No. 3). These two highly meritorious complaints are the ulterior motives behind Attorney McCann's sabotaging of my Habeas Corpus Petition via willfully waiving the highly meritorious Prosecution Misconduct Claim.

Furthermore the only other Attorney Mr. Rice has ever filed complaints against is Attorney Henry Owens, whom has a very infamous reputation within the legal community and this Bar has suspended Owens from practicing law (see Exhibit No. 7). Attorney McCann feels Owens received a bum rap from this bar. Therefore, my complaints against Attorney McCann are not "Well rehearsed" as he (McCann) frivolously contends! Also McCann further frivolously contends that if he doesn't raise the Prosecution Misconduct Claim, it is still a "viable" claim. IF the Petition is dismissed, myself or any other defendant cannot file a second Petition under the Anti-Terrorism and Effective Death Penalty Act (ATEDPA) governing Habeas Corpus Petitions which President Clinton signed into law in 1996. Therefore, the above reference claims by McCann, cited from Exhibit No. 6, are totally outrageous! And need to be addressed by this bar!

When Attorney McCann learned of this complaint Mr. Rice filed by with this bar. He (McCann), in a unprofessional manner threatening and attempted to coerce me into withdrawing this complaint and Mr. Rice's Mother was on the telephone during McCann's egregious misconduct. (See Exhibit No. 8). An exculpatory newly discovered witness has emerged that saw a White male covered in blood leaving the crime scene the morning in question. Please note, Mr. Rice is a fairly dark skinned Black Male. Attorney McCann won't speak with or secure an Affidavit from this newly discovered eyewitness because he has informed Mr. Rice and his Mother that he doesn't care if I (Rice) ever get out of prison because he doesn't like Mr. Rice (See Exhibit No. 8). Single handedly this newly discovered eyewitness will exonerate Mr. Rice from his wrongful murder conviction but due to McCann's lackluster representation this witness haven't been contacted. It should be noted that Massachusetts has the second highest wrongful conviction rate with the United States. In Fact 23 wrongfully convicted men have been exonerated and released over the last 22 years!" Therefore, failure to pursue the prosecution misconduct claim and the newly discovered witness is unethical.

Attorney McCann's ethical misconduct, i.e., refusing to purse the Prosecution Misconduct Claim that Judge Wolf appointed him to raise, is demonstrated in the foregoing and more importantly is a grave violation defined by the Massachusetts Rules of Professional Conduct, which warrants disciplinary action by this Bar.

(See Ex No. 9)

PAGE 3 of 3

# CONCLUSION

WHEREFORE, Attorney Dorothy Anderson's denial of Mr. Rice's complaint isn't based on factual evidence as demonstrated in the foregoing. Therefore, alternatively the reviewing Board Member of this bar should: (1) direct Bar Counsel to bring disciplinary charges against Attorney McCann and/or (2) reopen this file for further investigation that will result in disciplinary charges against Attorney McCann. Both requested remedies are within this Bar's Discretion (See Exhibit No. 10).

Signed under the pains and penalties of perjury this 15th day of February, 2006.

X. _____
Jordan M. Rice

Dated: February 15, 2006 A.D.

CC: Margaret Marshall, Chief Justice of the SJC
    Media Correspondent
    Rice Family
    Ronald Rice, Private Investigator
    Mark L. Wolf, Federal Judge
    Enclosure

Certified Mail No.
7004 2510 0000 6847 4368

## OFFICE OF THE BAR COUNSEL
BOARD OF BAR OVERSEERS OF THE SUPREME JUDICIAL COURT
99 High Street
Boston, Massachusetts 02110
(617) 728-8750
Fax: (617) 482-2992
www.mass.gov/obcbbo

DANIEL C. CRANE
BAR COUNSEL

February 13, 2006

PERSONAL AND CONFIDENTIAL

Mr. Jordan M. Rice
P.O. Box 800 - W65429
Shirley, MA 01464
LEGAL MAIL

Exhibit No. 1

RE: BBO File No. B2-05-0265 (Eugene Patrick McCann, Esq.)

Dear Mr. Rice:

We are in receipt of your correspondence to this office.

As I understand your allegations, you have been dissatisfied with Mr. McCann's defense strategy; particularly his failure to pursue certain arguments that you believe should be raised in your *habeas corpus* petition. An attorney, however, is expected to exercise his professional judgment in representing a client. He is not obligated to pursue legal issues or positions that in his professional judgment are frivolous or not meritorious or not in the client's best interest.

The Office of the Bar Counsel has jurisdiction to investigate complaints of ethical misconduct, as defined by the Massachusetts Rules of Professional Conduct, against attorneys registered to practice in the Commonwealth of Massachusetts. We do not have jurisdiction over claims of ineffective assistance of counsel, and we cannot provide legal advice or representation. If any proceedings you undertake result in a decision by the court that Mr. McCann engaged in misconduct, please bring this matter to our attention again at that time.

This file has been closed without disciplinary action. Enclosed please find a copy of a letter from the Chair of the Board of Bar Overseers advising you of your right to have this decision reviewed by a member of the Board.

Very truly yours,

Dorothy Anderson
Assistant Bar Counsel

DA/dw
Enclosure
cc: Eugene Patrick McCann, Esq.

Likewise, the Commonwealth's Autopsy Report by Dr. Bruce Weiner dated March 6, 1996 (R.187-192), indicated that the victim's ". . . genitalia *are unremarkable*", i.e., there was no medical evidence of rape trauma (R.190, p. 4). Incredibly, Mr. Owens also neglected to bring out this crucial piece of evidence at the trial, including in his cross-examination of the Commonwealth's pathologist, Dr. Bruce Weiner (R.78).

There clearly was no conceivable "strategic" reason for these omissions by trial counsel.



### *Counsel's Failure to Investigate, Test And Present Evidence Concerning The Bloody Palm Print On the Coffee Cup*

Nor did Mr. Owens make any attempt to investigate and arrange for a defense expert to conduct a comparison test against other suspects of the bloody palm print found on a coffee cup in the kitchen sink in the victim's apartment, pictures of which were introduced at the trial as Ex. "41" (T.II/177).

The bloody palm print on the coffee cup was perhaps the most significant piece of forensic evidence at the crime scene because the perpetrator undoubtedly moved the cup to the sink -- according to the Commonwealth's pathologist, Dr. Weiner, the victim died of a "rapidly fatal" stab wound to the right upper chest area (T.IV/22). The Commonwealth had obtained comparison prints of 48 individuals, including the victim and Rice, as well as James L. Morgan, John J. Madden, Jewell Whatley, and numerous others (T.II/158-159; *see also* Report of Patricia Beehan dated May 30, 1996, with attached list of suspects printed (R.194-195).

18

Recognizing its evidential significance, Trooper Beehan testified at the trial that she took photographs of the bloody palm print, but that subsequently, an FBI agent, Randall Fitzwaters, destroyed the print when applying chemicals to enhance it (T.II/148-149). When showing photographs of the print to its own expert(s), including a specialist, Ron Smith of the Mississippi Crime Laboratory, the palm print allegedly lacked sufficient detail to be identified with any of the prints of the 47 suspects, including Rice (T.II/149,159-161,162-163). Trooper Beehan's Report dated May 30, 1996, also indicated that Smith believed that the print was, in some respects, consistent with that of the victim, but that there was insufficient detail to make a positive identification (R.194-195).

Rice insisted that Owens thoroughly investigate the Commonwealth's evidence on this point because: (i) he doubted that the print on the coffee cup had been destroyed, as claimed by Trooper Beehan; and, (ii) he truly believed (and still believes) that the true perpetrator of the crime could be determined with proper and thorough testing of the evidence. At the very least, confirmation from a defense expert that the print on the coffee cup did not belong to either Rice *or the victim* would have established that someone other than Rice -- known or unknown -- must have committed the crime. The Commonwealth's explanation that the bloody print "probably" belonged to the victim -- unchallenged at trial by Mr. Owens -- was baseless in fact or common sense. The bloody print was recovered on a cup *in the kitchen* and the Commonwealth's theory of the crime was that the victim died on a couch *in the living room* where she was held down, sexually assaulted, and then died from a rapidly fatal stab wound. On the

19

Commonwealth's own theory of the crime, an unknown assailant must have left the print on the coffee cup recovered from the kitchen *since the victim would have been physically incapacitated and/or prevented from doing so*. Notwithstanding Rice's insistence that the Commonwealth's evidence be thoroughly investigated and tested by a defense print expert, Mr. Owens refused to do anything at all in this regard (R.80).[4]

Moreover, since Rice's conviction, present counsel's investigator, Mr. Ron Rice, learned that: (i) Randall Fitzwaters, the FBI agent who supposedly destroyed the print on the coffee cup with chemicals, *denies any knowledge or involvement with the alleged destruction of evidence*; and, (ii) Ron Smith, the latent print expert, did not provide a forensic opinion to the Commonwealth, only a courtesy examination, as there was not enough detail to either include or exclude the victim as the source of the print; *nor was Smith shown any of the comparison prints of Rice or any other suspects, directly contradicting Beehan's trial testimony that she brought with her all such comparison prints for Smith's examination* (T.II/162-163) (*see* Affidavit of Ron Rice sworn to October 25, 2002, R.310-317).

Had Attorney Owens conducted even a minimal investigation in this regard as Rice requested, he could have easily discredited the Commonwealth's claims in this regard at trial.    Newly discovered evidence like this warrants a new trial because "it casts real doubt on the justice of the conviction." Commonwealth v.

---

[4] By his motion for post-conviction relief, Rice requested access to all of the Commonwealth's forensic evidence (including print evidence of Harrigan) for testing by new counsel and a retained expert; the motion for post-conviction relief was denied without a hearing and without any discovery.

Grace, 397 Mass. 303, 305 (1986). Additionally, a conviction based upon false testimony violates due process. Giglio v. United States, 405 U.S. 150 (1972) (conviction based upon perjured testimony violates due process); Napue v. Illinois, 360 U.S. 264 (1959) (same).

Indeed, following present counsel's having obtained Mr. Owens's file, it is obvious that he did not even read all of the materials contained within it concerning the coffee cup for use at Rice's trial. By Cellmark Laboratory report dated January 7, 1998, found by present counsel in Mr. Owens's file (R.198-199), *the Commonwealth tested DNA material which was recovered from stained materials on the telephone and coffee cup at the crime scene (DNA material could not be extracted from a toilet seat for testing). Cellmark's testing excluded Rice as the source of the DNA material on the telephone and the coffee cup -- a fact which, remarkably, Mr. Owens never brought out at the trial, including in his cross-examination of Trooper Beehan.*

Indeed, Trooper Beehan testified at trial that she had no knowledge of DNA testing being performed on the coffee cup (T.II/169-170); *Attorney Owens failed to confront Beehan with the Cellmark January 7th Report which excluded Rice as the source of DNA material on both the coffee cup and telephone.* There hardly can have been a "strategic" reason for Mr. Owens to fail to present this exclusion evidence and to impeach Trooper Beehan's demonstrably false testimony.

*Counsel's Failure to Move To Dismiss The Indictment Due to The Commonwealth's Destruction of the Palm Print*

To the extent that the bloody palm print on the coffee cup was, in fact, destroyed, Rice argued in his new trial motion that trial counsel was ineffective in

21

failing to move to dismiss the indictments on the ground that potentially exculpatory evidence was destroyed (R.83-84).  Commonwealth v. Gliniewicz, 398 Mass. 744 (1986) (destruction of blood evidence in course of testing destroyed potentially exculpatory evidence and required suppression); Commonwealth v. Sasville, 35 Mass.App.Ct. 15 (1993) (destruction of aborted fetus destroyed potentially exculpatory evidence and required dismissal). *See generally* United States v. Bryant, 439 F.2d 642 (1971); Commonwealth v. Willie, 400 Mass. 427 (1987); Commonwealth v. Olszewski, 401 Mass. 749 (1988).

As stated above, DNA and/or print testing of the coffee cup may very well have established the true identity of the assailant of the victim.  The Commonwealth conceded the print was not that of the defendant; further, the Commonwealth's explanation that the bloody print may have belonged to the victim was dubious, at best, since the bloody print was recovered on a cup *in the kitchen*, and the Commonwealth's theory of the crime was that the victim died on a couch *in the living room* from a rapidly fatal stab wound.  Thus, Rice maintained that the Commonwealth's destruction and/or suppression of such critically important evidence, which would have established the true identity of the assailant, justified dismissal of the indictment on due process grounds -- even though trial counsel ineffectively failed to previously move for dismissal (R.83-84). *See* Brady v. Maryland, 373 U.S. 83, 88 (1963) (prosecution must turn over exculpatory evidence even absent request from defense counsel); United States v. Agurs, 427 U.S. 97, 103 (1976); Commonwealth v. Tucceri, 412 Mass. 401, 414 (1992) (same).  ◄ stop Here

22

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JORDAN M. RICE,                          )
        Petitioner,                      )
                                         )
        v.                               )      C.A. No. 04-10859-MLW
                                         )
TIMOTHY HALL,                            )
        Respondent.                      )
                                         )

ORDER

WOLF, D.J.                                              March 17, 2005

On April 29, 2004, the petitioner, incarcerated in state
prison on a conviction for first degree murder and arson, filed an
application for writ of habeas corpus under 28 U.S.C. §2254 (Docket
No. 5). The petition asserted a number of constitutional claims,
including ineffective assistance of counsel and prosecutorial
failure to disclose evidence. On the same day, the petitioner filed
a Motion for Appointment of Counsel (Docket No. 3). On August 4,
2004, the petitioner filed a renewed Motion for the Appointment of
Counsel and Affidavit in Support (Docket No. 10), claiming, among
other issues, that he had no access to the institutional law
library, that he has limited knowledge of the law and that he
suffers from a mental impairment. On August 31, 2004, petitioner
filed another renewed Motion for the Appointment of Counsel (Docket
No. 20), along with a Motion to Enlarge Time Until Counsel can be
Appointed (Docket No. 17). Most recently, on February 28, 2005, the
petitioner filed another Motion for the Appointment of Counsel

(Docket No. 29), accompanied by an affidavit (Docket No. 30), numerous exhibits, and a memorandum of law (Docket No. 32). The respondent has filed a Motion to Dismiss (Docket No. 11) on the grounds that the petitioner has failed to exhaust two of his claims. The petitioner has opposed (Docket No. 19) the Motion to Dismiss, stating that he does not know whether the claims are exhausted and offering to withdraw the two apparently unexhausted claims in order to pursue the rest of his case.

While "[t]here is no absolute constitutional right to a free lawyer in a civil case," DesRosiers v. Moran, 949 F.2d 15, 23 (1st Cir. 1991), the court has the authority to appoint an attorney for a financially eligible person seeking relief under 28 U.S.C. §2254 "upon the determination that the interests of justice so require." 18 U.S.C. §3006A(a)(2)(B). The factors the court considers in appointing counsel include: "the indigent's ability to conduct whatever factual investigation is necessary to support his or her claim; the complexity of the factual and legal issues involved; and the capability of the indigent litigant to present the case." Cookish v. Cunningham, 787 F.2d 1, 3 (1st Cir. 1986) (citations omitted). The court is satisfied that the interests of justice require appointment of counsel in this case.

The petitioner has alleged that the prosecution failed to disclose possibly exculpatory evidence, a claim which in this case may require expert testimony on DNA and other issues and is

2

sufficiently complex to warrant professional legal assistance. The petitioner has also asserted a variety of constitutional claims. Though the petitioner has demonstrated through his filings with this court an ability to pursue his claims vigorously and persistently, the complexity of his case warrants the appointment of counsel.

Accordingly, it is hereby ORDERED that:

1. Petitioner's Motions for the Appointment of Counsel (Docket Nos. 3, 10, 20 and 29) are ALLOWED. The Clerk is directed to appoint counsel from the Criminal Justice Act panel to represent the petitioner and to report to the court when this has been done.

2. Within sixty (60) days of the appointment of counsel, the petitioner shall file a supplemental reply to the respondent's Motion to Dismiss (Docket No. 11).

UNITED STATES DISTRICT JUDGE

3

B.H. Newspaper, Page No. 30, May 30, 2005

# Mobster walks today but victim's kin says he did it

**By J.M. LAWRENCE**

A Boston mob leader — who plead guilty to murder but claimed he didn't do it — can walk free today after a federal judge overturned his 22-year sentence because of prosecutors' misconduct.

An appeals court late yesterday refused to stop Vincent "The Animal" Ferrara's release while federal prosecutors appeal U.S. District Court Judge Mark Wolf's ruling the government withheld evidence during plea negotiations in 1991.

Massachusetts U.S. Attorney Michael Sullivan claims Ferrara, 56, poses "an immediate and significant danger to the public," but the court said the government didn't prove it.

"He wants to get home to his family," Ferrara's attorney Martin Weinberg said yesterday.

After 16 years behind bars without a single infraction, the Mafia capo plans to live with family in Marlboro and is about to become a grandpa.

He wasn't supposed to taste freedom until 2009 under a plea agreement he took to avoid a life sentence.

But two years ago, a witness came forward claiming an FBI agent and a federal prosecutor pressured him to testify that Ferrara ordered the 1985 murder of disloyal foot soldier James "Vincent" Limoli, 25.

The judge found a federal prosecutor tampered with a Boston police memo about the witness's attempt to recant.

Limoli's family said they're angry at the judge. "It feels like a slap in the face to us because Vinny did it. Vinny is an evil man. He's a murderer," Limoli's sister, Elizabeth DiNunzio, said yesterday.

But DiNunzio said she won't romanticize her brother, either. "I think I'm more mad at the judge than Vinny Ferrara because I know my brother did the same damn things," she said.

Exhibit No. 4

---

# Sentence Of Mob Boss Is Vacated

A federal judge vacated the prison sentence of a Mafia captain after concluding that prosecutors withheld key evidence during plea negotiations in the case in order to force him into admitting murder.

Vincent Ferrara pleaded guilty to racketeering and other charges in 1992, but also admitted to a 1985 murder he probably didn't commit, U.S. District Court Judge Mark L.



**WOLF**

Wolf found, because a prosecutor failed to disclose evidence that would have helped exonerate him of the killing.

"The government's misconduct utterly undermines the court's confidence in the outcome of Ferrara's case," Wolf wrote in a 124-page ruling issued almost a year after hearing where a Boston police detective's memo that was never provided to Ferrara's lawyers.

The judge's decision means that Ferrara, a Boston College-educated mob capo, could be freed as a soon as next month, rather than his scheduled release date of January 2009.

Wolf has frequently been critical of government misconduct in mob prosecutions.

Wolf, in his ruling, said there was evidence that Assistant U.S. Attorney Jeffrey Auerhahn did not tell Ferrara's lawyers that a key government witness tried to recant his allegation that Ferrara ordered the 1985 killing of Vincent "Jimmy" Limoli, a turncoat mob foot soldier.

The witness, Walter Jordan, claimed he was bullied by federal authorities to stick to his original story that Ferrara had ordered the killing of Limoli.

Ferrara, who faced life in prison if convicted of being involved in three murders he was charged with as part of the case, was sentenced to 22 years after pleading guilty to racketeering, gambling, extortion and ordering Limoli's murder.

After the plea, Ferrara told probation officials that he had not ordered Limoli's murder, but felt he had no choice but to plea to it; because if he maintained his innocence at trial and a jury convicted him, he would have faced a life sentence, according to Wolf's decision.

Ferrara's attorney, Martin G. Weinberg, said his client has always insisted that he never ordered Limoli's killing.

Wolf scheduled a May 3 re-sentencing date for Ferrara, who is in a federal prison in Pennsylvania.

U.S. Attorney Michael J. Sullivan said he has not decided yet whether to appeal Wolf's decision to dismiss the original sentence.

---

# Judge chides prosecutors

**By J.M. LAWRENCE**

A federal judge again accused federal prosecutors of sitting on exculpatory evidence but did not grill U.S. Attorney Michael Sullivan yesterday when he complied with an order to appear.

"I continue to find there is a persistent pattern of failure to discharge evidence in a timely way," said U.S. District Court Judge Mark L. Wolf.

The judge accepted Sullivan's explanation for why he did not immediately comply with an order to appear last week after a newly found state trooper's report surfaced in a Swansea drugs and gun case.

Wolf had threatened to have federal marshals bring Sullivan from a dentist appointment.

Sullivan yesterday told the judge it was "impossible" for him to appear on less than an hour's notice because he was in Holbrook at rush hour.

"I've never once disregarded a court order," Sullivan said.

Wolf maintained he has authority to order Sullivan to appear at any time.

Wolf has declared two mistrials this year based on late evidence while another judge delayed a bank robbery trial last week when prosecutors waited to reveal fingerprints.

Yesterday, the judge noted a notorious case in which the FBI withheld evidence leading to a wrongful conviction that was never corrected by the judiciary, he said.

"We live in a commonwealth that has to live with the memory of Joseph Salvati being imprisoned for 30 years," Wolf said.



# NEW ENGLAND LEGAL INVESTIGATIONS

### Certified Handwriting and Profiling Experts
53 AMANDA AVENUE • PLYMOUTH, MA 02360
TEL: (508) 759-2551 • FAX: (508) 759-4672

**CRIMINAL**
**INDUSTRIAL**
**INSURANCE**
**FORENSIC**

January 27, 2006

The Honorable
Mark L. Wolf
U.S. District Court
1 Court House Way
Room 5110
Boston, MA 02210

*Exhibit No. 5*
*(Page 1 of 2)*

Re:   Rice v. Brady
      Docket No.:  04-10859-MLW

Dear Judge Wolf:

My office represents Jordan M. Rice currently incarcerated at MCI Shirley, MA. I am a licensed private detective and personally investigated certain issues of interest for Mr. Rice and attorney Donald Harwood in support for his appeal from a judgment of conviction and sentence in the Brockton Superior Court.

It is my belief that certain statements sworn to at the trial of Jordan Rice by a law enforcement investigator are questionable and need to be brought to your attention. Also, concern by Mrs. Rice, mother of the defendant, and Jordan Rice over the sincerity of representation by current counsel. To justify our concerns please find the following:

1.    Pages 14 - 23 of the Brief For The Defendant - Appellant as prepared by attorney Donald A. Harwood.

2.    An affidavit from Blenda A. Rice, mother of the defendant.

### *Brief*

Pages 19 and 20 contain certain facts pertaining to FBI agent, Randall Fitzwaters and Ron Smith of the Mississippi Crime Laboratory. I personally spoke to FBI agent and fingerprint expert Fitzwaters regarding trooper Beehan's testimony that he destroyed the crucial print by applying chemicals to enhance it. Agent Fitzwaters personally returned my phone call, an almost unbelievable professional courtesy from an FBI agent to a private investigator, and adamantly denied any knowledge or involvement in the alleged destruction of the print. Further, fingerprint expert Ron Smith was clearly angered when informed of trooper Beehan's report. He clearly stated to me that he did not provide a forensic opinion to trooper Beehan regarding the questioned print.





Exhibit No. 5
(page 2 of 2)

- 2 -

I realize that the above is hearsay. However, would I be correct, and with all due respect, your Honor, to call your attention to *Chambers v. Mississippi 410. U.S. 284 1973?*   I am informed that this decision may very well be an exception to the hearsay rule.

Did FBI agent Fitzwaters intentionally provide false information to me regardless of the fact that he knew who I was and the purpose of my call?  Did Ron Smith from the Mississippi Crime Lab also provide false information to me as well?  Did trooper Beehan provide false information at the trial.  It would appear that some one is lying here.  The statements made to me by FBI agent Fitzwaters and Ron Smith would seem to suggest this.  One has to wonder why neither agent Fitzwaters or Ron Smith were subpoenaed to testify and corroborate trooper Beehan's testimony at the trial by then defense counsel or the commonwealth.

### *Affidavit of Blenda Rice*

 I call your attention to Point 6, 8 and 9.

### *Jordan Rice*

Mr. Rice has informed me that current counsel is good friends with former trial attorney whom is the subject of the meritorious ineffective assistance of counsel for failing to investigate the "Bloody Palm Print."  Also, current counsel is related to an SBCC correction officer whom Rice has registered complaints against for direct abuse toward him.  Rice is also preparing, if not already done so, a civil action against this officer for abuse.

On behalf of Jordan Rice, I thank you for considering our concerns.

Sincerely,

Ronald H. Rice (no relation)

attachments

cc:    Mrs. Blenda Rice
       Jordan Rice

# Manzi & McCann

ATTORNEYS AT LAW

59 Jackson Street
Lawrence, Massachusetts 01840
Telephone: (978) 686-5664
Fax: (978) 794-9628

Vincent C. Manzi, Jr.
Eugene Patrick McCann

*OF COUNSEL*
Steven A. Baddour

*OF COUNSEL*
Charles Scott Nierman, MA & FL

Peter J. McQuillan
Patrick F. McCann, TX only
Michael A. Manzi
Rick M. Seccareccio
Sonya B. Brown
Terrence B. Downes

January 25, 2006

**VIA FEDERAL EXPRESS**
Dorothy Anderson
Office of the Bar Counsel
99 High Street
Boston, MA 02110

Exhibit No. 6

RE:    BBO File No. B2-05-0265 (Jordan M. Rice)

Dear Ms. Anderson:

This letter will serve as a response to your letter, dated December 29, 2005. I have reviewed your letter and its enclosures. I am enclosing copies of selected filings in the Habeas Corpus Petition case. These filings include documents filed by Mr. Rice and my office, as well as some of Judge Wolf's orders and rulings. I have also included a copy of the SJC's opinion in *Commonwealth v. Rice*, 441 Mass. 291 (2004). I hope that after you review this letter, and its enclosures, you will agree that all of Mr. Rice's claims against me are frivolous and typical to his character.

The background of Mr. Rice's case is important. Mr. Rice was convicted of first degree murder by reason of extreme atrocity and cruelty, and he was also convicted of arson. The allegation was that Mr. Rice raped a woman, stabbed her eleven times on a couch, attempted to burn the couch with her on it, failed to burn the couch, moved her to a bed, and set the bed on fire. When interviewed by the police, Mr. Rice denied ever having sexual intercourse with the victim. After sperm cells inside the victim's vagina were identified by DNA testing to belong to Mr. Rice, he testified at trial that he had consensual sexual intercourse with her earlier on the day of the murder. Mr. Rice raised numerous issues on appeal, some of which were constitutional nature, and some were not. His convictions were upheld by the SJC and he filed a *pro se* petition for writ of habeas corpus.

His *pro se* petition had several problems on its face. In his petition, he raised some issues that had no federal constitutional grounds, were not raised in state court, or were otherwise expressly barred from habeas corpus review. The defendant filed a motion to dismiss the entire petition because it included some of these issues. Mr. Rice then filed a *pro se* motion to appoint counsel which was allowed by Judge Wolf. I was then appointed as counsel. I responded to the defendant's motion to dismiss by citing a very recent United States Supreme Court opinion

January 25, 2006
Dorothy Anderson
Office of the Bar Counsel
Page 2 of 3

Exhibit No 6

(decided after defendant's motion to dismiss was filed) where it was held that the appropriate course of action with such a petition is to excise the inappropriate claims as opposed to dismissing the entire petition. The court did just that.

Next, the defendant filed his answer to Mr. Rice's *pro se* petition. Judge Wolf ordered the plaintiff to file a reply to the defendant's answer, and I did. In the reply, I addressed select issues raised by the defendant's answer. All grounds raised in Mr. Rice's *pro se* petition, that were not dismissed pursuant to the defendant's motion to dismiss, are still viable regardless of whether they were addressed in the reply.

Mr. Rice's claims against me are frivolous and typical to his character. Mr. Rice has an estranged relationship with the truth. As the SJC stated in its opinion in reference to Mr. Rice's claim that the prosecutor inappropriately called him a liar in his closing argument, "[w]hen the evidence proves that the defendant has lied, it is not improper to refer to him as a liar." *Rice*, *supra*, at 301.

Mr. Rice's complaints against me are well rehearsed indeed. He is a chronic and habitual complainer who ritualistically attacks his attorneys without cause. Please note Mr. Rice's "tortuous history" with prior attorney's in this matter. *Rice*, *supra*, at 296-297. He moved to discharge his first attorney for reasons that included counsel's failure to hire a particular investigator. The motion was denied with a finding that counsel was "competent, loyal and diligent." A second attorney was appointed for an interlocutory appeal, but was discharged after Mr. Rice's family hired trial counsel. Trial counsel filed a motion to withdraw, supposedly at Mr. Rice's request. Trial counsel indicated Mr. Rice would not accept his advice. Mr. Rice alleged, during a two (2) day hearing, that any lack of cooperation was trial counsel's fault for not raising the defenses Mr. Rice wanted. "The judge expressed incredulity at [Mr. Rice's] assertion that counsel failed to communicate with him or show him any paperwork he had done in the case." All of Mr. Rice's unfounded allegations against his prior attorney's, *i.e.*, not pursuing defenses he wants, failure to communicate, failure to show paperwork, conflict of interest, incompetence, and breakdown in communication are merely old lies alleged anew against me.

Mr. Rice's repetition of the same complaints against different attorneys turned toward me by way of Document 43, filed in Federal Court on August 4, 2005. In this document, Mr. Rice alleges a "Breakdown in Communications," "Conflict of Interest," and "Denied Access to the Courts" (an apparent indictment of the Department of Corrections' "unconstitutional law library system" and not of counsel). I responded to this document by filing Documents Nos. 47 and 48, respectively entitled "Opposition to Petitioner's Request for New Counsel," and "Affidavit of Eugene Patrick McCann in Support of His Opposition to Petitioner's Request for New Counsel." In my opposition and affidavit, I made it clear that I had reviewed numerous letters from Mr. Rice, researched the issues the letters raised, and discussed them with Mr. Rice and his mother (with Mr. Rice's permission) on numerous occasions. Some of the issues were meritorious, and some, as in issues that were not raised in state court, were not. I counseled Mr. Rice to seek state court-appointed counsel to pursue these issues, because I was only appointed to federal matter.

PAGE 2 OF 3

January 25, 2006
Dorothy Anderson
Office of the Bar Counsel
Page 3 of 3

Exhibit No. 6

My opposition and affidavit also pointed out that I had met in person with Mr. Rice when necessary and had provided him with all documents I filed with the court.

Judge Wolf, like the trial judge, and the justices of the Supreme Judicial Court, found no merit to Mr. Rice's attacks on counsel. On September 30, 2005, Judge Wolf filed his Memorandum and Order, Document No. 56, ruling on the defendant's motion to dismiss and Mr. Rice's motion to appoint now counsel. Judge Wolf ruled that the unexhausted claims in Mr. Rice's petition should be deleted, and that his motion for new counsel was denied. Despite Mr. Rice's claims, Judge Wolf found that "McCann has been energetic and effective in representing Rice," and "Rice has failed to present any evidence that substantiates his claims that McCann maintains relationships with others that constitute conflicts of interest or that Rice has been denied access to the courts." This is reminiscent of the trial judge's "incredulity" over Mr. Rice's claims against trial counsel. *Rice, supra* at 296.

There has been no professional misconduct on my part in my representation of Mr. Rice. Judge Wolf pointed out in his Memorandum and Order, filed September 30, 2005, that Mr. Rice has no constitutional right to a court-appointed attorney in a civil case, and that even in a criminal case, a criminal defendant has no right to choose his court-appointed counsel. Mr. Rice has demonstrated a history of making unsubstantiated claims against his attorneys in hopes of replacing them with those who will pursue his meritless defenses. I will not pursue Mr. Rice's meritless defenses because to do so would be a futile waste of time and would move focus away from other, more meritorious, defenses. I have communicated and met with Mr. Rice where this strategy was made clear to him. I have effectively responded to the defendant's motion to dismiss and have replied to the defendant's answer in a manner consistent with this strategy. Ignoring irrelevant and frivolous claims does not amount to professional misconduct. It is the opposite.

Kindly notify me if, after your review of this letter and its enclosures, you feel differently. The trial judge, the SJC, and Judge Wolf, found no merit to Mr. Rice's claims. If you feel your legal abilities trump those of Judge Wolf, please tell me how so, and detail your reasons. If you feel further action on Mr. Rice's complaint is necessary, I request a full hearing.

Please do not hesitate to contact me should you have any questions or need additional information.

Thank you for your attention.

Very truly yours,

Eugene Patrick McCann

Enclosures
cc:    Jordan Martell Rice

Exhibit No. 6A

# Prison boss claims she's target of union harassment, threats

By MICHELE McPHEE

Kathleen M. Dennehy, the state's first female Department of Correction commissioner, said yesterday she is being harassed by union members who have slashed her car tires, made personal threats and followed her around with a giant inflated rat to undermine her push for more prison accountability.

In an interview at DOC headquarters in Milford, Dennehy said that on in recent weeks she had her car tires slashed.

She has received telephoned threats, but they are payment as part accountability is everything we do," Dennehy said, adding that her relationship with the Massachusetts Correction Officers Federated Union was fractured last year when she was forced to discipline two correction supervisors accused of posing a handcuffed prisoner. "My hope is to improve the performance of the institution and that can be threatening to folks," she said.

Union president Steve Kenneway denied any union member

vandalized Dennehy's car or threatened her, calling the allegations, "absurd and childish."

"She needs to 'grow up,'" said Kenneway, whose union demanded her resignation in a letter to Gov. Mitt Romney in February.

The tension between Dennehy and other officials worsened this week after images from a prison video tape appeared in the Herald depicting killer inmate Joseph L. Druce apparently re-enacting the vicious 2003 murder of jailed pedophile priest John J. Geoghan.

Dennehy fired two employees at the Souza-Baranowski Correctional Center in Shirley, saying both were jailed, made an unauthorized, pirated recording of Druce's ghastly pantomime. She called the tape "unconscionable."

Union officials have faulted Dennehy, saying the DOC should have possession of any and all security footage in the prison system and not the correction officers.

"We believe she is responsible for any tape released," Kenneway said. "This is another incident that shows she is unable to manage this department."

# Dennehy deserves better

There is no disputing that corrections officers have a dangerous and mostly thankless job to do.

But when certain union goons resort to bullying their boss because they're dissatisfied with her management, they lose any public sympathy they might earn when they walk through the locked prison doors.

We take Department of Correction Commissioner Kathleen M. Dennehy at her word when she says she has been harassed by some union members who have slashed her tires, made personal threats and followed her around with a giant inflatable rat.

Dennehy is one of those rare public officials who is widely respected on both sides of the aisle and has few detractors — the single exception, perhaps, being the Massachusetts Correction Officers Federated Union.

Talk about thankless jobs —

Dennehy has been charged with implementing the recommendations of the Harshbarger commission, formed after the prison murder of defrocked priest John J. Geoghan — whose report MCOFU dubbed "anti-union."

From the day she took over, Dennehy met with resistance from the union, which has issued repeated calls for her termination.

Dennehy is soft-spoken but tough. The harassment, she said, comes with the territory when you're trying to bring discipline and order to a department that lacked it.

Union leaders deny they have threatened Dennehy and issued this petulant response: "She needs to grow up," president Steve Kenneway told the Herald.

This from a man whose union members are using a giant toy rat to try and intimidate her.

And *she* needs to grow up?

If officer's will do this to her for disciplining officer's for abusing prisoner's. Now just imaging how myself and other prisoner's has been further retaliatory abused for speaking out for help. I been repeatedly Mentally, Physically and Sexually Tortured!

THURSDAY, MAY 31, 2001 · BOSTON HERALD    35

# Boston lawyer Owens faces suspension

**By ERIC CONVEY**

One of Boston's highest-flying legal eagles is fighting to keep his wings from getting clipped.

Civil rights lawyer Henry Owens III, who has fought some of the biggest race-related cases in recent Boston history, will be banned from practicing law for four years if the Board of Bar Overseers and Supreme Judicial Court follow a recommendation from a single BBO hearing officer.

In a scathing report, the hearing officer concluded that Owens gave false testimony in a case and over the course of several years held onto nearly $100,000 that was not rightfully his. In one disciplinary case, hearing officer John I. Mirick wrote, Owens offered "testimony (that) is not credible."

Owens said last night that he was sure he'd be "vindicated" by the state's high court, if not by a Bar panel that reviews Mirick's report.

"I've been a fighter my entire career and I do not intend to stop fighting now — especially now an injustice has been served," Owens said.

In addition to criticizing the way that Owens handled money on three occasions, Mirick slammed the lawyer for the way he represented himself during disciplinary hearings last January.

**OWENS: Vows a right because 'an injustice' has been done.**

"I do not find that Owens knowingly gave false testimony in the disciplinary proceedings," Mirick wrote. "Rather, I find that he had forgotten his prior testimony and, somewhat astonishingly for an experienced trial attorney, failed to review the prior testimony before testifying in the disciplinary hearing."

Working against Owens, Mirick wrote, is that the alleged misconduct was not carried out in the zealous defense of a client but was apparently for personal financial gain. Mirick suggested that Owens was having money problems at the time he allegedly held onto funds that should have been kept in escrow or returned to clients.

Most or all of the funds have since been returned, some after legal action. A board of overseers decision would not protect Owens from further legal action.

In one instance, Mirick alleges that Owens misrepresented himself in a case involving $50,000 claimed by the federal Department of Housing and Urban Development.

Popular within the defense bar, Owens is a flamboyant crusader against the status quo and a frequent critic of the Boston Police Department.

Among Owens' high-profile cases, he successfully sued the city for the widow of the Rev. Accelynne Williams, who died of a heart attack as police mistakenly stormed his home in a misguided 1994 drug raid.

Owens also represented appeals court Judge Frederick Brown after Brown got into trouble with the Judicial Conduct Commission for making hostile remarks about the way judges are picked.

[Handwritten box, top right:]

Exhibit No. 7

Page 1 of 1

[Handwritten note, right side:]

Attorney Owens basically Stole my family and I money because my Parents gave him twenty-five Thousand dollars and he refused to file any standard Pretrial Motions. Had these motions been filed the false charges against me would of been dismissed or I would of been exonerated by an jury of my peers!

In fact I had no defense at all against my false Charges!

## AFFIDAVIT OF BLENDA ANN RICE

Blenda Ann Rice, according to law being duly sworn, deposes and says:

1. I make this affidavit in support of my son, Jordan M. Rice.

2. On December 31, 2005 at approximately 10:18 am I at the request of my son called Attorney Eugene Patrick McCann's home telephone number (207-363-8314) via three ways call because my son informed me Attorney McCann wouldn't accept his collect calls.

3. My son, McCann and I were all on the telephone together.

4. During our conversation McCann's behavior was very unprofessional and pugnacious in nature.

5. McCann ask me if "I knew my son filed two complaints with the BBO (Board of Bar Overseers)?" I answered in the negative.

6. McCann then threaten my son in a loud tone via stating "If you file anymore complaints against me, I am going to go up there and stick it in your back side."

7. My son informed McCann Attorney Donald S. Bronstein of Committee for Public Counsel Services (CPCS) stated in his October 20, 2005 letter that he would appoint McCann to exhaust in State Court at Due Process Violation of Denied Fair Notice of Criminal Charges.

8. McCann acknowledge receipt of his copy of Attorney Bronstein's letter and further acknowledge that he wouldn't raise the Due Process Claim because he (McCann) didn't like my son and doesn't care if he ever gets out of prison.

9. McCann Further stated "The Department of Corrections has deemed your son a problem so they keep moving him to different prisons". Next McCann hang the telephone up in my son and me. I face abruptly terminating the telephone call.

10. I am willing to testify to the above matter in court under oath.

Signed under the pains and penalties of perjury this 31st day of December, 2005 A.D.

*Mrs. Blenda Ann Rice*
Blenda Ann Rice

Exhibit No. 8 - PAGE No. 1 of 2

I am willing to testify to the above in any court of law under oath.

Ply. ss.

_Blenda A. Rice_
(Name)

Blenda A. Rice

Date: ___1/20/06_____

     Subscribed and sworn this _20th_ day of. _January_ 2006 before me

_Elaine J. Spooner_
Notary Public

**ELAINE J. SPOONER**
Notary Public
Commonwealth of Massachusetts
My Commission Expires August 1, 2008

My Commission Expires: _____

Exhibit No. 9- Page No. 20f2

MADC SS#

# Mass. must atone for jailed innocents

No sense reminding Lawyer Johnson that the wheels of justice turn slow.

Johnson spent 10 years in prison — two on death row — for a murder he didn't commit, and while it took prosecutors less than two years to convict an innocent man, it has taken the state almost 20 years to right its own wrongs.

Ever since his release in 1982, Johnson, 52, has been fighting a reasonable fight based on one of the central tenets of the American justice system: Those who have inflicted an injury must compensate those who have suffered the injury in an amount appropriate to the wrong inflicted.

There is no humane way to assess the "appropriate" amount owed someone like Johnson. Yesterday the state Senate passed legislation to award those wrongfully convicted as much as $500,000 and to force officials to apologize.

State Sen. Dianne Wilkerson (D-Roxbury), a co-sponsor of the Senate version of the bill said her colleagues had little choice.

"This is more than a question of being fair," Wilkerson said, citing a recent Boston Herald series in which the faces of 21 wrongfully convicted men were published. "Those are the faces of reality and as a result of the countless stories that are appearing on a much too regular basis, the public pressure has become so intense that a responsible Legislature couldn't do anything but to approve this bill."

Once the bill is approved, Gov. Mitt Romney should also do the right thing and sign it

**Howard MANLY**

into law, Romney, a strong advocate for the death penalty, would at least have more credibility if he were to have the state accept responsibility.

Locking up an innocent man is bad enough; failing to acknowledge the mistake and compensate the innocent is worse, largely because the system depends on basic integrity. As it is now, 23 wrongfully convicted men have been exonerated and released over the last 22 years. Most of the convictions were overturned because of false identifications.

Until the apology and compensation become law, the wrongfully convicted must take their chances in court and sue the city or in some cases the detectives involved in pursuing them. It shouldn't come to that.

Just ask Johnson.

He was 18 when he was arrested for the murder of James Christian in Mission Hill. His conviction was based on the testimony of someone less than outstanding citizen later believed to be the real killer. Johnson was sentenced to death in 1972. The state abolished its death penalty two years later, and Johnson remained in maximum security until 1982.

His case was overturned when a new witness came forward. A year later, the Legislature gave preliminary approval to a bill that would have given Johnson $75,000 but that measure failed to gain final approval. To add more salt on Johnson's wounds, the state awarded $500,000 in 1992 to Bobby Joe Leaster, another innocent man who spent 15 years in prison for a crime he didn't commit.

But Johnson kept pressing. In 1999, three legislators — Reps. Patricia Jehlen (D-Somerville), Byron Rushing (D-South End) and

Benjamin Swan (D-Springfield) — took up his cause filed legislation to repay him $500,000. That bill has languished in the State House for the last five years. That's a crime in itself and was largely the result of an effective lobbying campaign waged by shameless district attorneys.

At one point, Johnson admits, he lost faith in the system.

"But then," Johnson said, "over a period of years, I realized that there are still some good people in government who would like to see the Legislature do the right thing in voting against the death penalty and I get rightfully compensated for this grave injustice that took 10 years of my life away from me."

Johnson can't get those 10 years back. But

## Lawyer Johnson is living proof of government's ability to err.

it is living proof of prosecutors' ability to make a mistake — and the death penalty's fatal flaw. And make no mistake about it. Compensation for the wrongfully convicted is part of the death penalty debate.

"The compensation is a prelude to the debate over Gov. Romney's much-anticipated error-proof death penalty," Wilkerson said.

"There's no such thing as an error-proof death penalty. In each one of these wrongfully convicted cases, a jury deliberated long and hard and reached a decision that met the incredible standard of beyond a reasonable doubt. But they were wrong. Dead wrong. But it happens. We're all human."

Johnson still must wait. But at least the rock is moving in the right direction —downhill

*Howard Manly's column runs Sunday, Tuesday and Thursday.*

Exhibit No. 109

The State of Massachusetts has the Second highest wrongful conviction in the United States. Illinois has the Highest wrongful conviction rate in the United States.

# BOARD OF BAR OVERSEERS

*of the Supreme Judicial Court*
99 HIGH STREET
BOSTON, MASSACHUSETTS 02110-2320

617-728-8700
Fax: 617-482-8000
www.state.ma.us/obcbbo

BOARD OF BAR OVERSEERS
ALAN D. ROSE, CHAIR
CONSTANCE L. RUDNICK, VICE CHAIR
MARK I. BERSON
JAMES P. CAREY
MARGUERITE T. GRANT
FRANCIS P. KEOUGH
LINDA R. MCKENZIE
J. CHARLES MOKRISKI
ELIZABETH N. MULVEY
JAMES B. RE
DAVID RIND, M.D.
FRANCIS J. RUSSELL

GENERAL COUNSEL
MICHAEL FREDRICKSON
ASSOCIATE GENERAL COUNSEL
KAREN D. O'TOOLE
ASSISTANT GENERAL COUNSEL
CAROL WAGNER
ASSISTANT GENERAL COUNSEL
LISA A. YEE

Exhibit No. 10

Dear Claimant:

As indicated by the enclosed letter, your grievance has been closed after investigation by the Office of Bar Counsel. This letter is written to inform you of your right, under the Rules of the Board of Bar Overseers, to request review of that decision by a member of the Board. The Board has a staff of its own and functions independently of the Office of Bar Counsel.

If you are dissatisfied with Bar Counsel's decision regarding your grievance, you may request that an independent review be made of the decision by a member of the Board. In that event, Bar Counsel will transmit your file to the office of the Board. Upon concluding his or her review, the Board member may conclude that Bar Counsel was correct in closing the file. If so, that will end the matter, since the Supreme Judicial Court has held that there is no appeal from a decision by the Board not to bring disciplinary charges against an attorney. Binns v. Board of Bar Overseers, 1 Mass. Att'y. Disc. R. 27, 28 (1976). Alternatively, the reviewing Board member may direct Bar Counsel to bring disciplinary charges or to reopen the file for further investigation.

If you wish the Board to review your complaint, you must file a written request no later than fourteen (14) days after the date of the enclosed letter from the Office of Bar Counsel. Your request for Board review should be sent to Office of Bar Counsel, Review Department, 99 High Street, Boston, Massachusetts 02110.

Very truly yours,

Alan D. Rose
Chair