# DNA Evidence Packet

    The cornerstone of the Prosecutions case against me was DNA Evidence but I don't deny the fact Diane Harrigan (victim) and I shared a sexual relationship and my semen, may or may not been found inside of her. I have discovered documentation which seriously calls into question the reliability of the DNA Evidence Results matching me to forensic evidence found inside Diane during her autopsy. I now will outline these facts in painstaking detail.

    The Massachusetts State Police Crime Laboratory has tainted, destroyed and loss exculpatory apieces of evidence (including DNA Evidence in a number of high profiled cases (See Exhibit No. 1). The Prosecutor hired for the Center For Blood Research of Boston, Massachusetts to DNA test the following items that were stolen from my jail cell on orders from the State Police for purpose of testing solely, i.e. White Shorts, White T-Shirt and Jail Orange JumpSuit (See Exhibit No. 2). In Commonwealth V. Van Sok, Superior Court Judge John F. Moriarty held in a 195 page ruling that the CBR Lab did not comply with Federal Standards for DNA Testing in criminal cases and barred the Prosecution from admitting DNA Testing at trial but on appeal prior to trial the States highest court reversed this ruling (See Exhibit No. 3). The CBR Lab held the odds matching me to semen located inside Diane to be approximately 1 of 1,770 (See Exhibit No. 2 at Pg. 3).

    Prior to the commencement of my trial, the prosecution sought new DNA testing and hired Cellmark Diagnostics Laboratory. Cellmark Lab first tested the vaginal swab and concluded in their Lab Report dated June 30, 1997 that the semen matching me odds were 1 in 1.5 Million. (See Exhibit No. 4).

    Most interestly, both CBR and Cellmark matched me to the semen on the vaginal swab with two different profiles of my DNA which is medically impossible. First, in Exhibit No. 2 at Pg. 4 the profile for the vaginal swab and my T-Shirt Stain is:

-2-

| DQ.1 | LDLR | GYPA | HBGG | D7S8 | GC |
|------|------|------|------|------|-----|
| 1.2/2 | B | B | AC | A | B |

In Exhibit No. 4 at Pg. 2, Cellmarks profile for the vaginal swab and my bloodstain is:

| DQ.1 | LDLR | HBGG | GYPA | D7S8 | GC |
|------|------|------|------|------|-----|
| 1.2.2 | B | B | AC | A | B |

Also both companies has a different profile for Diane's blood stain too. The Cellmark's Lab Report (Exhibit No. 4) cites the presence of someone else DNA in the Vaginal swab. Cellmark Lab would perform another type of DNA test on the vaginal swab and the odds matching me got even greater, i.e., 1 in 110 million but it also cites the presence of someone else's DNA presence in the ~~tested~~ vaginal swab ~~tested~~ (Exhibit No. 5 at pg. 2).

Cellmark would later DNA test forensic evidence found on an coffee cup, phone and toilet seat. During testing Cellmark Lab cites a different DNA profile for Diane and myself in Exhibit No. 6 at Pg. 2 as:

| | DQA.1 | LDLR | GYPA | HBGG | D7S8 | GC |
|------|------|------|------|------|------|-----|
| Diane | 1.3,4,1 | B | AB | A | B | C |
| Jordan | 1.2,2 | B | B | AC | A | B |

Compare the DNA profiles outline in Exhibit No. 4 at Pg. 2 ~~the Exhibit No. 6~~ for Diane Harrigan and myself to those outlined in Exhibit No. 6 at Pg. 2! In Exhibit No. 4 the DNA profile matches me to the semen on the vaginal swab and in Exhibit No. 6 the DNA profile here excludes me as the source on the coffee cup and phone. Which profile is correct?

Now the question arises "Is someelse's DNA presence or is there contamination of the sample?" It is transparent that the State Police Crime Lab in Sudbury, Massachusetts, whom handled all the forensic evidence in my case, has a history of contaminating evidence (See Exhibit No. 1). An Cellmark Diagnostics internal Fax cites how Prosecutor Michael O'Connell stated there was sometype of mix-up of samples in my wrongful conviction which was never revealed too my trial counsel (See Exhibit No. 7). How do we know that the Samples that were DNA tested to contaminated to manipulate the results to match me?

If another persons bodily fluids were presence in the vaginal swab, then it most likely belonged to Willie Johnson whom is a person of interests. Mr. Johnson by all accounts was the last person to see Diane alive. The night in question he drove and attended a wedding reception with Carlos Vega, Jewel Whatley and Diane. After leaving the said reception he claims that Carlos was dropped off first. Then Diane and Ms. Whatley were dropped off together, he drove off and went home for a moment before going out again. He drove around for about a hour alone and then returned home (See Exhibit No. 8 at Pg. 3).

Contrary to Mr. Johnson's version of events, Ms. Jewell stated "Willie dropped her off and then pulled up the street" with Diane. She further stated "She thought that Willie liked Diane". (See Exhibit No. 9). Therefore, Mr. Willie Johnson lied. The video tape of the wedding reception depicts Mr. Johnson and Diane dancing together all night. If the Cellmark Lab Reports are correct that another persons bodily fluids were present inside Diane's vaginal swab (Exhibit Nos. 4 & 5) and if the belong to Mr. Johnson, why did he lie?

The CBR Lab report does almost match Mr. Johnson's DNA to the vaginal swab sample (See Exhibit No. 2). My DNA could mask his due to the fact, he was at the time 50 years old and I was 22 years old which naturally my semen

- 4 -

would be more vigorous than his! Plus Diane's body was badly burned by the fire that was set in her apartment which the Arson Expert for the Prosecution testified burned an hour prior to the fire department arrived. This would rapidly speed up the breakdown of any bodily fluids inside Diane's body. Especially those presence that were inferior!

I have eye witness evidence that proves the Commonwealth's immunized witness committed perjuried when him and his family falsely claimed that I confessed to the murder of Diane Harrigan on March 19, 1996 at there home. (See Exhibit No. 10) Also my Family, Friends and My Church Members all support my meritorious claims of being INNOCENCE! (See Exhibit No. 11).



Boston Herald Library
One Herald Square
Boston, MA  02118

INVOICE #  11100601                                November 10, 2006

Jordan M. Rice
177 Battles Farm Rd.
Brockton, MA  02301

Invoiced Item:  Research/mailing fee for Boston Herald articles on
Massachusetts State Crime Lab.

Amount Due: **$10.00 (U.S.)**

Please make check payable to ***Boston Herald*** and remit payment to:

**Boston Herald Library
One Herald Square
Boston, MA  02118**

/s/
Alan M. Thibeault
Chief Librarian
Boston Herald
(617) 619-6678
athibeault@bostonherald.com

cc: file

- C -

NEWS
DNA cases questioned; Fast-track for Entwistle rankles
MAGGIE MULVIHILL
404 words
24 February 2006
Boston Herald
All Editions
004

Anxious relatives of crime victims have waited for months for state police DNA tests in hopes of a break in their cases, while the high-profile Entwistle case
had the lab work fast-tracked.
It takes about six to eight months to analyze a DNA sample at the state police laboratory, but DNA in the Entwistle murders was tested in less than three weeks.
Armed with the results, suspected wife and baby killer Neil Entwistle, 27, was arrested Feb. 9 by state police assigned to Middlesex District Attorney Martha Coakley's Office.
Meanwhile, the loved ones of other crime victims have waited years for results of DNA tests in equally horrific rapes and murders. The current backlog at the lab in Sudbury is about 1,300 cases, said Detective Capt. Kenneth Sullivan.
Jolene Bedoya, whose mother, Nancy Paiva, was slain by a suspected serial killer
targeting New Bedford women in the 1980s, said her heart surged when investigators said in 2002 they would try to test available evidence in the case
- including clothing, hair, bones, dirt and teeth.
"I think in this case they looked at these women as drug addicts, so this was bound to happen. But it doesn't matter. They were still someone's mother, grandmother daughter," Pedoya said.
"But the (Entwistles) were the all-American family. Here you have this woman and
her baby killed and it is going to hit every newsstand in the world and it is going to be pushed up to the top," she said. "It's sad but it's the truth."
Neither state police nor Coakley would comment yesterday on why the Entwistle tests were rushed ahead of other murder cases.
Sullivan said some cases are expedited at the request of prosecutors or investigators and in consultation with lab officials.
"The district attorneys have a lot of weight in determining what is a priority and what is not," he said. "If they have a special request, we drop everything."

Sullivan said state police have dramatically decreased the amount of time it takes for DNA analysis, to six to eight months now, down from nine to 18 months
last August.
A burst in state funding last year has allowed the lab to hire an additional 19
chemists, with 11 more to be hired this year.
About 250 cases were completed last year, he said.


NEWS
DNA evidence in slaying tainted at state crime lab
JENNIFER ROSINSKI
249 words
18 May 2005
Boston Herald
All Editions
023

Questions have surfaced about tainted DNA evidence taken from an 84-year-old
Quincy woman after her beating death almost four years ago.
It turns out the DNA of a state police crime lab analyst matches the DNA
profile
taken from Marina Calabro's rape kit in February 2003, according to a motion
filed in Norfolk Superior Court in Dedham by attorney Robert Griffin.
"They discovered that there was an unknown DNA donor in this case almost two
years ago. Why wasn't this information discovered and disclosed (earlier)," said
Griffin, who represents murder suspect Thomas Lally of Norton.
Norfolk District Attorney William Keating's office informed the court of the
boo-boo in March, but has yet to provide an explanation.
"We are committed to full disclosure," spokesman Kevin Bowe said. "In this case
the DNA test referred to in defendant Lally's motion has no bearing on the guilt
or the innocence of the defendant."
Lally, Calabro's great-nephew Anthony Calabro and Jason Weir are accused of
concocting a scheme to kill the old woman for a share of Calabro's $760,000
inheritance.
Investigators say Lally beat the former hairdresser with a frying pan, strangled
her and smothered her with a pillow while Calabro kept watch at the front door.
A spokeswoman for the Executive Office of Public Safety, which oversees the
Sudbury lab, said the office does not comment on open cases.


NEWS
Crime lab gets new boss to speed up DNA testing
Tom Farmer
344 words
15 May 2002
Boston Herald
All Editions
022


The Massachusetts State Police has put one of its top detectives in charge of
the department's beleaguered crime lab in an effort to get DNA testing for
high-profile cases on the fast track.
State police spokesman Lt. Paul Maloney confirmed yesterday that Capt. Mark
Delaney has been promoted to major and put in charge of the department's
laboratories and Crime Scene Services unit.
Sources said Delaney, the former commander of the Middlesex County detective
unit, will have the authority to prioritize cases for DNA testing. The move came
partly from the adverse publicity surrounding the murder of Truro fashion writer
Christa Worthington where investigators have been waiting nearly six months for
forensic test results.
"It's an embarrassment and (Delaney) is going in there with the authority to
give certain cases higher priority," one official said.
The Herald reported the results of a National Association of Medical Examiners
study last month that said state medical examiners and forensic investigators
are underfunded, understaffed and overworked. The state police lab in Sudbury is
so swamped with requests for DNA testing that getting results back takes at
least six months.
"We know we have serious problems there that need to be addressed, but by
putting (Delaney) in there, we're taking away some of the decision-making from

"It's not going to address the whole issue, but it's a step in the right direction. We still need more money to perform an adequate job across the commonwealth," Jajuga said.

District attorneys and police interviewed for the assessment repeatedly complained about the refusal by the main State Police Crime Lab in Sudbury to run DNA tests in rape and other cases where no suspect has been identified but where the sample could be compared against the national DNA Convicted Offender Database.

"Rape, unfortunately, is the orphan child here. We can't get murders done, let alone rapes," Cape and Islands First Assistant District Attorney Michael O'Keefe
said. "These problems have been around for years. That report, as scathing as it
is, could be much worse."

The report slams the state labs for adhering to a "draconian" protocol limiting
the state's district attorneys to submitting just one or two cases a month for DNA profiling — a measure dictated by budget and staff constraints. The result is long waits and missed trial dates.

"We are not where we should be," Jajuga said. "We are behind and the problem is
creating a real crisis. The DAs will tell you that. I am aware of it. The governor's office is aware of it. I am trying to find the resources to address it."

The report also found space is so limited at the main state police lab in Sudbury and others scattered throughout the state, criminalists are forced to "pluck" evidence from the clothing of suspects and victims on separate days to avoid cross-contamination.

All seven state crime labs need better storage facilities and all lack a secure
area to examine vehicles.

Other findings:

-- The Crime Scene Services unit at Devens is located in a building with a potential asbestos problem and such limited space that unsealed evidence is stored everywhere, including a leaky locker outside, the report notes. Like other forensic units, the Devens crew operates without written procedures and with no training budget.

-- In Bourne, the Crime Scene unit works off excerpts from old and outdated manuals; the Middleboro unit is so shorthanded, due work is completed on a "day-to-day basis."

-- The one medical examiner assigned to the satellite office in Worcester often
must "beg, borrow or steal" supplies from UMass Medical Center, where the office
is located.

-- The medical examiner's office in Pocasset should be closed immediately as a hazard to public health, the report states. The facility, located in a long-closed mental health hospital, has no drain in the autopsy room, which forces coroners to catch all body fluids in a five-gallon bucket.
The unsanitary situation was highlighted by a National Association of Medical Examiners report in 2000 but ignored.

"The facility would surely fail an inspection by OSHA or any Department of Health," the study states.

The report's authors singled out the Boston Police Department's crime lab for praise despite the unit operating independently of the state's system. The Boston lab, unlike the state police crime labs, has no backlog on DNA tests and
recently applied for national accreditation.



Exhibit No.

2

SEP-18-96 WED 12:53    CNTR FOR BLOOD RESEARCH    FAX NO. 6172783493    P.04



# CBR LABORATORIES, INC.

800 HUNTINGTON AVENUE, BOSTON, MASSACHUSETTS 02115    (817) 731-6470 FAX (617) 278-3493

September 17, 1996

F71/97
GM

Mr. Michael O'Connell
Assistant District Attorney
32 Belmont Street
Brockton, MA 02403

Re: Commonwealth of Massachusetts Crime Lab. No. C95-983 Brockton
    CBRL Case No. F579

Dear Mr. O'Connell:

On November 22, 1995, a package was hand delivered by Debbie McKillop
Shields, Massachusetts Department of State Police, Crime Laboratory,
59 Horse Pond Road, Sudbury, MA 01776 to Janice Williamson of CBR
Laboratories. Enclosed were a letter of authorization, and the
following items:

| CBRL Item | Description |
|-----------|-------------|
| 14572 | Item 28, vaginal swab |
| 14573 | Item 66, Diane Harrigan, blood stain |
| 14574 | Item 67, Willie Johnson, blood stain |
| 14575 | Item 68, Carlos Vega, blood stain |
| 14576 | Item 69, James Morgan, blood stain |
| 14577 | Item 70, Paul Dacey, blood stain |
| 14578 | Item 71, John Madden, blood stain |

On July 10, 1996, a package was hand delivered by Joseph V. Mason,
Office of the District Attorney, Plymouth County, Massachusetts State
Police, W. Grove Street, RTE 28, Middleboro, MA 02346 to Janice
Williamson of CBR Laboratories. Enclosed was the following item:

| CBRL Item | Description |
|-----------|-------------|
| 14939 | 4 swabs, John J. Julian, suspect |

On August 9, 1996, a package was hand delivered by Joseph V. Mason,
Office of the District Attorney, Plymouth County, Massachusetts State
Police, W. Grove Street, RTE 28, Middleboro, MA 02346 to Janice
Williamson of CBR Laboratories. Enclosed were the following items:

A SUBSIDIARY OF THE CENTER FOR BLOOD RESEARCH
HARVARD MEDICAL SCHOOL AFFILIATE

SEP 18 '96 12:58    6172783493    PAGE.04

SEP-18-96 WED 12:53   UNIR FOR   UUD RESEARCH   FAX NO. 6172763004   P.05

Case 1:04-cv-10859-MLW   Document 148-2   Filed 08/28/2007   Page 12 of 42.

page 2

F57197
GM

Mr. Michael O'Connell

Re: Commonwealth of Massachusetts Crime Lab. No. C95-983, Brockton
CBRL Case No. F579

| CBRL Item | Description |
|-----------|-------------|
| 14991 | White Sheet |
| 14992 | White T- Shirt |

On August 16, 1996, a package was hand delivered by Joseph V. Mason,
Office of the District Attorney, Plymouth County, Massachusetts State
Police, W. Grove Street, RTE 28, Middleboro, MA 02346 to Janice
Williamson of CBR Laboratories. Enclosed were the following items:

| CBRL Item | Description |
|-----------|-------------|
| 14993 | Orange Jump Suit |

Photographs were taken of all of the items. There was no evidence of
tampering.

An attempt was made to extract DNA from samples received. The sexual
assault item was extracted by a two step method which will recover DNA
from non-sperm cells usually associated with the victim called (the
epithelial cell lysate) and recover DNA from any sperm cells present
called (the male lysate). Extracted DNA was amplified to DQA1, LDLR,
GYPA, HBGG, D7S8 and GC Loci using Applied Biosystems Perkin Elmer
AmpliType Kit(s). The results are summarized in Table 1:

Diane Harrigan (CBRL item 14573) cannot be excluded as the donor of
the DNA extracted from the epithelial cell lysate of CBRL item 14572
in the DQA1, LDLR, GYPA, HBGG, D7S8 and GC systems.

Willie Johnson (CBRL item 14574), Carlos Vega (CBRL item 14575), James
Morgan (CBRL item 14576) Paul Dacey (CBRL item 14577) and John Madden
(CBRL item 14578) can be excluded as the donors of the DNA extracted
from the male lysate of CBRL item 14572.

DQA1 testing was performed on Willie Johnson (CBRL item 14574) on May
30, 1996. Willie Johnson (CBRL item 14574) is excluded as the donor
of the DNA extracted from the male lysate of CBRL item 14572.

John J. Julian (CBRL item 14939) can be excluded as the donor of the
DNA extracted from the male lysate of CBRL item 14572.

The donor of the DNA extracted from the White Sheet (CBRL item 14991-
1) cannot be excluded as the donor of the DNA extracted from the male
lysate of CBRL Item 14572 in the DQA1, LDLR, GYPA, HBGG, D7S8 and GC
systems.

page 3

Mr. Michael O'Connell

Re: Commonwealth of Massachusetts Crime Lab. No. C95-983, Brockton
    CBRL Case No. F579

The donor of the DNA extracted from the White T-Shirt (CBRL item
14992-1) cannot be excluded as the donor of the DNA extracted from the
male lysate of CBRL Item 14572 in the DQA1, LDLR, GYPA, HBGG, D7S8 and
GC Systems.

The donor of the DNA extracted from the White T-Shirt (CBRL item
14992-C) cannot be excluded as the donor of the DNA extracted from the
male lysate of CBRL Item 14572 in the LDLR, GYPA, HBGG, D7S8 and GC
Systems.

The combination of genetic types DQA1; 1.2/2, LDLR; B, GYPA; B, HBGG;
AC, D7S8; A and GC; B, is found in approximately 1 out of 1,770
African Americans, 1 out of 6,315,000 Caucasians, 1 out of 691,500
Southeast Hispanics and 1 out of 2,667,000 Southwest Hispanics.

If there is further assistance we can provide you, please contact us.

Sincerely yours,

David H. Bing, Ph.D.
Director, Clinical Testing
DHB/eag

SEP 18 '96 12:59

Page 4

Mr. Michael O'Connell

Re: Commonwealth of Massachusetts Crime Lab No. C95-983-Brockton
    CBRL Case No. F579

Table 1: DQ Alpha Amplitype(R) and Amplitype PM Results(R)

| CBRL Item | Description | DQA1 Results | LDLR | GYPA | P M Results HBGG | D7S8 | GC |
|-----------|-------------|--------------|------|------|------|------|-----|
| 14573 | Diane Harrigan, blood stain | 1.3/4.1 | B | AB | A | B | C |
| 14574 | Willie Johnson, blood stain | 1.2 | B | B | AC | A | BC |
| 14575 | Carlos Vega, blood stain | NT | B | A | B | B | BC |
| 14576 | James Morgan, blood stain | NT | A | A | A | AB | C |
| 14577 | Paul Dacey, blood stain | NT | AB | AB | AB | B | C |
| 14578 | John Madden, blood stain | NT | A | AB | A | A | C |
| 14572 | Item 28, vaginal swab epithelial cell lysate | 1.3/4.1 | B | AB | A | B | C |
| 14572 | Item 28, vaginal swab male lysate | 1.2/2 | B | B | AC | A | B |
| 14939 | John J. Julian, suspect | 1.2/3 | AB | A | B | AB | AB |
| 14991-1 | White Sheet | 1.2/2 | B | B | AC | A | B |
| 14991-C | White Sheet, unstained Area | Inc. | Inc. | Inc. | Inc. | Inc. | Inc. |

F71/1197
BAM
849

-14-

SEP-18-96 WED 12:54    UNIT FU 'LOOD RESEARCH    FAX NO. 81/918'"4J    P.01
508 946 0182  in 15803533311    SEP-15 '96 11:35 :A    P.02

Page 5

Mr. Michael O'Connell

Re: Commonwealth of Massachusetts Crime Lab No. C95-983-Brockton
    CBRL Case No. F579

Table 1: DQ Alpha Amplitype (R) and Amplitype PM Results (R)

| CBRL Item | Description | DQA1 Results | LDLR | GYPA | P M Results HBGG | D7S8 | GC |
|---|---|---|---|---|---|---|---|
| 14992-1 | White T-Shirt | 1.2/2 | B | B | AC | A | B |
| 14992-C | White T-Shirt unstained area | Inc. | B | B | AC | A | B |

All controls gave expected results.

NS = None Seen
NT = Not Tested
9/17/96



3

# DNA test-case hurdles delay justice

**DELAY**
continued from Page A1

: esoteric science finds its way n the laboratory into the courtm and how the legal system slowdjusts to accommodate it.

"It's inexcusable that anyone, un- normal circumstances, would nd 4½ years incarcerated waiting the result of some scientific test-" said Harvard Law professor rles Ogletree. "I'm just shocked he delay in these cases . . . This is n how bad case law is made."

Ogletree said the slow process ates a defendant's right to a edy trial, guaranteed by the conption, and hurts the families of victims as they wait for the clo-e that a verdict can bring. "It's a t set of problems," he said.

But for those ensnared in what etree called the "sausage grind-of the court system, there is only seemingly endless wait for the liminary skirmish to end so the in question can be decided: Is Sok ity of murdering Or?

The same issue — the validity of DNA tests — has been raised in death of music student Allan l, slain in May 1993 allegedly by f-brothers Herdius Evans and nes Ware in the South End; in the ober 1992 deaths of Takeisha Nickles and her grandfather omas McNickles allegedly by bert McNickles, a relative; and in March 1994 murder of elderly chariah Johnson, allegedly by ary Juan Williams.

Sok, Evans, Ware, McNickles d Williams have been in jail since eir arrests and have now been held otal of nearly 15 years, with Sok ing held the longest. The court-appinted attorneys for all the defenants opposed Martin's effort to use e PCR version of DNA evidence ainst their clients.

All the cases have been combined appeal to the Supreme Judicial urt.

Mary K. Ames, who helped steer e DNA effort by Martin's office fore going into private practice, id some of the delay "actually and onically benefited the defense" because the defense attorneys had ne to learn DNA science, knowl-ge that they used to effectively at-

ity of the DNA tests.

In Sok's case, some of the delay was caused by his own psychological problems. He has tried at least twice to kill himself since being sent to the Nashua Street Jail in 1992 and was transferred to Bridgewater State Hospital for several months, which made him unavailable for trial.

Moreover, Sok remains under a suicide watch at the jail, where he has spent his entire time there in a 22-bed medical unit. Sok is a native of Cambodia who spent seven years in a refugee camp to escape the murderous rule of the Khmer Rouge before coming to the United States in 1985, according to records.

His attorney, Elliot Weinstein, has asked Superior Court Judge Vieri Volterra to dismiss the charges or release Sok on bail due to the jail stay. Volterra has not yet ruled. Attorneys for the other defendants have raised similar conerns.

To Martin and other prosecutors, DNA testing can be an important tool in matching a suspect to a crime. But the only method so far allowed in Massachusetts, RFLP, requires a large sample of blood, semen or hair before it can be used. PCR works with smaller samples that are then duplicated until the sample is large enough for testing, a process that defense attorneys contend makes it susceptible to contamination. Small amounts of material are often found at crime scenes.

The PCR type of DNA testing


GLOBE FILE PHOTO
Vao Sok is led in 1992 from the Revere police station to his arraignment on charges of raping and murdering a 5-year-old girl.

torney General Paul R. McLaughlin since police found a bandana and sweatshirt from which DNA samples can be obtained for comparison — once a suspect is firmly identified or in custody.

In a 195-page ruling, Superior Court Judge John P. Moriarty ruled in March the reliability of PCR testing has been generally accepted by scientists. But he also ruled the laboratory Martin hired for the tests, the Center for Blood Research of Boston, did not comply with medical standards for DNA testing in criminal cases. Dr. David Bing is the CBR

lab director.

The CBR used three different ways of PCR testing. Moriarty ruled that one test, known as the DQalpha, could be used against Sok, Evans, Ware and Williams. He ruled two other tests, the PM and D1S80, could not be used at trial.

But in the biggest blow to fine either, Moriarty excluded DNA evidence against McNickles whose arrest rests heavily on forensic science and not testimony from eyewitnesses.

Martin now wants the SJC to overturn Moriarty's ruling before any trial is held because the large DNA evidence "gravely compromises" the cases. Since a person may not be tried again if acquitted of murder, Martin wants to have the strongest possible case to present to a jury and that means the DNA evidence, according to court papers.

Martin and his top aide, chief trial counsel Elizabeth Keeley, declined an interview request last week. Women Fields, the office spokeswoman, would not comment on pending litigation. But, she said, "I think it's safe to assume that this office views those cases are the best representatives of why the admissibility of this technology would be helpful."

A hearing before a single justice of the SJC has been set for January. If the full SJC takes the cases, a ruling is unlikely until later in the year.

# Fight on DNA test case gives murder suspects a long wait

By John Ellement
GLOBE STAFF

Ammorian Or was just 5 years old when she died, allegedly at the hands of Vao Sok, a 27-year-old Cambodian who worked as a handyman at the Revere apartment building where the girl lived and where her father found her raped, battered and bruised by her killer.

Now, 4½ years after Sok was charged with raping and murdering the child, he has yet to be tried even though he allegedly confessed to the crime, and even though Suffolk

torney Ralph C. Martin 2d's ecutors decided in 1994 they wto use the May 1992 murder of and four other unrelated murd as the test case for the admissi of a new type of DNA testing, k by its acronym, PCR.

But the plan to put Martir fice on the cutting edge of for science was blunted by a Sup Court judge in March. And the struggle between prosecutors fense attorneys and judges wil into 1997 as Martin's office tr salvage the test case and the sie technique. Meanwhile, Va it is jail and waits

# Vao Sok chronology

Following is a chronology of some of the major events in the case of Vao Sok, who has been in jail 4½ years awaiting trial on charges of murdering and raping a 5-year-old Revere girl in May 1992.

### 1992

- **May 16:** Anmorian Or, 5, is found by her father, unconscious, inside a vacant apartment in the building where she lived at 146 Shirley Ave., Revere, one day after she disappeared.
- **May 19:** Anmorian Or dies at Massachusetts General Hospital. Sok is taken into protective custody by Revere police.
- **May 22:** Vao Sok is arrested and charged with murder. Since May 19, police interrogate him, administer a polygraph test, and obtain samples of his hair, blood, saliva and clothing. He is indicted May 28 on charges of first-degree murder, rape of a child, and kidnapping. He is ordered held without bail at Nashua Street Jail.
- **Nov. 16:** The State Police crime lab reports that a microscopic examination of pubic hair found on the girl's lower body and in the apartment where she was found has "similar microscopic characteristics" to pubic hair samples provided by Sok.

### 1993

- **May 4:** Sok attempts suicide with razor blades at the Nashua Street Jail and begins first of several stays at Bridgewater State Hospital because of suicidal tendencies.
- **Aug. 17:** The report of a psychiatrist at Bridgewater State Hospital finds that Sok is competent to stand trial.

### 1994

- **June 9:** The prosecution announces it intends to do DNA testing using the new PCR method instead of the RFLP method, which is already allowed. Defense objects.
- **Aug. 8:** Judge James Donahue allows prosecution to do DNA testing.
- **Oct. 18:** Appeals Court denies defense challenge to allowance of DNA testing and for more money for defense DNA expert.

### 1995

- **March 9:** The prosecution completes DNA testing using PCR method. Testing began in November 1994.
- **Sept. 5:** Judge John Moriarty begins hearing on the use of PCR testing for DNA evidence. Hearing lasts until Oct. 19. Sok's case and those of four other defendants are bundled into one.

### 1996

- **March 5:** Moriarty issues 195-page ruling. He lets one type of PCR testing to be used against Sok and two other defendants. Bars all DNA evidence in a third case.
- **March 15:** The prosecution files appeal with the Supreme Judicial Court to get the issue settled before trial.
- **Aug 28:** Sok's attorney asks the court to dismiss the charges or release Sok on bail because of his failure to get a speedy trial. The motion is still pending before Judge Viera Guy Volterra.

### 1997

- **Jan. 22:** Oral hearing before single justice of the Supreme Judicial Court.

SOURCE: Suffolk Superior Court and Supreme Judicial Court records.

Globe staff chart

-18-



Exhibit No.

4


# CELLMARK
### D I A G N O S T I C S

20271 Goldenrod Lane · Germantown, Maryland 20876

Telephone: (301) 428-4980  (800) USA-LABS
Administration Fax: (301) 428-4877
Laboratory Fax: (301) 428-7946

## REPORT OF LABORATORY EXAMINATION
June 30, 1997

Ms. Debbie McKillop Shields
Chemist II
Massachusetts Department of State Police
Crime Laboratory-Serology Section
59 Horse Pond Road
Sudbury, MA 01776

Re:  Cellmark Case No. F971197
     Your Lab No. C95-983 Brockton

## EXHIBITS:

Polymerase chain reaction (PCR) testing was performed on the following items which were received
for analysis on April 29, 1997:

| ID# | Description |
|---|---|
| 28 | One swab labelled "vaginal swabs..." |
| 66 | Bloodstain labelled "...Diane Harrigan" |
| 72 | Bloodstain labelled "...Jordan Martel Rice" |

## RESULTS:

DNA was isolated from the items listed above. DNA from each of the items was amplified using
the PCR and typed for HLA DQA1, the LDL receptor (LDLR), glycophorin A (GYPA), hemoglobin
G gammaglobin (HBGG), D7S8 and group specific component (GC) using the AmpliType® PM +
DQA1 PCR Amplification and Typing Kit; and amplified and typed for the short tandem repeat
(STR) loci HUMCSF1PO, HUMTPOX and HUMTHO1 and for gender (X,Y) using the GenePrint™
STR Multiplex System and the GenePrint™ Sex Determination System (Amelogenin), respectively[1].

The types detected for each sample are listed below:

Report for F971197
June 30, 1997
Page Two

## ALLELES DETECTED

| Sample | CSF1PO | TPOX | THO1 | X,Y |
|---|---|---|---|---|
| vaginal swab (non-sperm fraction) | 11* | 8,9* | 6,7 | X |
| vaginal swab (sperm fraction) | 11* | 8,9* | 7* | X Y⁺ |
| Diane Harrigan | 11 | 8,9 | 6,7 | X |
| Jordan Martel Rice | 11 | 8,9 | 7 | XY |



\* In addition to the types listed, faint results were obtained. These results may be due to the presence of DNA from more than one individual or to technical artifacts.

⁺ It may not be possible to determine whether DNA from a female is present when DNA from a male is detected.

## ALLELES DETECTED

| Sample | DQA1 | LDLR | HBGG | GYPA | D7S8 | GC |
|---|---|---|---|---|---|---|
| vaginal swab (sperm fraction) | 1.2,2 | B | B | A C | A | B |
| Diane Harrigan | 1.3,4.1 | B | A B | A | B | C |
| Jordan Martel Rice | 1.2,2 | B | B | A C | A | B |

## CONCLUSIONS:

The DNA obtained from the non-sperm fraction of the vaginal swab is from a female. Jordan Martel Rice is excluded as the source of the DNA obtained from the non-sperm fraction of the vaginal swab. Diane Harrigan cannot be excluded as the source of the DNA obtained from the non-sperm fraction of the vaginal swab.

The DNA obtained from the sperm fraction of the vaginal swab contains DNA from a male. Diane Harrigan is excluded as the source of the DNA obtained from the sperm fraction of the vaginal swab. Jordan Martel Rice cannot be excluded as the source of the DNA obtained from the sperm fraction of the vaginal swab. Using Recommendation 4.1 from the 1996 National Research Council[2] report, the approximate frequencies in the Caucasian, African American and Hispanic populations of the HLA DQA1, LDLR, GYPA, HBGG, D7S8, GC, CSF1PO, TPOX and THO1 types obtained from sperm fraction of the vaginal swab and the bloodstain labelled Jordan Martel Rice are as follows:

Report for F971197
June 30, 1997
Page Three

| Population data base | Frequency |
|---|---|
| Caucasian | 1 in 6.9 billion |
| African American | 1 in 1.5 million |
| Hispanic | 1 in 780 million |


Robin W. Cotton, Ph.D.
Laboratory Director

Melisa A. Weber
Senior Molecular Biologist

[1] This test is performed pursuant to licensing arrangements with Roche Molecular Systems, Inc. and the Perkin Elmer Corporation.

[2] The National Research Council on DNA Forensic Science (1996) The Evaluation of Forensic DNA Evidence. National Academy Press, Washington, D.C. (see p. 122, using $\theta=0.03$).



5



# CELLMARK
**DIAGNOSTICS**

20271 Goldenrod Lane · Germantown, Maryland 20876

Telephone: (301) 428-4980  (800) USA-LABS
Administration Fax: (301) 428-4877
**REPORT OF LABORATORY EXAMINATION**   Laboratory Fax: (301) 428-7946
July 7, 1997

Ms. Debbie McKillop Shields
Chemist II
Massachusetts Department of State Police
Crime Laboratory-Serology Section
59 Horse Pond Road
Sudbury, MA 01776

Re: Cellmark Case No. F971197
    Your Lab No. C95-983 Brockton

## EXHIBITS:

Polymerase chain reaction (PCR) testing was performed on the following items which were received for analysis on April 29, 1997:

| ID# | Description |
| --- | --- |
| 28 | One swab labelled "vaginal swabs..." |
| 66 | Bloodstain labelled "...Diane Harrigan" |
| 72 | Bloodstain labelled "...Jordan Martel Rice" |

## RESULTS:

DNA previously isolated from the items listed above was amplified using the PCR and typed for the D1S80 locus using the AmpliFLP™ D1S80 PCR Amplification Kit.

The types detected for each sample are listed below:

### ALLELES DETECTED

| Sample | D1S80 |
| --- | --- |
| Vaginal swab (sperm fraction) | 17,24* |
| Diane Harrigan | 18 |
| Jordan Martel Rice | 17,24 |

*Accredited by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board*

- 24 -

*Cellmark Diagnostics, Inc. is a subsidiary of Lifecodes Corporation*

Report for F971197
July 7, 1997
Page Two

* In addition to the types listed, faint results were obtained. These results may be due to the presence of DNA from more than one individual or to technical artifacts.

## CONCLUSIONS:

Diane Harrigan is excluded as the source of the DNA obtained from the sperm fraction of the vaginal swab. Jordan Martel Rice cannot be excluded as the source of the DNA obtained from the sperm fraction of the vaginal swab.

Using the HLA DQA1, LDLR, GYPA, HBGG, D7S8, GC, CSF1PO, TPOX and THO1 data provided in the **Report of Laboratory Examination** dated June 30, 1997, the D1S80 data listed above, and Recommendation 4.1 from the National Research Council[1] report, the approximate frequencies in the Caucasian, African American and Hispanic populations of the types obtained from the sperm fraction of the vaginal swab and the bloodstain labelled Jordan Martel Rice are as follows:

| Population data base | Frequency |
|---|---|
| Caucasian | 1 in 2.3 trillion |
| African American | 1 in 110 million |
| Hispanic | 1 in 130 billion |


Jennifer E. Reynolds, Ph.D.
Staff Scientist

Melisa A. Weber
Senior Molecular Biologist

---

[1] The National Research Council on DNA Forensic Science (1996) The Evaluation of Forensic DNA Evidence. National Academy Press, Washington, D.C. (see p. 122, using θ=0.03).

- 25 -





# CELLMARK
**D I A G N O S T I C S**

20271 Goldenrod Lane · Germantown, Maryland 20876

Telephone: (301) 428-4980  (800) USA-LABS
Administration Fax: (301) 428-4877
Laboratory Fax: (301) 428-7946

## REPORT OF LABORATORY EXAMINATION
January 7, 1998

Ms. Debbie McKillop Shields
Chemist II
Massachusetts Department of State Police
Crime Laboratory-Serology Section
59 Horse Pond Road
Sudbury, MA 01776

Re: Cellmark Case No. F971197
    Your Lab No. C95-983 Brockton

### EXHIBITS:

Polymerase chain reaction (PCR) testing was performed on the following items which were received for analysis on December 19, 1997:

| ID# | Description |
|-----|-------------|
| 16 | Stained material labelled "...coffee cup..." |
| 15 | Stained material labelled "...phone" |
| 14 | Stained material labelled "...toilet seat" |

### RESULTS:

DNA isolated from material labelled coffee cup (item 16) and from the material labelled phone (item 15) was amplified using the PCR and typed for HLA DQA1, the LDL receptor (LDLR), glycophorin A (GYPA), hemoglobin G gammaglobin (HBGG), D7S8 and group specific component (GC) using the AmpliType® PM + DQA1 PCR Amplification and Typing Kit.

The types detected for each sample and the types previously provided for the bloodstain labelled Diane Harrigan and for the bloodstain labelled Jordan Martel Rice in the **Amended Report of Laboratory Examination** dated December 22, 1997, are listed below:

-27-

Accredited by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board

Cellmark Diagnostics, Inc. is a subsidiary of Lifecodes Corporation

Report for F971197
January 7, 1998
Page Two

### ALLELES DETECTED

| Sample | DQA1 | LDLR | GYPA | HBGG | D7S8 | GC |
|---|---|---|---|---|---|---|
| coffee cup | 1.3,4.1 | B | A B | A | B | C |
| phone | 1.3,4.1* | B | A B | A | B | C |
| Diane Harrigan | 1.3,4.1 | B | A B | A | B | C |
| Jordan Martel Rice | 1.2,2 | B | B | A C | A | B |

* The HLA DQA1 types reported above for the material labelled phone are discernible, however, the expected control dot was not detected.

No PCR products were obtained when an extract from the material labelled toilet seat (item 14) was amplified using the AmpliType® PM + DQA1 PCR Amplification and Typing Kit.

### CONCLUSIONS:

No conclusion can be made regarding the material labelled toilet seat.

Diane Harrigan cannot be excluded as the source of the DNA obtained from the material labelled coffee cup. Jordan Martel Rice is excluded as the source of the DNA obtained from the material labelled coffee cup.

No conclusion can be made regarding the HLA DQA1 data obtained from the material labelled phone.

Using the LDLR, GYPA, HBGG, D7S8 and GC data, Diane Harrigan cannot be excluded as the source of the DNA obtained from the material labelled phone. Jordan Martel Rice is excluded as the source of the DNA obtained from the material labelled phone.

Jennifer E. Reynolds, Ph.D.
Staff Scientist

Melisa A. Weber
Senior DNA Analyst



Exhibit No.

7

# CELLMARK
## DIAGNOSTICS

20271 Goldenrod Lane · Germantown, Maryland 20876

Telephone: (301) 428-4980  (800) USA-LABS
Facsimile: (301) 428-4877

## FAX TRANSMISSION COVER SHEET

TO: Debbie McKillop- Shields                    DATE: 6/6/99

FAX: _____

FROM: Melisa Weber

NUMBER OF PAGES INCLUDING COVER: 2

Copy of letter from Russell Redgate. I called Michael
O'Connell, he realizes it was a mixup and these samples
were never sent.

Please Note:    Faxes for Laboratory Personnel and Customer Service Personnel should be
sent to (301) 428-7946.

If there are any questions concerning this fax, please feel free to contact us at (301) 428-4980 or
1-800-872-5227.

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED FOR THE PERSONAL AND
CONFIDENTIAL USE OF THE DESIGNATED RECIPIENTS NAMED ABOVE. This message may be an attorney-
client communication, and as such is privileged and confidential. If the reader is not the intended recipient, you are
hereby notified that you have received this document in error, and that any review, dissemination, distribution or
copying of this message is strictly prohibited . If you have received this communication in error, please notify us
immediately by telephone.

Accredited by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board          Cellmark Diagnostics, Inc. is a subsidiary of Lifecodes Corporation

- 36 -



Exhibit No.

8

*The Commonwealth of Massachusetts*
*Department of State Police*

WILLIAM F. WELD
*GOVERNOR*

KATHLEEN M. O'TOOLE
*SECRETARY*

COLONEL CHARLES F. HENDERSON
*SUPERINTENDENT*

**Massachusetts State Police**
**Plymouth County CPAC Unit**

September 25, 1995

To:         Detective Captain William Brown
            Bureau of Investigative Services

From:       Trooper Scott A. Berna, #604
            Plymouth County CPAC Unit

Subject:    Interview with Willie Johnson and Carlos Vega
            Supplement to Harrigan Homicide Invest
            Case No. 95-113-0900-0191

1.          On September 23, 1995, at approximately 1215 hours, this officer and
Sgt MJ Crisp had occasion to interview Willie Johnson, DOB 5-9-45, of 24
Livingston Rd. apt #5, Brockton, MA, tel.no. 587-4982. Johnson had been
identified as one of several persons who had accompanied murder victim Diane
Harrigan to a celebration at the Wedgewood Country Club during the evening of
Friday, September 22, 1995.

2.          Sgt Crisp and I picked up Johnson at his residence and transported
him to the Brockton Police station where we conducted our interview in the
academy area. Johnson stated that his friend, Carlos, had called him during the
day on Friday, September 22nd, and asked him whether he was going to the
wedding party for Johnny and Gloria Watkins. Johnson was supposed to drive
Carlos to the party. Carlos then called him again later on, approximately
1330-1400 hrs, and left a message on his answering service (Nynex) inquiring
about driving Diane (Harrigan) to the party too. Apparently she needed a ride and
had asked Carlos if she could go along with them. Johnson knew Diane through
their affiliation with Alcoholics Anonymous (AA). He had met her at the Tuesday

night meetings at St. Edward's Church in Brockton and has known her
approximately one and one-half to two years.

3.         Johnson told us that he picked up Carlos last evening at the Supreme
Doughnut shop on Main St. and they drove over to Battles Farm to get Diane.
They mistakenly thought that she lived at #449. When they discovered she did not
live there they went over to Carlos apartment, which is located in the elderly
housing area next to Battles Farm, and they telephoned Diane. Then they drove
over to #475. They arrived at approximately 1925-1930 hours and went into
Diane's apartment and waited while she got ready. Johnson stated that the party
had been scheduled to start at 1930 hours so they were already late. He and Carlos
were anxious to get there and they declined Diane's offer to fix them a cup of
coffee. He and Carlos got some cigarettes from Diane and smoked. Diane's
friend, Jewel, came in after they got there and Diane helped her fix her dress.
Johnson said that he had never met Jewel before this evening. Jewel was also
invited to the wedding party and she got a ride with them.

4.         Johnson said that the four of them drove over to the party in his car, a
1986 white Pontiac Parisian, and they left Diane's at approximately 1945 hours.
During the course of the party the four of them sat at the same table and Johnson
danced a number of dances with Diane. He said that while she did speak to a
number of people at the party, she did not attach herself to any one particular
person. He said that she, in fact, spent most of the evening in his company.
Johnson told us that during the evening Diane talked about her boyfriend a little
bit. She said that he was a truck driver and was probably on the road. She said
that their relationship was, "shaky", but she did not mention having romantic
relationships with anyone else. Johnson described Diane as being in a good mood
during the evening and said that she did not have any alcohol to drink. We
inquired about any mention of a recent fall in her home where she had been
injured. Johnson said that she did not speak about any injury, recent or otherwise.

5.         Johnson said that the four of them left the party together at
approximately 2245 hours. They drove north along Main St. until they reached
the turn at Supreme Doughnuts. Diane asked him what time the coffee shop
closed and he recalled that he looked at the digital clock on his dash which read,
11:08 pm. He told Diane that the shop closed at 11:00. They drove up the road
and dropped Carlos off at his residence. Johnson then drove the two women into
Battles Farm Village and dropped them off near Diane's apartment. He did not

walk them to the apartment. Johnson recalled that it was dark and rainy in the neighborhood and he did not see any other persons walking around in the area. Johnson said that after the women got out of his car, he drove off and went home for a moment before going out again. He told us that he drove around the city for a little while, going down Main St., and the West Elm St. area. He said that he did not stop anywhere and he returned home at approximately 2400 hours.

6.          Johnson stated that he received a telephone call from Johnny Watkins this morning, Saturday, September 23rd. Watkins told him that Diane had died from smoke inhalation in a fire at her home last night. Johnson then called his friend Roger, an AA pal, to talk about her death. Then he called his AA sponsor, Smitty, to talk about Diane. Johnson explained that AA members deal with stressful events in their lives in such a manner, by reaching out for each other to talk. Johnson told us that when Diane attended AA meetings, she was a member of his group.   Johnson also tried to call Carlos with the news, but he was not at home. Johnson later learned that Carlos had gone to an AA meeting. Johnson himself then went to an AA meeting at the Brockton VA Hospital.

7.          We drove Johnson back to his residence after our interview and we proceeded to Carlos' residence to speak with him. Carlos was more particularly identified at that time as Carlos Vega, DOB 2-4-51, SSN 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. Vega resides at bldg 2, 10 Kennedy Drive, Brockton, tel.no. 559-1429. This interview was conducted at approximately 1305 hours on Saturday, September 23, 1995.

8.          Vega told us that he has known Diane, the victim, approximately two and one-half years and that they had met through AA on Tuesday nights at St. Edward's church. He said that he would see her riding her bicycle alot and that he sometimes went to the store for her. On Friday, September 22nd, he telephoned Diane to see if she was okay. He told her during their conversation that he was going to a wedding that evening. She said that she was going to a wedding too, and after speaking about it they discovered that it was the same event. Diane asked him if she could ride along with him and he told her that he would check with his friend. He then called Willy (Johnson) and Willy said it would be okay with him.

9.          Later that day Carlos went to the coffee shop (Supreme Doughnut) and met Willy. They went to #449 Battles Farm and found that it was the wrong house. The two of them returned to Carlos' apartment and telephoned Diane.

They then drove to #475 Battles Farm and waited inside while Diane was getting ready. She was also on the telephone when they arrived and she seemed to be okay. While they were waiting, Diane's friend Jewel came over and Diane helped her get ready. They left for the party at around 1945 hours. The party was at the Wedgewood and they were there from 2000 to around 2300 hours.

10.        Vega told us that while they were at the party, Diane looked happy, but she also looked worried at times. The four of them; Vega, Willy , Diane, and Jewel sat at the same table at the party and they danced with each other. Vega did not recall Diane mentioning anything to him about her boyfriend during the course of the evening.

11.        Vega said that they left the wedding at approximately 2300 hours and that Willy dropped him off at his house at 2315 hours. He was the first one to get dropped off. Willy, Diane, and Jewel then drove off to go to Battles Farm. Vega remembered that the news was on television when he went in.

12.        Vega attended an AA meeting at Massasoit Community College Saturday morning, September 23rd. That is where he first heard the news about Diane's death.

Respectfully Submitted,

Scott A. Berna, Trooper
Massachusetts State Police
Plymouth County CPAC Unit



9



*The Commonwealth of Massachusetts*
*Department of State Police*
MASSACHUSETTS STATE POLICE
PLYMOUTH COUNTY CPAC

WILLIAM F. WELD
*GOVERNOR*

KATHLEEN M. O'TOOLE
*SECRETARY*

COLONEL CHARLES F. HENDERSON
*SUPERINTENDENT*

August 9, 1995

TO:                    Detective Captain William Brown.
                       Bureau of Investigative Services

FROM:                  Sergeant Michael J. Crisp  #829
                       Plymouth County CPAC

SUBJECT:               Dianna Harrigan Homicide
                       Interview of Jewell Whately, BF, DOB 05-05-47.

Case #                 95-113-0900-0191

1.              On Saturday, September 23, 1995 at 1030 Hrs this officer and Tpr Mason interviewed a Jewell Whately,BF, DOB 05-05-47, of 451 Battles Farms Drive, Brockton, Phone Number (508) 586-0963 regarding the Dianna Harrigan homicide.

2.              At that time we asked Jewell to tell us what she knew about the victim and what they had done together Friday evening into Saturday morning. She then related the following:

        She told us that Dianna was divorced and that her ex husband lives in Boston and is remarried. She told us that Dianna has had a boyfriend "Jack", who she thinks had been going with Dianna for three to four years. She thought Jack didn't drink anymore and she said he was a white male in his fifties, graying hair and beard.  She also said that Dianna had an ex boyfriend who Dianna couldn't stand.  She thought that his name was "Jimmy", and that he hung out at Asack's opposite Nemo's on Main Street. She said that Dianna doesn't really talk much about him.   She also mentioned that the victim and a Laura Jackson don't get along at all.  We then asked her if the victim was careful with locking her apartment doors and if she'd open the door without checking to see who was there first.  Jewell told us that Dianna usually locked her door and would ask who was there before opening the door to someone knocking.

3.              We then asked Jewell to tell us about her last contact with Dianna and what they had done the previous evening.  She told us that she and Dianna had gone to a birthday party at the Wedgewood Country Club. She really didn't remember times, but told us that a friend of Dianna's, a guy named Willie, phone 587-4982, and Carlos had given them a ride. She said that Dianna had danced with Willie at the party but they were just friends. Jewell said that

she thought that Willie liked Dianna. She said that Carlos liked her and Dianna but Dianna told him that she had a boyfriend. Jeweel said that they didn't leave the party too late. They left with Willie and Carlos and Carlos was dropped off first. Then she said that Willie dropped her off and then pulled up the street with Dianna. Jewell said that she then went into her apartment. Jewell said that the victim had wanted Jewell to stay at her apartment and had asked her a couple times to stay over that night, but Jewell didn't want to. Jewell then , once again, told us that both Willie and Carlos seemed to have an interest in Dianna, but she wasn't interested. Jewell then told us that she had a feeling that Jack was around and that he was always jealous and asking Jewell who calls Dianna. She also told us that Jack has his own key to Dianna's apartment. Then, she again told us that alot of guys liked Dianna.

4.          We then asked her what she had seen or heard relative to the fire at Dianna's. She said that she heard nothing until she got up and saw the police and fire departments there. The interview was then concluded.

Michael J. Crisp # 829
Sgt. Mass State Police
Plymouth CPAC



Paul S. Chase
254 Plymouth Street
Abington MA 02351                                    February 16, 2007

Re: Letter of support for Jordan M. Rice:

To whom it may concern:

    I, Paul S. Chase, hereby author this letter of support for Jordan M. Rice and his families quest for a probe into his wrongful murder conviction. I wholeheartedly believe I possess knowledge of Mr. Rice's innocence because I was the Production Manager at Ryan Iron Works Inc. where Mr. Rice was employed as a "Helper". On March 19, 1996 from 7am to 3:30 pm I personally witnessed Mr. Rice presence in the area of his "work station", which made it impossible for him to engage in the late morning criminal activities in connection with his wrongful murder conviction, as attributed to him by the Commonwealth of Massachusetts.

    It has also come to my attention that there is other evidence that establishes the innocence of Mr. Rice other than myself. Such as a newly discovered eyewitness from the crime scene, a bloody palm print on a coffee cup, found at the crime scene, which has been held from Mr. Rice's defense. Therefore, for the forgoing reasons, I fully support Mr. Rice's claim of innocence, and also support his request for an independent probe into his wrongful murder conviction.

Respectfully submitted,

*Paul S Chase*

Paul S. Chase  -  Production Manager
Ryan Iron Works Inc.
Tel. # 781 878 9215

-40-



11

# MESSIAH BAPTIST CHURCH

## 80 LEGION PARKWAY · BROCKTON, MASSACHUSETTS 02301 · 508-584-1963

MICHAEL WAYNE WALKER
ADMINISTRATIVE MINISTER

MONIQUE HUGHES
CLERK

11,September 2006

To Whom It May Concern:

Re: Reference for Jordan M. Rice

This letter comes on behalf of Mr. Jordan Rice and his quest for and independent inquiry into his conviction.

Mr. Rice's family has been affiliated with the Messiah Baptist Church of Brockton for many, many years. His adorable mother and sister are two of the finest people I know. Mr. Rice has a tremendous support system and family structure. Please feel free to contact my office if you have any questions or concerns. I urge you to consider Mr. Rice's request for and independent inquiry into his conviction.

Sincerely,

The Rev Michael Wayne Walker

"A WILLING MIND AND AN ABLE GOD"

-42-