UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JORDAN M. RICE,               )
      Petitioner              )
                              )
      v.                      )      C.A. No. 04-10859-MLW
                              )
TIMOTHY HALL,                 )
      Respondent              )

MEMORANDUM AND ORDER

WOLF, D.J.                                    September 30, 2007

I. INTRODUCTION

        Petitioner Jordan Martel Rice seeks a writ of habeas corpus under 28 U.S.C. §2254. He alleges the following: denial of his right to (1) substitute appointed counsel prior to trial under the Sixth Amendment (Ground One); (2) be free from unreasonable search and seizure under the Fourth Amendment (Ground Two); (3) be free from prosecutorial misconduct (improper opening and closing arguments) under the Due Process Clause of the Fourth Amendment (Ground Three); (4) be free from compelled self-incrimination under the Fifth Amendment (Ground Four); (5) effective assistance of counsel under the Sixth Amendment (Ground Five); (6) have had the jury properly instructed under the Due Process Clause of the Fourth Amendment (Ground Six); (7) have the prosecution disclose all materially exculpatory evidence under the Due Process Clause

(Ground Nine).[1] The court allowed the petitioner's request to delete two additional grounds, seven and eight, that were unexhausted. See Sept. 30, 2005 Memorandum and Order at 6.

## II. FACTS

As this court is reviewing a collateral attack, it must presume that the state court's factual determinations are correct unless the petitioner rebuts this "presumption of correctness" by coming forward with "clear and convincing evidence" to the contrary. See 28 U.S.C. §2254(e)(1); Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000). The Massachusetts Supreme Judicial Court (the "SJC") found the following facts:

> The defendant was convicted of murder in the first degree on a theory of extreme atrocity or cruelty. He was also convicted of arson. He filed a motion for a new trial alleging ineffective assistance of counsel. The motion was denied without a hearing. On appeal the defendant alleges error in (1) the denial of his motion to suppress evidence; (2) the denial of trial counsel's motion to withdraw; (3) the admission of certain expert testimony; (4) the prosecutor's summation; (5) the judge's instruction on extreme atrocity or cruelty; and (6) the denial of his motion for a new trial.
>
> * * *
>
> On September 22, 1995, the victim attended a wedding reception with friends. She arrived at approximately 7:30 P.M. and left at approximately 10:30 P.M. The defendant also attended the reception, staying until about 1 or 1:30 A.M. on September 23.
>
> The victim telephoned her daughter at 1 A.M. on September

----

[1] The petition does not number Grounds 5 through 9. However, they are labeled in the order that they are raised in the petition.

2

23, and there was nothing unusual about her tone of
voice. She left a voicemail message for her boy friend at
1:15 A.M., which was also unremarkable. At 4:40 A.M. on
September 23, neighbors in the victim's Brockton
apartment complex awoke to the smell of smoke and
telephoned the Brockton fire department. Fire fighters
arrived within minutes and went to the victim's
apartment, which was the apparent source of the fire. The
front door was ajar. They entered and went to the
bedroom. The victim's naked and lifeless body lay on the
bed, which was in flames. A smoke detector had been
dismantled and placed under the bed. An arson
investigator determined that attempts had been made to
burn a blood-soaked couch in the living room, but were
unsuccessful because the couch was made of flame
retardant material. The bed had been set afire by
igniting a cardboard box and papers that had been placed
under the foot of the bed.

A forensic pathologist determined that the victim had
eleven stab wounds and four incised wounds to her body
consistent with a single edged knife blade at least two
inches long. A wound to her right upper chest
corresponded with a punctured blood vessel that supplied
blood to the right lung, causing her to bleed to death
within minutes. The pathologist estimated the time of
death at between approximately midnight and 4 A.M. on
September 23, 1995, and that the absence of carbon
monoxide in her blood and soot in her lungs suggested
that she was dead when the fire started. The presence of
full sperm cells in her vagina indicated that she had had
sexual intercourse within eighteen to twenty-four hours
of the autopsy, which had begun at 1 P.M. on September
23. Deoxyribonucleic acid (DNA) testing established that
the defendant was the source of the sperm. There was no
other physical evidence connecting the defendant to the
victim's apartment.

When the defendant was interviewed by police on January
5, 1996, he admitted knowing the victim and where she
lived (they lived in the same apartment complex), but
denied ever having sexual intercourse with her. He
acknowledged that he was at the wedding reception on
September 22, 1995, but said he was alone and left at
about 1 A.M. He then went directly home where he stayed
for the night.

Several friends and acquaintances of the defendant

3

testified about statements he made. Alan Paine testified
that in September, 1995, shortly after the victim was
killed, he telephoned the defendant and asked if he was
aware of her death. The defendant replied in the
negative. When Paine asked if he killed her, the
defendant replied that he "can't talk about that," and
later told Paine he thought his telephone was tapped. In
January or February, 1996, the defendant told Paine, in
the presence of Paine's girl friend, that the police took
his fingerprints. He then asked Paine how long it would
take the police to obtain the results of a fingerprint
analysis, and if burning something would destroy prints.
In February, 1996, the defendant told Paine and Jamie
Baker that he had had a girl friend who "disrespected
him, and he had gotten rid of her, and had put plenty of
holes in her, and burned her." In March, 1996, the
defendant told Paine that he "expected to be arrested for
murder" and that the police were "trying to set [him] up
like O.J. Simpson."

On January 28, 1996, at a birthday party for Joanne
Maldonado's daughter, the defendant was being teased by
some children about "beating up his girl friend."
Maldonado asked him about it and the defendant said "the
bitch got what she deserved. I smoked her ass." The
defendant then stormed out of the house. Teresa Baker,
Maldonado's daughter, overheard the conversation.

The defendant testified at trial that he had had
consensual intercourse with the victim at approximately
4 P.M. on September 22, 1995, and had begun an intimate
relationship with her about one month before. He said he
lied to the police about not having sexual relations with
her because he was afraid. He denied making incriminating
statements to Alan Paine and the others, and he denied
killing the victim.

* * *

There was evidence from which the jury could have found that the
defendant had intercourse with the victim...; that he held a knife
to her neck, evidenced by the knife wounds on her neck and the
statements he made to friends; that he raped and killed her; and
that he then tried to incinerate her body.

Commonwealth v. Rice, 441 Mass. 291, 292-294, 301-02 (2004).

    Before his trial, the petitioner's trial counsel filed a

4

motion to withdraw. The court held a hearing spread out over two
days. The SJC explained those proceedings as follows:

> On the second hearing day the defendant asserted that any
> lack of cooperation was not on his part, but on the part
> of counsel, who insisted on "putting up the defense he
> wants . . . [not] the defense that . . . I want." The
> judge expressed incredulity at the defendant's assertion
> that counsel failed to communicate with him or show him
> any paperwork that he had done in the case. Near the
> conclusion of the hearing the defendant stated, "I have
> no problem going forward with [counsel] if we can . . .
> cooperate. . . . I'm more than willing to cooperate with
> him."

> In a written decision, the judge, who was also the trial
> judge, denied the motion. He found "that there has not
> been an irreconcilable breakdown in the attorney-client
> relationship," and that the defendant's "unjustifiable
> mistrust[]" and "lack of full cooperation has not
> prevented [experienced counsel] from providing a thorough
> and competent representation of the defendant. His
> pretrial preparations have been extensive and include
> careful preparation and expert consultation on the
> difficult DNA issues."

> The judge described in detail the defendant's tortuous
> history with two previous attorneys appointed to
> represent him in the case. The defendant had moved to
> discharge his first attorney, also an experienced
> criminal defense attorney, for reasons that included
> counsel's refusal to engage a particular person as his
> private investigator. That motion was denied after a
> hearing before a different judge, who concluded that the
> defendant's first attorney "has been competent, loyal and
> diligent in his handling of [the] case thus far." A
> second attorney was appointed to pursue an interlocutory
> appeal, but while that matter was pending the defendant's
> family retained his third attorney (trial counsel). The
> judge noted that, unlike his experience with first
> counsel, the defendant did not file a motion to discharge
> his third attorney; it was the third attorney who filed
> a motion to withdraw.

> The judge noted that a trial date had been set in early
> October, just five weeks away, and that two previously
> scheduled trial dates had to be changed because of

pending motions in the case or for reasons attributable to the court's backlog. The judge also considered the statement of the defendant that he had not made arrangements for representation by any other attorney, and was not interested in representing himself.

Id. at 296-97.

III. ANALYSIS

The court is deciding the merits of all of the respondent's contentions that the petitioner has failed to state claims upon which relief may be granted. The petitioner is correct that at least some of those contentions could have been presented in the respondent's motion to dismiss. However, Federal Rule of Civil Procedure 12(h)(2) provides that a defense of failure to state a claim upon which relief can be granted is not waived by not being included in a motion to dismiss, but rather can be raised at any time.

A. Unexhausted Claims Must Be Deleted

In Ground Four, the petitioner argues that he was denied the right to be free from compelled self-incrimination under the Fifth Amendment. In Ground Nine, he contends that he was denied the right to have the prosecution disclose all materially exculpatory evidence under the Due Process Clause of the Fourth Amendment. Before the SJC, the petitioner contended that his trial counsel was ineffective under the Sixth Amendment for failure to raise these issues at trial. He did not, however, raise the independent Fourth and Fifth Amendment claims that he brings in the instant case. As

6

Grounds Four and Nine were not presented to the SJC, they are unexhausted.

A habeas court cannot allow a petition that contains unexhausted claims. See Rose v. Lundy, 455 U.S. 509, 518-19 (1982). The court will sometimes stay a habeas proceeding and allow the petitioner to exhaust his claims before the state courts. However, the petitioner must first establish good cause for his failure to exhaust and show that his unexhausted claims are potentially meritorious. See Rhines v. Weber 544 U.S. 269, 278-79 (2005).

In the instant case, the petitioner does not attempt to show good cause for his failure to exhaust. Instead, he argues that the respondent waived any exhaustion claims by his failure to raise them earlier. However, 28 U.S.C. §2254 provides that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." Id. at §2254(b)(3). Respondent has made no such express waiver.

The Supreme Court instructs that in the absence of good cause, district courts should permit petitioners to delete unexhausted claims from a mixed petition and proceed with the exhausted claims "if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." Rhines, 544 U.S. at 278-79. This court has previously allowed the petitioner's motion to delete any unexhausted claims in order to avoid precluding

7

unfairly the possibility of any federal review of the petitioner's claims. See Sept. 30, 2005 Memorandum and Order at 6. For the reasons stated in that previous order, the remaining unexhausted claims are being deleted.

B. Procedurally Defaulted Claim Not Subject To Review

In Ground Three, the petitioner argues that the prosecutor made improper comments in his opening and closing arguments in violation of the Due Process Clause of the Fourth Amendment. This claim is procedurally defaulted.

Generally, habeas review is precluded when a state court reaches its decision on an independent and adequate state law ground. See Coleman v. Thompson, 501 U.S. 722, 729 (1991). A petitioner's procedural default constitutes an adequate and independent state law ground so long as the state consistently applies the rule and has not waived it. See Wainwright v. Sykes, 433 U.S. 72, 87 (1977). Here, the SJC held that the petitioner's prosecutorial misconduct claim was procedurally defaulted because trial counsel did not object. Rice, 441 Mass. at 299. It then reviewed the claim to ensure against a miscarriage of justice. Id. It is well-established that the SJC's limited review of a procedurally defaulted claim under its miscarriage of justice standard does not constitute a waiver of a petitioner's procedural default. See, e.g., Horton v. Allen, 370 F.3d 75, 81 (1st Cir. 2004).

A habeas court may consider a procedurally defaulted claim only if the petitioner establishes "cause and prejudice" with respect to the procedural default or demonstrates to this court that refusal to hear his defaulted claim would result in a fundamental miscarriage of justice. See Dretke v. Haley, 541 U.S. 386, 391-94 (2004). Here, the petitioner contends that failure to address his prosecutorial misconduct claim would result in a fundamental miscarriage of justice. However, the petitioner, who is represented by counsel, provides no citations or substantive argument in support of this assertion. As the petitioner failed to include substantial argumentation on this point, the argument is waived. See D. Mass. R. 7.1(b)(1) ("A party filing a motion shall at the same time file a memorandum of reasons, including citation of supporting authorities, why the motion should be granted."); D. Mass. R. 1.3. ("Failure to comply with any of the directions or obligations set forth in . . . these Local Rules may result in dismissal, default, or the imposition of other sanctions as deemed appropriate by the judicial officer.").

Additionally, the petitioner does not meet the fundamental miscarriage of justice standard. A fundamental miscarriage of justice is a case in which "a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" Murray v. Carrier, 477 U.S. 478, 496 (1986). "Actual innocence" in turn "means factual innocence, not mere legal insufficiency."

Bousley v. United States, 523 U.S. 614, 623 (1998). In the instant case, proof of improper prosecutorial commentary might establish the petitioner's legal right to a new trial. However, it would not establish his factual innocence.

C. <u>Fourth Amendment Claim Not Subject To Review</u>

In Ground Two, the petitioner contends that his conviction was obtained improperly through the use of evidence unreasonably seized under the Fourth Amendment. Because suppression of illegally obtained evidence is a prophylactic remedy to deter violations of the Fourth Amendment, and because habeas review is unlikely to deter further police misconduct underlying an illegal search and seizure, habeas review is not available to review a Fourth Amendment claim that was fully and fairly litigated in the state courts. See <u>Stone v. Powell</u>, 428 U.S. 465, 480-82 (1976); <u>Tart v. Massachusetts</u>, 949 F.2d 490, 497 n.6 (1st Cir. 1991). Here, the petitioner does not contend that his Fourth Amendment claim was not fully and fairly litigated. Therefore, further review is not available.

D. <u>Claims On The Merits</u>

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 110 Stat. 1214 (1996), establishes the deferential standard of review applied by a habeas court for the review of a state court

10

judgment that is rendered "on the merits." See 28 U.S.C. §2254(d).[2]

On review of state court judgments rendered on the merits of a petitioner's federal claim, the court may issue a writ of habeas corpus only if the judgment was "contrary to clearly established law as established by the Supreme Court," or where the judgment provided an "unreasonable application of Supreme Court precedent." 28 U.S.C. §2254(d)(1).

A state court decision is "contrary to" clearly established law in only two circumstances: 1) where "the state court applies a rule that contradicts the governing law set forth [in United States Supreme Court] cases;" or 2) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Court] and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The petitioner does not contend that the SJC's

_____

[2] Section 2254 states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

determination was contrary to clearly established law.

An application is unreasonable only "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407-09, 413. The fact that the state court merely may have reached an incorrect result is not sufficient; the result must be unreasonable. See McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc). Where, for example, the state court reaches a result that is "devoid of record support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied. Id. at 37. The petitioner fails to establish that the SJC's applications of Supreme Court precedent were unreasonable.

1. Substitute Counsel

In Ground One, the petitioner argues that he was denied his right to substitute appointed counsel prior to trial under the Sixth Amendment. The petitioner did not move for substitute counsel. Rather, his trial counsel moved to withdraw. Rice, 441 Mass. at 296. As the petitioner did not wish to represent himself and did not make arrangements for representation by another attorney, withdrawal of trial counsel would have necessitated appointment of substitute counsel.

In his opposition to the motion to dismiss, the petitioner cites no law and makes no argumentation regarding this claim. As

such, it is waived. See D. Mass. R. 7.1(b)(1); D. Mass. R. 1.3.

Moreover, Judge Douglas Woodlock of this District rightly rejected a similar claim in Asadoorian v. Ficco, No. 02-11534, 2004 WL 1932753 (D. Mass. August 23, 2004). As Judge Woodlock persuasively explained, no Supreme Court decision establishes a right to substitute counsel. Asadoorian, 2004 WL 1932753 at *6. Accordingly, the SJC's holding that there was no Sixth Amendment violation could not be contrary to clearly established Supreme Court precedent.

The petitioner also could not show that the SJC's opinion was an unreasonable application of Supreme Court precedent. As the First Circuit interprets the Sixth Amendment right to counsel, "[t]he right to counsel of one's choice is not absolute. A court need not tolerate unwarranted delays, and may at some point require the defendant to go to trial even if he is not entirely satisfied with his attorney." Maynard v. Meachum, 545 F.2d 273, 278 (1st Cir. 1976). Also, "the cases uniformly hold that the right of an accused to choose his own counsel cannot be insisted upon in a manner that will obstruct reasonable and orderly court procedure." United States v. Poulack, 556 F.2d 83, 86 (1st Cir. 1977); see also Castillo v. Matesanz, 348 F.3d 1, 9-10 (1st Cir. 2003); United States v. Pierce, 60 F.3d 886, 891 (1st Cir. 1995).

A "court's decision not to permit substitution of trial counsel is given deference and is reviewed only for abuse of

discretion, especially when that decision is based on legitimate trial concerns." United States v. Diaz-Martinez, 71 F.2d 946, 950 (1st Cir. 1995). To that end, the court considers:

> several factors, including the timeliness of the motion, the adequacy of the court's inquiry into the defendant's complaint, and whether the conflict between the defendant and his counsel was so great that it resulted in a total lack of communication preventing an adequate defense.

United States v. Allen, 789 F.2d 90, 92(1st Cir. 1986).

In the instant case, the trial judge held a two-day hearing on the motion to withdraw. Rice, 441 Mass. at 296. He found that there was not an irreconcilable breakdown of communication preventing an adequate defense. Id. As the facts would support a denial of a motion for substitute counsel in the First Circuit, it was not unreasonable for the SJC to affirm the denial in this case.

## 2. Ineffective Assistance of Counsel

In Ground Five, the petitioner argues that he was denied effective assistance of counsel under the Sixth Amendment. He alleges that trial counsel was ineffective because he failed to: (1) analyze and preserve potentially exculpatory forensic evidence; (2) retain and call expert witnesses; (3) move to dismiss the indictment for destruction of forensic evidence; (4) present other witnesses and proof that other persons committed the crime; (5) effectively confront and cross-examine witnesses; (6) move for mistrial upon a highly prejudicial opening statement; (7) move for a Bill of Particulars; (8) object to the term "rape kit;" (9) make

14

an opening statement; (10) object properly to, or propose, jury instructions; (11) move for dismissal of the indictment; (12) investigate; (13) honor the petitioner's pretrial requests or file pretrial motions; (14) show motive evidence and other favorable proof.

To succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate: (1) that counsel's performance fell below an objective standard of reasonable effectiveness; and (2) that counsel's deficient performance was so prejudicial as to undermine confidence in the outcome of the trial. See Strickland v. Washington, 466 U.S. 668, 699-689 (1984); Argencourt v. United States, 78 F.3d 14, 16 (1st Cir. 1996).

When reviewing counsel's performance, "judicial scrutiny of counsel's performance must be highly deferential," and "every effort [should] be made to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Moreover, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689.

The "prejudice" element of an ineffective assistance claim presents another high hurdle. To show prejudice, a claimant must affirmatively prove "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

The SJC addressed the petitioner's fourteen claims of alleged ineffectiveness and held that trial counsel's performance was neither unreasonable nor prejudicial. Rice, 441 Mass. at 303-09. In his opposition to the motion to dismiss, the petitioner discusses only one of the fourteen claims of ineffectiveness. He explains that counsel was ineffective for failing to investigate a lab report stating that the blood stain on a coffee cup was not the petitioner's and for failing to raise this report at trial. The petitioner argues that the blood could not have been the victim's because she died in a different room.

The SJC did not discuss this aspect of the petitioner's claim. However, it might have reasonably concluded that the petitioner's claim failed under the "prejudice" prong of Strickland. The victim had "eleven stab wounds and four incised wounds to her body . . . with a punctured blood vessel that supplied blood to the right lung, causing her to bleed to death within minutes." Id. at 293. The victim's body was found "naked and lifeless . . . on the bed" and the perpetrator had attempted "to burn a blood-soaked couch in the living room" in order to destroy the evidence of the crime. Id. at 292-93. Further, "[t]here was evidence from which the jury could have found that the [petitioner] had intercourse with the victim

16

. . . ; that he held a knife to her neck, evidenced by the knife wounds on her neck and the statements he made to friends; that he raped and killed her; and that he then tried to incinerate her body." Id. at 301-02.

The brutal and bloody murder makes it likely that the blood on the cup was the victim's, left there by the victim during the course of the rape, or by the petitioner - who likely had the victim's blood on him - as he attempted to destroy the evidence of his crime. Moreover, no blood other than the victim's is reported to have been found at the crime scene and the petitioner has not now produced evidence suggesting that the blood on the mug belonged to a third party. As such, it is reasonable to conclude that the blood evidence was not materially exculpatory and that the petitioner was not prejudiced by counsel's failure to investigate and raise the blood on the mug.

This conclusion is strongly reinforced by the substantial evidence implicating the petitioner in the murder. The evidence suggested that the victim was raped in the course of being murdered and it is undisputed that the petitioner's newly produced sperm was found in the victim's vagina. Rice, 441 Mass. at 293, 301-02. Moreover, the petitioner had made a series of incriminating statements to his friends bragging about, and implicating himself in, the victim's murder. Id. at 293-95. Given this evidence, the SJC could reasonably have concluded that evidence implicating

17

another person would suggest only that, at most, the petitioner was aided and abetted by someone else. In these circumstances, he was not prejudiced by the failure of his counsel to address the blood on the cup.

As the petitioner presents no substantial arguments in support of his other claims of ineffectiveness, because the SJC explained its reasonable denial of those claims, and because this court has found no arguments to support these claims, this court will not address them further. See D. Mass. R. 7.1(b)(1); D. Mass. R. 1.3.

### 3. Jury Instruction

In Ground Six, the petitioner contends that he was denied due process because the jury was not instructed that it must unanimously agree as to the facts constituting extreme atrocity or cruelty. Extreme atrocity or cruelty is an element of first degree murder in the Commonwealth of Massachusetts. See M.G.L. c. 265, §1; Commonwealth v. Cunneen, 389 Mass. 216, 226 (1983). The SJC has:

> delineated a number of factors which a jury can consider in deciding whether a murder was committed with extreme atrocity or cruelty. These include indifference to or taking pleasure in the victim's suffering, consciousness and degree of suffering of the victim, extent of physical injuries, number of blows, manner and force with which delivered, instrument employed, and disproportion between the means needed to cause death and those employed.

Id. at 227. The SJC holds that these factors "are neither elements of the crime nor separate theories of culpability, but 'evidentiary considerations' that guide a jury in determining whether a murder was committed with extreme atrocity or cruelty." Commonwealth v.

18

<u>Moses</u>, 426 Mass. 598, 605 (2002). As such, it does not interpret the Due Process Clause to require jury unanimity as to the several factors. <u>Id.</u> at 605-06; <u>see</u> <u>Rice</u>, 441 Mass. at 302 (applying <u>Moses</u> to the petitioner's claim).

The petitioner relies on <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), and argues that the SJC's holding is an unreasonable application of Supreme Court precedent. In <u>Schad</u>, the Supreme Court held that the Arizona legislature could, consistent with the Due Process Clause, define first-degree murder to include either premeditation or felony murder without requiring jury unanimity as to which category a defendant falls under. 501 U.S. at 632 (plurality opinion); <u>id.</u> at 651 (Scalia, J., concurring) (providing the fifth vote). All nine justices of the Supreme Court recognized that a jury need not be unanimous on evidentiary factors used to establish an element of a crime. 501 U.S. at 632 (plurality opinion); <u>Id.</u> at 649 (Scalia, J., concurring); <u>Id.</u> at 656-57 (White, J., dissenting). They also agreed that the Due Process Clause imposes some limits on the power of the states to define which facts are evidentiary and which are necessary elements of a crime. 501 U.S. at 632-33 (plurality opinion); <u>Id.</u> at 651 (Scalia, J., concurring); <u>Id.</u> at 656 (White, J., dissenting). They disagreed, however, as to what these limitations are.

The plurality interpreted premeditation and felony murder as evidentiary factors under Arizona law because the Arizona Supreme

Court had interpreted the state's law to be so and because the federal courts do not have the authority to disregard the state court's interpretation of its own law. <u>Id.</u> at 637. Turning to the constitutional issue, the plurality recognized that the Due Process Clause limits a state's "capacity to define different courses of conduct, or states of mind, as merely alternative means of committing a single offense." <u>Id.</u> at 632. Deeming it impracticable "to derive any single test for the level of definitional and verdict specificity permitted by the Constitution," the plurality proposed that the appropriate measure of specificity be measured by reference "to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the <u>mens</u> <u>rea</u> element of a single offense." <u>Id.</u> at 637-38 (internal citation omitted).

The plurality emphasized the "threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime." <u>Id.</u> at 638. It explained that the distinction between facts necessary to the crime and facts that are mere means of committing that crime is a value choice that is "appropriately made in the first instance by a legislature[.]" <u>Id.</u> at 638. Judicial restraint is particularly appropriate where state definitions are at issue because "'it goes without saying that preventing and dealing with crime is much more

the business of the States than it is of the Federal Government.'" Id. (quoting Irvine v. California, 347 U.S. 128, 134 (1954) (plurality opinion)).

Applying this test, the plurality concluded that the States had historically defined murder as the killing of another with malice aforethought - a mens rea requirement that included both premeditation and felony murder. Id. at 640-43. Moreover, the plurality believed that a state could reasonably deem premeditation and felony murder morally equivalent and therefore sufficient to support the requisite mens rea. Id.

Concurring, Justice Scalia considered not material the moral equivalency analysis of the plurality. Id. at 651. In his view, the Due Process Clause requires no more than that provided by historical practice and, as the plurality had explained, Arizona's law was consistent with such practice. Id.

As no majority opinion controlled in Schad, the SJC was entitled to apply some reasonable interpretation of either the plurality or concurring opinion. It did so. It explained in Moses, supra, that extreme atrocity or cruelty under the first degree murder statute, M.G.L. c. 265, §1, is proven by the evidentiary factors discussed in Cunneen. 426 Mass. at 605-06. These factors are, under Massachusetts law, not elements or alternative theories of culpability. Id. The issue, then, is whether it was unreasonable to conclude that the legislature's intent to denominate those facts

as evidentiary does not violate the Due Process Clause.

The petitioner has not demonstrated that the SJC's conclusion is unreasonable. As explained by the plurality in Schad, the legislature is presumed competent to distinguish between those facts that are necessary elements and those that are merely evidentiary. 501 U.S. at 638.[3] Against this presumption, the petitioner has presented no argument suggesting that it is unreasonable to defer to the legislature's choices. He points to no historical practice requiring a different result. Therefore, he fails under Justice Scalia's concurring opinion. See id. at 651. Further, he makes no argument regarding the moral equivalence of the Cunneen factors. Accordingly, the petitioner also fails under the plurality's opinion in Schad. See id. at 643-44.

Rather than discussing the tests raised in Schad, the petitioner analogizes the Supreme Court's statutory interpretation of 21 U.S.C. §848(a) in Richardson v. United States, 526 U.S. 813 (1999). Richardson holds that Congress defined the phrase "series of violations" in §848(a) as an element of a federal offense rather than as a mere means of committing that offense. 526 U.S. at 815. This holding has no constitutional import because the Court "ha[d]

---

[3] The petitioner argues that this court should disregard the presumption of legislative competence and deference to the states because the Cunneen factors are court made rather than statutory. However, the SJC is the final arbiter of the Massachusetts legislature's intent and the federal courts do not have the authority to disregard the state court's interpretation of its own law. See Schad, 501 U.S. at 637.

no reason to believe that Congress intended to come close to, or to test, [the due process] limits when it wrote this statute." <u>Id.</u> at 820. As such, <u>Richardson</u> does not render the SJC's application of <u>Schad</u> unreasonable, and the petitioner's final claim in Ground Six fails.

IV. ORDER

For the reasons discussed in this Memorandum, it is hereby ORDERED that the Petition For Writ Of Habeas Corpus (Docket No. 5) is DENIED.

<u>      /s/ Mark L. Wolf      </u>
UNITED STATES DISTRICT JUDGE